**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1-18-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
      EDWARD MASELLI              *
                                  *   19-cv-1248-AJ
            v.                    *   September 20, 2022
                                  *   1:45 p.m.
THOMAS DURDEN AND JOHN YURACK     *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY ONE - AFTERNOON SESSION
BEFORE THE HONORABLE ANDREA K. JOHNSTONE

APPEARANCES:


For the Plaintiff:        Jared Joseph Bedrick, Esq.
                          Champions Law




For the Defendants:       Brian J.S. Cullen, Esq.
                          Jonathan M. Shirley, Esq.
                          Cullen, Collimore & Shirley, PLLC




Court Reporter:           Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| EDWARD MASELLI | | | | |
| By Mr. Cullen | | 10 | | |
| By Mr. Bedrick | | | 37 | |
| CHRISTOPHER DITULLIO | | | | |
| By Mr. Cullen | 47 | | 94 | |
| By Mr. Bedrick | | | 68 | |

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Defendant's Exhibit E. | | 17 |
| Defendant's Exhibits A, B and C. | | 57 |

```
 1                    P R O C E E D I N G S

 2                (IN COURT - NO JURY PRESENT)

 3           THE CLERK:  This Court is now in session.

 4           THE COURT:  All right.  So, counsel, before we

 5  bring the jury back in, during the lunch break did anything

 6  come up that needs to be addressed with the Court?

 7           MR. CULLEN:  Yes, your Honor, there is just one

 8  thing.

 9           The plaintiff testified on his direct, unsolicited

10  I believe, but testified on his direct that he had no idea why

11  the police were there on the day.  I don't think that's really

12  fair, and I would seek to cross-examine him on the possibility

13  that he knew exactly why the police were there given the

14  history of that day and, candidly, his history prior to that

15  day.

16           The police -- as we know, although the jury doesn't

17  yet, the police were there to investigate a felony assault, a

18  sexual assault.  The plaintiff had had an encounter with a

19  woman that he didn't previously know that very day who had

20  left his apartment, after having planned to stay to watch the

21  football game left his apartment early, and then all of the

22  sudden the police show up at his door the same day.

23           As I say, if this were perhaps a one-time thing,

24  maybe he wouldn't connect the dots, but this was the third

25  time that he had been visited by the police after a sexual
```

1  encounter with a female.  I think to get up there and say he

2  had no idea why they were there leaves a false impression with

3  the jury.

4            THE COURT:  Okay.

5            Attorney Bedrick.

6            MR. BEDRICK:  Your Honor, I don't think there's any

7  reason to believe that there was any door opened.

8            I think, first, I just have to address Attorney

9  Cullen's characterization of the events.  All of the sudden is

10  not what happened here.  The encounter with the woman with

11  whom there is a dispute about consent, and not only that but a

12  dispute over whether any lack of consent was communicated,

13  right, that was nine hours prior to the police showing up at

14  the door.

15            And in the prior instances the police didn't show

16  up to speak or approach Mr. Maselli not even on the same day,

17  right?  So there's no connection between those days and this

18  one in terms of, you know, a pattern.  And even if there were,

19  those were years earlier and there's no reason for him to

20  think now, you know, after he's had those two experiences,

21  that every time the police show up at his house subsequent to

22  a sexual encounter of some indefinite vintage that he's

23  supposed to believe -- he's supposed to assume now that

24  they're there to question him about the propriety of that

25  sexual encounter.

1    I think that it's minimally probative as far as,

2  you know, moving the ball to some kind of impeachment zone,

3  but extremely prejudicial and in an unfair way in the sense

4  that it just serves to inflame the sense of disgust that comes

5  with this type of charge.  So I think that the Court should

6  continue to exclude that.

7    THE COURT:  All right.

8    So, Attorney Cullen, let me ask you this.  There's

9  a stipulation that the officers were investigating a serious

10 felony.

11    MR. CULLEN:  Correct.

12    THE COURT:  And so that's going to be told to the

13 jury, that the parties agree to that.  Isn't that enough to

14 address whatever your concern is about some possible confusion

15 or misapprehension on the part of the jury?

16    MR. CULLEN:  Well, I don't think it is.  It does

17 agree as to why they were there, but he's expressed his belief

18 that I didn't know why they were there, and that's very

19 different from just us agreeing that the purpose of their

20 visit was to investigate a serious felony.  He's disowned any

21 knowledge of what that felony might have been and is sort of

22 making it out as though he's just, you know, any person, any

23 random person with no idea why the police are in his apartment

24 that day.

25    He's not a criminal defendant in this case.  I

1  understand if he were, the situation might be different, but

2  he's brought suit against my clients accusing them of excess

3  force.  I don't think he should be able to get up there and

4  just say that he had no idea why they were there and be

5  unimpeached on that.

6           THE COURT:  All right.

7           Anything further, Attorney Bedrick?

8           MR. BEDRICK:  Well, in the context of the

9  questioning, the reason -- he said he didn't know why they

10 were there at that present moment.  So I'm not sure what

11 proposition -- I don't think Attorney Cullen has really set

12 forth a real proposition that's advanced by this line of

13 questioning.

14          The fact is his clients are on trial for excessive

15 force, and that's why all the discussion of that is relevant

16 as opposed to Mr. Maselli not being on trial.

17          In these prior instances that Attorney Cullen is

18 trying to connect to this Mr. Maselli was never even charged.

19 I mean, those were accusations that just came about later and

20 went away because they never went anywhere.

21          And so to suggest here that he's not telling the

22 truth about not connecting the dots between an encounter he

23 didn't have any idea was nonconsensual with the surprise

24 appearance of the police, who in discovery admit were

25 intentionally vague about their purpose, doesn't really give

1   us any real factual advancement.

2           THE COURT:  Okay.  So, Attorney Cullen, here's what

3   I remember about the context of that particular bit of

4   testimony or where we are with the testimony.

5           We have the recording of the officers and the

6   conversation between Mr. Maselli and the law enforcement

7   officers that were outside his door, and he expressed that he

8   didn't know why they were there.

9           And as the Court understands it, and I think as the

10  jury may reasonably consider that in the context of why they

11  were there at his door that evening asking who he was and

12  asking him to come out of the apartment or to allow them

13  access to the apartment, I don't see that as opening the door

14  and so I'm going to deny your request.

15          And to the extent that that evidence would be

16  relevant to what's going on here today and would serve to

17  impeach in the context of the testimony as it's been presented

18  to the jury thus far, the Court finds that it would be highly

19  prejudicial and that prejudice outweighs any probative value.

20          All right.  Is there anything else you want to add?

21  Do you want to put something on the record?

22          MR. CULLEN:  No.  Thank you for your consideration,

23  your Honor.

24          THE COURT:  All right.  Very good.

25          MR. BEDRICK:  Your Honor, before we start, over the

1  break I did have a minute to gather my thoughts and reconsider

2  whether I would go forward with Mr. Maselli's testimony.  I

3  think I'm done with him here, and of course that's my last

4  witness.  So if you want to talk about how you want to read

5  the stipulation to the jury and proceed from there.

6          THE COURT:  All right.  He hasn't been

7  cross-examined yet.

8          MR. BEDRICK:  Oh.

9          MR. CULLEN:  I do plan to do that.

10          MR. BEDRICK:  Sorry.

11          THE COURT:  I changed my mind.  We're all done.

12  We're going home.  No.

13          Here's what I'm thinking.  What I hear you saying

14  is that you don't have any additional questions for Mr.

15  Maselli.

16          MR. BEDRICK:  Correct, and I misspoke.

17          THE COURT:  That's all right.

18          MR. BEDRICK:  I should have said should I read the

19  stipulation to the jury before he cross-examines or do we want

20  to wait until the end of his testimony before --

21          THE COURT:  I think -- my inclination would be to

22  wait until the end.  And if the attorneys wish to have that

23  testimony read in by one of them, I'm fine to have you do

24  that.  I'm also fine to tell the jury that the parties have

25  stipulated and to give them those two statements.

1          MR. BEDRICK:  Okay.  Thank you, your Honor.

2          THE COURT:  You're very welcome.

3          So let me tell you what my thoughts are.  It's now

4     almost 2 o'clock.  I am going to ask Mr. Maselli to go back

5     onto the -- get himself back up on the witness stand.  We'll

6     bring the jury in.  I'll allow Attorney Cullen to cross.

7          I'm thinking that we should give the jury a break

8     sometime between 3:00 and 3:30, so we'll see where we are

9     then, and then we can decide how to proceed from there.

10          MR. CULLEN:  Thank you, your Honor.

11          THE COURT:  All right.  Does that make sense?

12          You can just go right up there, sir.  That way

13     you'll be there when the jury arrives.  You can stay right

14     there, but you might as well stay standing because -- yes, you

15     can have that water -- because the jury is going to come right

16     in.

17          (IN COURT - JURY PRESENT)

18          THE COURT:  All right.

19          Attorney Bedrick, when we concluded, there was the

20     possibility that you would have additional questions for this

21     witness, and so I just want to ask, have you completed your

22     direct examination?

23          MR. BEDRICK:  We're all set from here, your Honor.

24          Thank you.

25          THE COURT:  All right.  Very good.

1           Then I will turn it over to you, Attorney Cullen.

2           And before Attorney Cullen asks his questions, I

3  just want to remind you, Mr. Maselli, that you're still under

4  oath, sir.

5           THE WITNESS:  Thank you.

6           THE COURT:  All right.  Very good.  Thank you.

7           MR. CULLEN:  Thank you, your Honor.

8           Just confirming, I am tested from before so I'm

9  removing my mask with your permission.

10          THE COURT:  Okay.  Thank you.

11                        CROSS-EXAMINATION

12  BY MR. CULLEN:

13      Q.   Mr. Maselli, you had relatively recently moved into

14  51 Kinsley Street as of the time that the police came to your

15  door; is that right?

16      A.   That's right.

17      Q.   And you lived there alone?

18      A.   I did.

19      Q.   Okay.  And so sometime around 8 o'clock, or shortly

20  thereafter, on October 2nd you heard some sort of banging on

21  the door?

22      A.   Can you ask me that a little slower, please?

23      Q.   Yeah.  Sometime around 8 o'clock, or shortly after,

24  you woke up to hear banging on the door?

25      A.   Correct.

1      Q.    And that banging was coming on what you call your

2   kitchen door?

3      A.    Yes.

4      Q.    And that door has a couple of locks at least.  You

5   said a push-button lock and a latch on it?

6      A.    Correct.

7      Q.    Okay.  And you asked who was at the door, correct?

8      A.    I did.

9      Q.    And they told you that it was the police, right?

10      A.    They said the Nashua police.

11      Q.    They said it was the Nashua police, and of course

12   you were in Nashua, right?

13      A.    Yes.

14      Q.    Okay.  And at first you didn't believe them, right?

15      A.    I'm sorry?

16      Q.    At first you didn't believe them, correct?

17      A.    I didn't know who they were and I had no way to

18   verify them.

19      Q.    Okay.  And they in fact suggested that you could

20   call the police station and confirm that there were detectives

21   at your door, correct?

22      A.    Yeah, they said I could call the Nashua police,

23   correct.

24      Q.    Okay.  And you did not do that, right?

25      A.    I did not.

1    Q.    And they asked you -- and you didn't do it because
2    you concluded that they were in fact the police?
3    A.    I'm not sure why I didn't do it.  I saw the sirens
4    outside so I put two and two together I think.
5    Q.    Okay.  And when you say you saw sirens outside, do
6    you mean the lights?
7    A.    The lights, thank you, yes.
8    Q.    And when the police spoke to you, the officer said
9    that they were Nashua police and he said he wanted to speak
10   with you, correct?
11   A.    No.  He wanted to speak with Edward Maselli.
12   Q.    Okay.  And you are Edward Maselli, correct?
13   A.    Not that he knew at the time.
14   Q.    No, but --
15   A.    Presently, yes, and I then I was Edward Maselli.
16   Q.    Okay.  And so you were the person they were looking
17   to speak to?
18   A.    Yes.
19   Q.    And you said that you did not want to speak to
20   them, correct?
21   A.    I didn't give them my name, and I told them I
22   wasn't going to speak with them without an attorney.
23   Q.    Okay.  And they asked you your name separately.
24   They said they wanted to speak with Edward Maselli, right?
25   A.    Correct.

1    Q.    And they asked you what you were doing there?

2    A.    Correct.

3    Q.    And whether you lived there?

4    A.    Correct.

5    Q.    And whether you had any other reason to be in the

6  apartment?

7    A.    Correct.

8    Q.    And you declined to answer any of those questions,

9  correct?

10    A.    If by declined you mean not respond, yes.  I didn't

11  say, no, I'm not going to answer your questions.

12    Q.    You simply sat there quietly without saying a word?

13    A.    At which point, sir?

14    Q.    Well, when they asked you who you were, did you

15  tell them you weren't going to answer or did you just not

16  answer?

17    A.    Again, at which point, sir?  They asked me who I

18  was throughout the evening, and so in order to answer that

19  accurately I need to know which question you're referring to.

20    Q.    Okay.  Well, let's start from the beginning, Mr.

21  Maselli.  What was the first thing the officers said when they

22  arrived?

23    A.    Are you Edward Maselli.

24    Q.    And how did you respond?

25    A.    I didn't.

1        Q.    You didn't say a word?

2        A.    Well, I told them to go and get a warrant, and I

3   asked them what they were doing there.

4        Q.    Okay.  At a certain point they told you that they

5   were there to investigate a crime, correct?

6        A.    A potential crime.

7        Q.    A crime that they believed had occurred at your

8   apartment, correct?

9        A.    Said may have occurred in the apartment.

10       Q.    Okay.  And they informed you that they would get a

11   search warrant, didn't they?

12       A.    No.  They said they could.  They never told me they

13   would.

14       Q.    They informed you that while they were in the

15   process of getting a search warrant you would have to vacate

16   the premises, correct?

17       A.    If they were to get one, I wouldn't be allowed to

18   stay in my apartment, yes.

19       Q.    But they didn't just say that, right?  They said

20   that you couldn't even stay in your apartment even while they

21   were looking to get the search warrant, correct?

22       A.    That's what I said.

23       Q.    So what they told you was you would have to vacate

24   even while they applied for the search warrant, right?

25       A.    Yes.

1      Q.    Okay.  And you would not be under arrest at that

2  particular point if you vacated the apartment, right?

3      A.    They never told me I would be under arrest.

4      Q.    Okay.  When the officers said you need to vacate

5  the apartment, did you respond to them or did you not respond

6  to them?

7      A.    I did not respond to them.

8      Q.    You said nothing at all?

9      A.    Again, they asked me the same question multiple

10  times so it's difficult to pinpoint which one you're referring

11  to and at which point.

12      Q.    At any point did you tell them that you would not

13  vacate the premises?

14      A.    I told them I'm not talking to them without a

15  lawyer and I'm not letting them in without a warrant.

16      Q.    Okay.  And I think we heard the tape where the

17  officer says to you that that's okay, he understands that, but

18  you need to vacate the premises, correct?

19      A.    Correct.

20      Q.    And you refused that command, right?

21      A.    I wouldn't characterize it as a command.  I think

22  he was asking me to leave.

23      Q.    Well, he told you you had to leave, right?

24      A.    Well, it was confusing because he was asking me to

25  open the door but then also telling me I had to leave.

```
1                  Would you mind repeating your question for me?

2       Q.   Well, he told you you had to leave?

3       A.   Yes.

4       Q.   Okay.  And you said on your direct testimony that

5  at that point the officer's tone shifted?

6       A.   Correct.

7       Q.   And that was sometime after you took the video/

8  audio that we saw/heard earlier, correct?

9       A.   Correct.

10      Q.   And he started to get more aggressive?

11      A.   Correct.

12      Q.   You agree he wasn't aggressive on the piece that

13  you recorded, right?

14      A.   I don't know.  I would characterize DiTullio at

15  that point, he seemed pretty annoyed because he was, like, oh,

16  I really don't care, and at that point I think his tone

17  changed.

18      Q.   Okay.  And is that an example of the tone that he

19  started to use with you?

20      A.   That would be one of the initial changes, yeah.

21      Q.   Now, when the police first start to force the door,

22  you said you saw it bump open a little ways, right?

23      A.   Correct.

24           MR. CULLEN:  Stacey, can you pull up, please,

25  Exhibit E?
```

1          This is a full exhibit, your Honor.

2     Q.   Do you recognize the photograph, what's depicted in

3   this photograph?

4     A.   Yeah.  It's the door they kicked.

5     Q.   Okay.

6          MR. CULLEN:  Your Honor, I would just ask that this

7   be admitted as a full exhibit.  It's Exhibit E.

8          THE COURT:  All right.  This exhibit has been

9   marked by agreement, and so it is now a full exhibit.

10          MR. CULLEN:  Thank you, your Honor.

11          (Defendant's Exhibit E Admitted)

12     Q.   Mr. Maselli, the door that's open in the middle of

13   Exhibit E, that's the door we've been referring to as the

14   kitchen door?

15     A.   That is correct.

16     Q.   Okay.  Can you point on that picture where your

17   feet were when the door opened?

18          And you can actually do this right on your screen

19   and I think it will show up.

20     A.   Which screen are you referring to, the one behind

21   me or --

22     Q.   Actually, since it's not going to show up on yours,

23   go ahead and point up on the screen behind.

24     A.   So where my feet were?

25     Q.   Where your feet were when the door first opened.

1    A.    When you say first opened, do you mean the first

2  bump or when it swung open?

3         Q.    How about for the first bump, where were your feet?

4               (Witness indicates on monitor)

5               Could you just indicate that again, Mr. Maselli?

6               (Witness indicates on monitor again)

7               Is it in that spot?

8         A.    Yeah.  I think you nailed it.

9         Q.    Okay.

10        A.    I mean, it's hard to tell with the depth because I

11  can't tell if that's, like, behind where the door was?  Do you

12  know what I'm saying?  When I say behind, behind from this

13  angle versus behind from --

14        Q.    But it was roughly in that zone?

15        A.    Yes.  I would be directly in front of the door.

16        Q.    Okay.  And you made it a point to specify the

17  difference between when the door first bumped and when it

18  swung open?

19        A.    Right.

20        Q.    Did you move when the door bumped?

21        A.    I did not.

22        Q.    Okay.  So actually that was a distinguishment

23  without any purpose, right?  You stayed in the exact same

24  spot?

25        A.    When you say --

1      Q.    When the door fully opened and swung open, you had

2   not moved from where this X is?

3      A.    Can you explain distinguished without any purpose?

4   Because I was distinguishing where I was when it first bumped

5   versus where I was when they came in.  So I feel like that's

6   what I was saying.

7      Q.    Okay.  Sure.

8      A.    Is that understood?

9      Q.    That's what I'm trying to get to.

10      A.    Okay.

11      Q.    So when the door first bumped, you were at the

12   location marked with an X on the screen?

13      A.    Yes.

14      Q.    And I think I asked you if you moved after the door

15   bumped.

16      A.    Right.  And I said I was in the same spot.

17      Q.    Right.  Between then and when the door fully

18   opened, did you move?

19      A.    No.

20      Q.    So when the door fully opens -- I'm sorry.  Go

21   ahead.

22      A.    Do you mean, like, positioning my feet but moved,

23   like, my upper body or anything like that?

24      Q.    Just the position of your feet.  Did your

25   feet move?

```
 1        A.    No.  My feet did not move.

 2        Q.    Your body moved, right, because you sort of

 3   compulsively turned, didn't you, when the door --

 4        A.    That was when the door fully swung in, and it

 5   wasn't a turn.  It was a -- may I?

 6        Q.    You can stand and demonstrate.

 7              (Witness demonstrates)

 8              Incidentally, you've got your hands up now, right?

 9   Would you characterize what you just gestured as your hands

10   are up?

11        A.    That was to demonstrate the -- yeah.

12        Q.    I mean, you would call that your hands up, correct?

13        A.    I would call it my hands up, correct.

14        Q.    And when you testified previously in relation to

15   this matter, you said that your hands were by your sides,

16   right?

17        A.    Yeah, to the side of me.

18        Q.    Okay.  That's not up.  That's by your side.

19        A.    It can be both.  It was both.  It is both.

20        Q.    Okay.  So when you testified previously in relation

21   to this matter that your hands were to your side, you weren't

22   trying to suggest that they were to your side down.  You were

23   suggesting that they were up?

24        A.    To the side up on like -- like I demonstrated then

25   and I'm demonstrating now.
```

1       Q.    Okay.

2       A.    It was easier then because you're not relying on

3  text.  They saw where I placed them.

4       Q.    Okay.  And when you said that you had your hands up

5  or to the sides, as you're now describing it, the reason you

6  did that is that you did not want it to look like you were

7  resisting arrest; is that right?

8       A.    I did not want it to look -- I basically didn't

9  want to escalate the situation.  I didn't want them to be

10  mistaken about anything.  I was trying to be as compliant as

11  possible.

12       Q.    And you didn't want it to look like you were

13  fleeing?

14       A.    Precisely, which was why I was on the other side of

15  the door.

16       Q.    Okay.  And you wanted to make sure that they could

17  see your hands, right?

18       A.    Exactly.

19       Q.    Wouldn't a better way to make sure they could see

20  your hands be to have turned the lights on?

21       A.    Not necessarily.

22       Q.    No?  You think standing in your kitchen in the dark

23  was the best way to show them that you weren't resisting in

24  any way?

25       A.    There was enough ambient light to see where my

1    hands were where I was.

2         Q.   Oh.  You took the video in this case as well as the

3    audio, and you took that by the door, right?

4         A.   I took it kind of in -- because I walked around a

5    little bit, it wasn't exactly in one spot.

6         Q.   Okay.

7              MR. CULLEN:  Stacey, can we just pull that up for a

8    second?  I think it's Exhibit D.

9              (A portion of Defendant's Exhibit D played)

10             Can you stop it there?

11        Q.   I can hear the officer pretty clearly through the

12   door, can't you, in that?

13        A.   I can.

14        Q.   You must be pretty close to the door.

15        A.   I was.

16        Q.   It looks pretty dark.

17        A.   Yeah.  Sometimes when you hold a camera or you hold

18   a phone, your finger covers the lens.

19        Q.   Oh, so you think that's why it was dark, you might

20   have had your finger accidentally over the lens?

21        A.   I think it may have been a variety of factors.  I

22   don't really want to speculate because I don't know.

23             MR. CULLEN:  Stacey, can you go forward, please?

24             (A portion of Defendant's Exhibit D played)

25             Stop.

1    Q.   That little piece of light on the screen, Mr.

2  Maselli, does that appear to you like you've just moved your

3  finger?

4    A.   I can't tell you where my finger is at that time.

5    Q.   Okay.  You had actually purposely kept the

6  apartment dark, hadn't you?

7    A.   Purposely for sleeping or purposely in what sense?

8    Q.   Well, you didn't want to turn the lights on for the

9  officers, right?

10    A.   That's correct.

11    Q.   You didn't want them to be able to see when they

12  came in, right?

13    A.   No.  I didn't want to turn on the hallway lights

14  for them because they had broken into my home.

15    Q.   Which hallway lights is that?

16    A.   The hallway lights that they -- when they came in

17  through my front door and walked up the stairs, that hallway.

18    Q.   It was dark inside also, though, right?

19    A.   Well, no.  There was the ambient light.

20    Q.   There's the ambient light coming -- you've got a

21  single window in your kitchen, right?

22    A.   Yes.  Well, no.  There's two.  I mean, where would

23  you constitute one versus two?

24    Q.   There's one opening, isn't there, Mr. Maselli?

25    A.   But there is, like, a partition going down it that

1    separates it into two.  So is it two windows or one?

2         Q.    There's one opening, right, that has windows that

3    face out somewhere?

4         A.    So it has windows.  Yes, there's one opening with

5    windows.

6         Q.    And that doesn't face the street.  It faces the

7    side of the building, right?

8         A.    No.  That depends on what angle you're looking out

9    the window.  Because you can step here and you can see the

10   street or you could step here and you could look at, like, a

11   parking lot.

12        Q.    And if you're standing in front of the window, as

13   most of us do when we're looking out the window, you're

14   looking at the parking lot, right?

15        A.    No.  It's like saying if I'm looking out that

16   window, I'm only looking that way, versus, oh, look, that way.

17        Q.    So if you angle, you can see out to the street as

18   well?

19        A.    Like, if you move your eyes or head, if that's what

20   you mean by angle, yes, you can see.

21        Q.    Well, you understand the word angle, don't you,

22   sir?  You went to law school?

23        A.    Yeah.  We don't really study angles in law school.

24        Q.    So the lights are off inside because you haven't

25   turned them on?

1       A.    Correct.

2       Q.    But your testimony to the jury is that the reason

3  you were standing there with your hands now apparently up --

4       A.    Always up.

5       Q.    Always up, is because you wanted the police to know

6  that you were complying?

7       A.    Yes.

8       Q.    Okay.  And turning on the kitchen lights never

9  occurred to you?

10       A.    Not in that moment, no.

11       Q.    Well, not in that moment?  You said you were there

12  for an hour with the police.

13       A.    Not in any of those moments, no.

14       Q.    So for the full hour it never occurred to you to

15  turn on the lights in the kitchen?

16       A.    For the full hour I was not expecting them to kick

17  in my door.

18       Q.    Well, even when they told you they were going to

19  have to come in if you didn't come out, you still didn't turn

20  on the lights, right?

21       A.    I don't know if they told me they had to come in.

22  So I'm not sure about that.

23       Q.    And so the door opens and you're --

24            MR. CULLEN:  Can we go back to the exhibit?  I

25  think it was E.  Hopefully the X will show up in the right

1    place.  Yeah.

2         Q.    So this door opens and you stand there, and Officer

3    Durden you think is the first one to come through the door,

4    right?

5         A.    Correct.

6         Q.    And he's wearing a police uniform, correct?

7         A.    I don't know.  I can kind of only see the upper

8    part, so what looks to be a police uniform.

9         Q.    Okay.  You can only see the upper part because he

10   had to come upstairs to get in through that door, right?

11        A.    Yes.

12        Q.    And as he comes in, he shouts Nashua Police

13   Department, right?

14        A.    No.

15        Q.    He didn't say that?

16        A.    No.  He kicked in the door.  Get on the ground.

17        Q.    And your testimony today is that you immediately

18   got on the ground?

19        A.    Yes.

20        Q.    In that sort of push-up that you demonstrated to

21   the jury earlier?

22        A.    That's correct.

23        Q.    Okay.  And when you did that, where were your feet?

24        A.    Right in the same spot because all I'm doing is

25   turning and lowering myself down.  So the feet weren't really

1   adjusting as much as me getting down for him.  I mean, back to

2   the angles, maybe 45.

3        Q.   Okay.  So you're how tall, Mr. Maselli, 5'9"?

4        A.   5'7".

5        Q.   5'7".  Okay.

6             And you testified I think that the door was about

7   32 inches?

8        A.   Yes.

9        Q.   Okay.  So a little under three feet?

10       A.   Yes.

11       Q.   So it's fair to say that when you got on the

12  ground, you didn't get on the ground heading towards the door.

13  You either were facing towards the kitchen or some other

14  direction, right?

15       A.   I was facing the kitchen, correct.

16       Q.   And when you laid down, in fact your body was in

17  the kitchen, not in the hallway or anywhere else, right?

18       A.   I mean, again, it's very difficult to see from this

19  angle because we're looking down so you cannot see how long

20  the hallway actually is, and it's also a bit of an arbitrary

21  distinction between where the hallway begins and the kitchen

22  ends or vice versa.

23            So as far as lying down, basically feet were there,

24  if you can imagine me, and then lowering myself down to the

25  push-up position to the right from where I'm facing now,

1  coming down like that.

2      Q.   Okay.  And that puts your head up towards this

3  stove that has the pizza box in the picture, right, in that

4  direction?

5      A.   No.  Again, that's the problem with this angle.

6  That's well into the kitchen.  My head was probably closer to,

7  like, the -- what would be the foot, past the foot of that

8  cabinet, liquor cabinet.

9          MR. CULLEN:  Stacey, can you show us Exhibit E,

10  please?  I apologize.  I think that was E.  F.

11     Q.   This is if you came in the door that was opened up

12  by the police and looked to your left.  This is the rest of

13  your kitchen, right?  You can see the pizza box, for example?

14     A.   This is pretty well into my kitchen.  It doesn't

15  make sense that you would have been able to see that box in

16  that picture and then have it show up here, so I'm not quite

17  sure on that, because the kitchen was substantially -- pretty

18  long.  It was a long, narrow kitchen.  And so it isn't like

19  the door is immediately here.  It's kind of, again, funny

20  angles, if you will, of capturing what the kitchen actually

21  looked like.

22     Q.   But relative to the door, the kitchen door, your

23  head would have been in the direction of the refrigerator,

24  correct?

25     A.   Yes.

1      Q.    And it's your testimony today, and I think you said

2    this repeatedly, that no officer touched you until after you

3    were handcuffed?

4      A.    That's correct.

5      Q.    Okay.  So your excess force claims aren't based

6    upon the officers pulling you to the ground in any way?

7      A.    Nope.

8      Q.    They're not based on them delivering any strikes or

9    blows or anything else prior to you being handcuffed, correct?

10     A.    That's correct.

11     Q.    It's entirely based on your claim that officers

12    struck you after you were handcuffed, correct?

13     A.    That's correct.

14     Q.    And that was something that you said took place

15    over about 45 seconds?

16          I apologize.  That is a terrible question.  I'll

17    start it again.

18     A.    It was.

19     Q.    After you were handcuffed you said the officers

20    struck you for approximately 45 seconds?

21     A.    It would be 45 seconds to a minute.  It was as long

22    as I was on the ground.

23     Q.    Okay.  And in that 45 seconds to a minute, I know

24    you weren't counting, but what's your best estimate of how

25    many blows you received?

1        A.    I would -- from each or total?

2        Q.    In total.

3        A.    In total?  Probably about six or seven.

4        Q.    Okay.  So about -- were they even on each side of

5   you, the number of blows?

6        A.    I don't know what you mean by even.

7        Q.    Well, you said six or seven blows over the course

8   of 45 seconds to a minute.  Were you getting -- did you get

9   three on each side or three on one and four on the other?

10       A.    My face was in my kitchen floor.  I was asking

11  what's going on.  Someone is saying stop resisting.  Someone

12  else is laughing.  Two people are hitting me causing me

13  trauma.  I'm not counting, and I really don't think it's

14  appropriate to speculate.

15       Q.    But your best estimate, appropriate or not, was in

16  the six to seven range.  Do you want to up that now?  Having

17  thought about it, do you think it's a higher number?

18       A.    I don't know.  I'm not going to speculate now.

19       Q.    Okay.  With respect to those blows that took place

20  after you were handcuffed, you didn't see which specific

21  officers delivered those alleged blows, right?

22       A.    No.

23       Q.    There's not going to be any testimony today that

24  Officer Durden hit you after you were handcuffed, right?

25       A.    From him or from me?

1    Q.    From you.

2    A.    No.  Again, my face is in the floor.  I have no way

3  to identify him.  I'm not going to.

4    Q.    And there's not going to be any testimony from you

5  that Sergeant Yurcak hit you after you were handcuffed because

6  you didn't see that either, right?

7    A.    No.  The same thing.

8    Q.    And after you were -- now, didn't you previously

9  say this whole thing was over before it even started?

10    A.    As far as me getting on the ground, yes.

11    Q.    Okay.  So the part of you going on the ground --

12  when you testified at a prior event that the whole thing was

13  three to four seconds, you're talking about from the officers

14  arrival, entry, to you being on the ground?

15    A.    Entry into my kitchen through the hallway?

16    Q.    Into the kitchen.

17    A.    I would say it's probably -- again, I wasn't going

18  one Mississippi, two Mississippi, three.  The door swings

19  open, get on the ground, push-up position, lowering myself,

20  stop resisting, frozen, how am I resisting, hands.

21         So I would say three seconds, yeah, is pretty -- a

22  pretty fair assessment.

23    Q.    So within about three seconds the officers have

24  entered the kitchen area, kitchen hallway area, and securely

25  put you into handcuffs?

```
 1        A.    (Nods affirmatively).

 2        Q.    Right?

 3        A.    Yes.

 4        Q.    You just have to say it for the stenographer.

 5        A.    Yeah, yeah, yeah.

 6        Q.    And after you claimed that you were hit several

 7   times, somebody helped you to your feet, correct?

 8        A.    After I was hit several times eventually somebody

 9   helped me to my feet.

10        Q.    Okay.

11        A.    And by helped --

12        Q.    Sure.  Describe it however you like.

13        A.    It was a little rougher.  They pulled me up.

14        Q.    They pulled you up to your feet?

15        A.    Yes.

16        Q.    All right.  And you were then driven to the police

17   station, correct?

18        A.    Yes.

19        Q.    Okay.  And the police station, that's not even a

20   five-minute drive from Kinsley Street?

21        A.    I don't know.  It's been --

22        Q.    How long did it feel to you?

23        A.    That's a good question.  Probably -- because I was

24   in the car for a while, and with no one else in it, parked.

25   So are we talking about strictly the time I spent in the car
```

1    or the time I spent traveling in the car?

2        Q.    Well, how long were you -- when you got picked up,

3    how long was it from the time that somebody pulled you to your

4    feet and the time that you were in the police car?

5        A.    That was probably like a minute.  Just walking down

6    my steps, out my door, around the corner to a cop car.

7        Q.    And then after you were placed in the police car,

8    how long were you in there before the car started driving?

9        A.    I would probably say five to ten minutes.

10       Q.    And then once you got to the station, you went

11   through a booking process, correct?

12       A.    I did.

13       Q.    And I think we talked about that at that time you

14   didn't complain to anyone at the station that you felt that

15   somebody had used excess force on you, correct?

16       A.    I was not going to tell them on themselves for fear

17   of worse repercussions.

18       Q.    But you did testify that you were in considerable

19   pain still?

20       A.    Yeah.

21       Q.    And after you left the police station at no time

22   thereafter did you file a complaint like the next week or the

23   next month against the police who arrested you for excessive

24   force, correct?

25       A.    That's correct.

1      Q.    In fact, prior to filing this suit in 2019, you had

2  never complained to the Nashua Police Department that officers

3  in its employment had used excessive force during your arrest,

4  right?

5      A.    That's correct.

6      Q.    And when you went to -- when you were taken to

7  Valley Street, you went through a process there to be booked

8  into Valley Street Jail, correct?

9      A.    Yes.

10      Q.    Okay.  And during that time the officer asked you

11  if you had any injuries, right?

12      A.    Yes.

13      Q.    And you said you did not, right?

14      A.    Yes.

15      Q.    And you've seen that paperwork now as agreed upon

16  Exhibit H in this case?

17      A.    I've never looked at paperwork from Valley Street.

18      Q.    You never looked at the exhibits that were agreed

19  upon to be entered into this case?

20      A.    I mean, it's going to depend on which exhibit

21  you're referring to because I've seen some things in the past

22  and I haven't seen others.  So I can't speak to what I haven't

23  looked at in its entirety.

24          MR. CULLEN:  May I approach, your Honor?

25          THE COURT:  Yes, please.

1        Q.    So showing you what's been agreed upon as Exhibit

2   H, have you seen that document before?

3        A.    This in its entirety is H?

4        Q.    Yes.

5        A.    No, I have not looked at this.

6        Q.    You've never seen that?

7               MR. CULLEN:  Stacey, can you pull up Exhibit H,

8   please?

9               This has been previously agreed to as an exhibit.

10       Q.    So what you're looking at --

11              MR. CULLEN:  H.  Okay.  Stop there.  Let's take off

12  the X, if we can.  Actually, maybe I have to do that.

13              Sorry, your Honor.  I'm going to leave the X there.

14  I don't want to erase everything.

15              THE COURT:  That's fine.  Let's just make sure so

16  that the record is clear.  There's an X that's marked on the

17  exhibit as its being shown, but that's not part of the

18  exhibit.

19              MR. CULLEN:  Thank you, your Honor.

20              THE COURT:  All right.  Thank you.

21       Q.    The officer went through with you at your booking

22  at the Valley Street Jail a series of questions about your

23  health and your well-being, correct?

24       A.    Yes.

25       Q.    And at that time you did not indicate to them that

1   you were having any injuries, correct?

2        A.    For the same reasons as before, Brian.

3        Q.    Because you didn't want to have the officers at the

4   jail know that you were complaining that you had been beaten

5   during your arrest?

6        A.    That's correct.

7        Q.    And when you left Valley Street, as we talked

8   about, you still didn't make that complaint, correct?

9        A.    That's correct.

10       Q.    And you're not seeking costs of any medical

11   treatment that you received as a result of the officers'

12   conduct, correct?

13       A.    That's correct.

14       Q.    But you did go see your PCP, your primary care

15   physician, three weeks after your arrest, and at that time you

16   didn't tell him that you had suffered any injuries, right?

17       A.    In relation to --

18       Q.    Your arrest.

19       A.    That's correct.

20       Q.    Okay.  You didn't tell him, hey, I got beat up by

21   the police a couple weeks ago, can you check it out, nothing

22   like that?

23       A.    No.

24       Q.    You didn't take any pictures of any bruises up and

25   down your body?

1          A.    I did not.

2                MR. CULLEN:  If I may just have a moment, your

3    Honor?

4                THE COURT:  Yes.  Of course.

5                (Pause.)

6          Q.    And then, sir, just a couple weeks after -- a week

7    after you saw your PCP you saw a counselor, and you didn't

8    tell the counselor either that you had been beaten up by the

9    police or report any misconduct by the police to that doctor,

10   either, right, Dr. Mallya?

11         A.    No.  That's -- no, no.

12         Q.    Okay.

13               MR. CULLEN:  I don't have anything further, your

14   Honor.

15               THE COURT:  All right.  Thank you.

16               Attorney Bedrick.  Any redirect?

17               MR. BEDRICK:  Thank you.

18                         REDIRECT EXAMINATION

19   BY MR. BEDRICK:

20         Q.    I just want to get this clear, Ned.

21               Attorney Cullen just asked you if you were going to

22   testify that Officer Durden, now Detective Durden, hit you at

23   the time of your arrest, right?  Do you remember that?

24         A.    I'm sorry.  Can you repeat the question?

25         Q.    Attorney Cullen had just asked you whether there

1  was going to be any testimony from you about Officer Durden

2  striking you.

3          A.   Yes.

4          Q.   Right?  Okay.  So you remember that?

5          A.   Yes.

6          Q.   Okay.  And specifically he was talking about after

7  you were handcuffed, right?

8          A.   Correct.

9          Q.   Now, this might seem obvious, but did you see the

10 people that were hitting you?

11         A.   I did not.

12         Q.   Okay.  But you recognized somebody coming in the

13 door and you recognized that person being in the courtroom,

14 right?

15         A.   Yeah.

16         Q.   And you pointed him out?

17         A.   I did.

18         Q.   And then the defense stipulated that that was

19 Officer Durden.

20              That person was the first person through the door

21 that night, right?

22         A.   He was.

23         Q.   And you felt on your left side -- I'm sorry.  Could

24 you just describe again what you were feeling on your left

25 side?

1    A.    There was the knee slam, like someone dropped on me

2    with their knee, and then there were continual strikes which I

3    imagine were like a reloaded knee being like drawn back, that

4    kind of thing.

5    Q.    And that was all after you were handcuffed?

6    A.    That's correct.

7    Q.    And now as that was going on, there was something

8    going on in your right side?

9    A.    There was.

10    Q.    Can you tell me about that?

11    A.    I felt what could have been a fist or a toe kind of

12    doing similar -- or causing similar impacts on my right side.

13    Q.    You weren't able to see who --

14    A.    I was still on the linoleum.

15    Q.    Okay.  But from the direction that those blows were

16    coming were you able to determine whether that was the same

17    person or a different person?

18    A.    It was -- it couldn't have been from what I was

19    feeling.

20    Q.    Why not?

21    A.    The amount of momentum that it took to, like, shoot

22    that kind of force into one side, it doesn't make physical

23    sense for, like, someone to jump over, reload, and do it from

24    the other.

25    Q.    Okay.  At the time that you had felt those painful

1  strikes, were you resisting their efforts to do anything with

2  you?

3       A.   No.  My face was in the floor, my hands were in

4  cuffs, and I was asking them what is going on.

5            MR. BEDRICK:  I've got nothing further.

6            THE COURT:  Attorney Cullen?

7            MR. CULLEN:  No further questions.

8            THE COURT:  All right.  Very good.

9            Sir, you can step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  Attorney Bedrick, do you have any

12  additional witnesses that you intend to call?

13           MR. BEDRICK:  No, your Honor.

14           Other than the stipulations, the plaintiff rests.

15           THE COURT:  All right.

16           Attorney Cullen, do you have a preference as to

17  whether you would like the Court to read to the jury the

18  stipulations that have been agreed to by the parties or do you

19  have an objection to Attorney Bedrick reading those into the

20  record?

21           MR. CULLEN:  I think it probably makes more sense

22  for the Court to read them if you're willing to do that, your

23  Honor.

24           THE COURT:  All right.

25           Attorney Bedrick?

1          MR. BEDRICK:  I would agree, your Honor.

2          THE COURT:  All right.  Very good.

3          Members of the jury, the parties have reached the

4    following stipulations that I'm now going to read to you:

5          The parties agree that the police were present at

6    Mr. Maselli's apartment on the day in question to investigate

7    his involvement in a serious felony.

8          The parties agree that Officer Durden administered

9    a knee strike and Sergeant Yurcak a palm heel strike to Mr.

10   Maselli in the process of arresting him.

11         All right.  The plaintiff rests.

12         I think that it probably makes sense for us to take

13   a brief recess.  We'll let the jury be excused momentarily so

14   that I can address any motions that counsel may have.

15         So we're a little bit ahead of schedule, but if we

16   could take a short recess.  Thank you.  Maybe ten minutes.

17         (IN COURT - NO JURY PRESENT)

18         THE COURT:  All right.  So the plaintiff has

19   rested.  Are there any motions that need to be made at this

20   time in the case?

21         MR. CULLEN:  Yes, your Honor.

22         In light of the somewhat unexpected testimony from

23   Mr. Maselli that he was not hit at all prior to his being

24   handcuffed -- I understand the purpose of our stipulation was

25   to avoid anyone having to be recalled in the case, and I'm

1    trying not to renege on that at all, but neither of the

2    officers testified that they administered those blows and

3    there's no evidence that they testified to those blows

4    happening prior to him being handcuffed.  It was -- I mean,

5    they submitted affidavits in the case previously indicating

6    that they administered the knee strike and the single palm

7    strike prior to handcuffing him.

8              I guess I'm just not convinced that there's

9    evidence that these officers struck him after he was

10   handcuffed.

11             THE COURT:  Okay.

12             MR. CULLEN:  Therefore, I would move for a directed

13   verdict.

14             THE COURT:  All right.

15             Attorney Bedrick.

16             MR. BEDRICK:  Your Honor, there is evidence in the

17   record from which the jury could determine that two separate

18   officers struck Mr. Maselli, that it was in the course of a

19   constitutionally deemed seizure, and that it was not necessary

20   for the purpose of effecting that seizure.

21             There's an agreement -- well, there's an

22   observation by the witness that the first person in the room

23   is Officer Durden and testimony that it was implausible for

24   all of those strikes to come from Officer Durden himself.

25             So couple that with the stipulation that the

1    other -- that Sergeant Yurcak had administered strikes on that

2    day, it's plausible to determine -- or the jury can determine

3    through direct evidence, the stipulation, and inferences that

4    the strikes coming from the side opposite of Durden were

5    coming from Yurack, and those were also unnecessary to effect

6    the seizure that they were attempting to -- or that they had

7    just completed.

8              THE COURT:  Attorney Cullen, anything further?

9              MR. CULLEN:  No, your Honor.

10             THE COURT:  All right.  I'm going to take the

11   motion under advisement, and we can proceed.

12             MR. BEDRICK:  Thank you.  I do have one motion on

13   our own.

14             I would ask -- or request for instruction on

15   punitive damages and enhanced compensatory damages be read to

16   the jury.  I think the language is agreed upon.  However,

17   whether to read them was not agreed upon.

18             I think they're based on evidence that after the

19   handcuffs were put on Mr. Maselli that the strikes were

20   delivered while the officers were saying stop resisting in a

21   mocking tone, that officers were laughing, that this was

22   clearly, if the jury were to believe that testimony, an event

23   that was based on malicious intentions, that it was reckless,

24   that it was -- I'm sorry, in reckless disregard of his

25   constitutional rights, and that each of those would support --

```
 1   well, the reckless disregard for his constitutional rights

 2   would support the punitive damages component and the

 3   maliciousness would support the instruction for enhanced

 4   compensatory damages.

 5              THE COURT:  All right.

 6              Attorney Cullen, do you wish to be heard on that

 7   now, or would you like to reserve that for the charging

 8   conference?

 9              MR. CULLEN:  I would reserve that, your Honor.

10   Thank you.

11              THE COURT:  All right.  Very good.

12              I appreciate very much, Attorney Bedrick, you

13   raising those issues now.  I think it's helpful to have that

14   on the record.

15              What I would suggest that we would do is -- I'm

16   going to take all of your arguments under advisement, and why

17   don't we address that in the charging conference in the

18   context of the discussion about the Court's proposed jury

19   instructions and what I'm prepared to give and not give.

20              MR. BEDRICK:  That works for me, your Honor.

21              Thank you.

22              THE COURT:  All right.  Very good.

23              Okay.  Is there anything else administratively that

24   we need to address before we begin with the defendant's

25   evidence?
```

1           MR. CULLEN:  Nothing from the defense, your Honor.

2           THE COURT:  All right.

3           Anything else, Attorney Bedrick?

4           MR. BEDRICK:  Nothing from us.

5           THE COURT:  All right.

6           So let me just check with our court reporter.  It's

7    a quarter of 3:00.  We'll probably go until 4 o'clock today,

8    maybe a little longer.

9           Would you like to have a short break?

10          (Court reporter indicates she does not need a

11   break)

12          MR. CULLEN:  I would love just sort of a five --

13   three-minute break before we get going.

14          THE COURT:  I'm fine to do that.  So why don't we

15   take ten minutes, and that will give everyone time to be back

16   here ready to go.

17          MR. CULLEN:  Thank you.

18          THE COURT:  Thank you.

19          (RECESS)

20          THE COURT:  Counsel, before we bring the jury back

21   in, is there anything that needs to be addressed with the

22   Court?

23          MR. BEDRICK:  Not from my standpoint, your Honor.

24          MR. CULLEN:  Nothing from us, your Honor.

25          Thank you.

1              THE COURT:  All right.  Very good.

2              Then why don't we go ahead and bring the jury back

3      in, and then I'll have you call your first witness.

4              (IN COURT - JURY PRESENT)

5              THE CLERK:  This Court is now in session.

6              THE COURT:  Attorney, Cullen, I ask you to call

7      your first witness, please.

8              MR. CULLEN:  Thank you.

9              The defendants call Officer Christopher DiTullio.

10             THE COURT:  All right.  Sir, if you would leave

11     your mask on just for now and come forward.

12             THE WITNESS:  Yes, your Honor.

13             THE COURT:  All right.  Before you swear in the

14     witness --

15             Sir, were you tested for COVID-19 today?

16             THE WITNESS:  I was, your Honor.

17             THE COURT:  And did you receive a result?

18             THE WITNESS:  I have not received it.

19             THE CLERK:  Your Honor, he's negative.

20             THE COURT:  Thank you very much.

21             I'm going to allow you to remove your mask during

22     your testimony.  So if you would like to do that, sir, you

23     may.

24             THE WITNESS:  Thank you, your Honor.

25             THE COURT:  All right.  Very good.

1          And then I'll allow you to administer the oath.

2                      CHRISTOPHER DITULLIO

3          having been duly sworn, testified as follows:

4              THE CLERK:  Please be seated.

5              Please state your name and spell your last name for

6      the record.

7              THE WITNESS:  My name is Christopher DiTullio, and

8      my last name is spelled D-I-T-U-L-L-I-O.

9                        DIRECT EXAMINATION

10     BY MR. CULLEN:

11         Q.   Good afternoon.  Is it officer, or detective,

12     sergeant?  Where are you?

13         A.   Sergeant.

14         Q.   Sergeant.  Congratulations.

15         A.   Thank you.

16         Q.   Back in October of 2016, what was your position?

17         A.   I was a detective.

18         Q.   Okay.  If I lapse back and forth, I trust you'll

19     forgive me.

20         A.   I won't take it personal.

21         Q.   Okay.  Tell me a little bit about your background,

22     sir, if you would.

23              Where did you grow up?

24         A.   I grew up in Massachusetts.

25         Q.   Okay.  And did you go to high school there?

```
 1          A.    I did.

 2          Q.    And when did you graduate?

 3          A.    2001.

 4          Q.    Okay.  And what did you do after you graduated from

 5   high school?

 6          A.    I went into the United States Army.

 7          Q.    And how long did you serve in the Army in some

 8   capacity?

 9          A.    It was just over nine years.

10          Q.    Okay.  And was that Reserves, full Army, a bit of

11   both, or what was the combination?

12          A.    It was Reserves, but I did spend some active duty

13   time on deployments.

14          Q.    Where was that?

15          A.    In 2002 I was in Guantanamo Bay, Cuba.  And from

16   2008 and 2009 I was in Baghdad, Iraq.

17          Q.    Okay.  I take it -- did you say you went into the

18   Army right after high school?

19          A.    I did.

20          Q.    So I assume you went in as an E-5?

21          A.    I started as a private, E-1.

22          Q.    E-1.  Okay.  And how about when you left the

23   military?

24          A.    Sergeant, E-5.

25          Q.    Okay.  During your time there did you get
```

1    specialized training or assignments or anything like that?

2         A.    I mean, we do -- in basic training you learn how to

3    be a soldier first, and then whatever mission or job that

4    you're assigned to, specialty training for that, and then you

5    do periodic training throughout your career to advance your

6    career through the Army.

7         Q.    Okay.  And what was your -- what were your duties

8    in Baghdad?

9         A.    I was convoy security for a military police

10   company.

11        Q.    Are you married, sir?

12        A.    I am married, yes.

13        Q.    Kids?

14        A.    Two.

15        Q.    How old are they?

16        A.    12 and 8.

17        Q.    Good ages.

18        A.    Good ages.

19        Q.    Did I drag you up here from Nashua today?

20        A.    No.  I was actually in Concord this morning.  I'm

21   in training at the Police Standards and Training Council this

22   week.

23        Q.    Okay.  And what's your training that you're doing

24   this week?

25        A.    Training for active shooter incident management.

1      Q.   Okay.  We'll try to get you up and down here.

2           Tell me this, when did you start your law

3   enforcement career?

4      A.   March of 2006.

5      Q.   Okay.  And where was that?

6      A.   With Nashua.

7      Q.   So that's while you're still also on Reserves with

8   the Army?

9      A.   Yes.

10     Q.   When you started at the police department, did you

11  undergo any training of any sort?

12     A.   Yes.

13     Q.   And can you tell the jury just what the standard

14  training is that you received?

15     A.   So once I was hired with Nashua, I attended the

16  police academy at the Police Standards and Training Council,

17  which at the time was, like, 16 weeks.  I think it's a little

18  longer than that now, but all the police go through the same

19  police academy here in New Hampshire.

20          So after I graduated there I did another twelve

21  weeks of field training program with the Nashua police where I

22  shadow another police officer who kind of teaches me the

23  ropes.

24          So you get to learn the basics at the academy.  And

25  then when you get to your department, you do more training,

1   another twelve weeks of shadowing another officer and kind of

2   going through and learning how each department kind of does

3   what each department does based on what you learned in the

4   academy.

5        Q.   And do you get training in the use of force at the

6   academy?

7        A.   We do, yes.

8        Q.   And about how long is that?

9        A.   I don't remember.  I think it was like a week

10  between OC spray, baton deployment, hand-to-hand techniques,

11  as well as firearms.

12            Firearms is a week on its own, but I believe

13  everything else is another week or so.

14       Q.   And then when you go to Nashua for the field

15  training, is there additional use of force training at the

16  department?

17       A.   We do.  We do use of force training annually

18  required by law.

19       Q.   I know you're a sergeant today.  When did you

20  become a sergeant?

21       A.   It was 2018.

22       Q.   Okay.  Back in 2016, in October of 2016, in

23  particular, what was your position then?

24       A.   I was a detective.

25       Q.   Okay.  And detective, if I understand correctly, is

1    an assignment more than a rank in Nashua?

2         A.    Correct.  Yes.

3         Q.    As a detective, what's your general function?

4         A.    To investigate felonies that occur within the city

5    of Nashua.

6         Q.    Okay.  Now, skipping ahead to -- or specifically to

7    October 2, 2016, my understanding is that was a Sunday.  Does

8    that comport with your memory?

9         A.    Correct.

10        Q.    Do they make detectives work Sundays?

11        A.    We do.

12        Q.    Okay.  Do you remember what your hours were that

13   day?

14        A.    It would be 3:00 p.m. to 11:00 p.m.

15        Q.    At some point did you become involved in the

16   investigation of a serious felony that day?

17        A.    I did.

18        Q.    Okay.  And did you learn any of the people who were

19   specifically involved in that or potentially involved in that?

20        A.    Yes.

21        Q.    Okay.  And who was that?

22        A.    Edward Maselli.

23        Q.    Okay.  And do you see Mr. Maselli here today?

24        A.    I do.

25        Q.    Did you learn where he lived?

1      A.    Yes.

2      Q.    And where did he live at that time?

3      A.    On Kinsley Street in Nashua.

4      Q.    Okay.  And can you describe Kinsley Street?

5      A.    It's a two lane one-way road that travels from the

6    Exit 5, FE Everett Turnpike, to Main Street.  So it travels in

7    the easterly direction.

8      Q.    Okay.  Based on the information you had over the

9    course of that day, did you develop a plan to go to 51 Kinsley

10   Street?

11     A.    We did.

12     Q.    Okay.  Why did you decide to go there?

13     A.    To make contact with any resident, including Edward

14   Maselli, that was living there, and to secure the apartment as

15   a potential crime scene.

16     Q.    Okay.  Why not get the warrant first and then go?

17     A.    You know, in certain circumstances getting a

18   warrant could take several hours to get.  We have to complete

19   paperwork.  We have to call a judge who's on-call.  We have to

20   wait for them to review the warrant and then get it back.

21           In this particular case we believed it to be time

22   sensitive, so we decided to go to the apartment, make contact

23   with any resident, tell them that their apartment was being

24   held as a crime scene.  We then would have police hold it from

25   the outside of the apartment and then interview and speak with

1  anybody that was inside, and then, if need be, apply for a

2  search warrant.

3        Q.    Now, did you go over to Kinsley Street on your own?

4        A.    No.

5        Q.    Okay.  Who did you go with?

6        A.    I went with my partner at the time, Detective Frank

7  Lombardi.

8        Q.    And how were you dressed?

9        A.    Very similar to how I am today.  I was wearing a

10  shirt and tie, dress pants, dress shoes, badge on a chain

11  hanging from my neck, gun, radio, flashlight, and handcuffs.

12        Q.    Okay.  Do you have a full duty belt?

13        A.    No full duty belt, no.

14        Q.    And when I say a duty belt, can you just tell this

15  jury what that is?

16        A.    So like you normally would see a patrol officer

17  wearing, you know, it would be a full leather duty belt.  So

18  it would have a big, bulky leather belt with a gun holster,

19  usually two handcuffs, magazines, radio holder, flashlight

20  holder, and things like that.  I was not wearing that that

21  day.

22        Q.    When you arrived at Kinsley Street, what did you

23  do?

24        A.    We, based on the instructions that we received at

25  the time, went to the door, the exterior door of where we

1    believed Mr. Maselli was living.

2         Q.   The exterior door.  Do you mean the one on the

3    ground level, street level?

4         A.   Yes.

5         Q.   Okay.  And can you describe that to us?

6         A.   There was a screen or like an aluminum door, like a

7    screen door, I don't know if it was screen or glass at the

8    time, and then there was an exterior wooden door.

9         Q.   Was the screen door locked in any way?

10        A.   It was not.

11        Q.   Okay.  Was the other door locked in any way?

12        A.   No.  It was unlocked.

13        Q.   Okay.  And when you come into that next zone, where

14   did you believe the apartment to be?

15        A.   On the second floor.

16        Q.   Okay.  Were there other doors off that entryway?

17        A.   There was.

18        Q.   Okay.

19             MR. CULLEN:  Stacey, could you do me a favor?

20   Could you pull up Exhibit A for us?

21        Q.   Ignoring, if you will, the clutter to the right, do

22   you recognize this photo?

23        A.   Yes, I do.

24        Q.   Okay.  And the items to the right, were any of

25   those there on the night of October 2, 2016?

```
1          A.    They were not.

2          Q.    Was there anything there that you recall?

3          A.    I don't recall anything being there.

4          Q.    Okay.

5                MR. CULLEN:  Stacey, could you move to Exhibit B,

6    please?

7          Q.    And, sir, do you recognize this picture also?

8          A.    I do.

9          Q.    What is this?

10         A.    This is the stairwell to the second floor of Edward

11   Maselli's apartment.

12         Q.    Okay.

13               MR. CULLEN:  Stacey, if you could just do one more

14   for us, C.

15         Q.    And do you recognize this?

16         A.    I do.

17         Q.    And what do you recognize this to be?

18         A.    That was the entry door to Edward Maselli's

19   apartment.

20               MR. CULLEN:  Your Honor, I would ask -- A, B, and C

21   are already full exhibits so I don't know if I need to move

22   them formally into evidence or not, but if I do, I would ask

23   to do that now.

24               THE COURT:  All right.  They are admitted into

25   evidence as they've been agreed to.  Thank you.
```

1          MR. CULLEN:  Thank you, your Honor.

2          (Defendant's Exhibits A, B, and C Admitted)

3     Q.   What did you do when you got up to that door that's

4  shown here in Exhibit C?

5     A.   I knocked on the door.

6     Q.   Okay.  Did anyone respond?

7     A.   Yes.

8     Q.   And when that person responded, did they say

9  anything?

10    A.   They asked who it was.

11    Q.   And what did you say?

12    A.   I identified myself as a detective with the Nashua

13 Police Department.

14    Q.   And what response did you get to that?

15    A.   He asked why we were there.

16    Q.   And how did you respond?

17    A.   I spoke vaguely at first and explained that, you

18 know, there was a reported incident that occurred in the

19 apartment, that I needed to speak with whoever was inside, and

20 asked them to come outside.

21    Q.   Why were you vague?

22    A.   I didn't know who I was talking to.  I asked him

23 his name.  He didn't tell me his name at all.  So, you know, I

24 didn't know if it was just a friend that was visiting or if it

25 was Mr. Maselli that I was speaking with at the time.

1          At that point in the conversation I didn't want to,

2   you know, reveal my true purpose for being there until I had

3   an understanding of who I was speaking with.

4          Q.   Now, did Mr. Maselli have to talk to you?

5          A.   No.

6          Q.   Okay.  Did you ever tell him that he had to talk to

7   you?

8          A.   No.

9          Q.   Did he ask you about a warrant at any time?

10         A.   He did.

11         Q.   And what did he ask you?

12         A.   He asked if I had a warrant.

13         Q.   And what did you say?

14         A.   I said I did not.

15         Q.   Okay.  Did he tell you to leave at any time?

16         A.   I don't remember if he said to leave or not.

17         Q.   Okay.  If he did ask you to leave, would you leave?

18         A.   No.

19         Q.   Why not?

20         A.   There was evidence, or potential evidence anyway,

21   from a serious felony that we were investigating that had

22   occurred within that apartment.  So if we left, evidence could

23   be destroyed, altered, thrown out.  So at that point we were

24   going to stay.

25         Q.   And when you say you were going to stay, what was

1    the plan if the occupants wouldn't agree to a search at that

2    time?  What would you do?

3         A.    We would have to seek an alternate method of going

4    into the apartment and getting anybody that was inside out of

5    the apartment.

6         Q.    Did you ask the person on the other side of the

7    door to leave the apartment?

8         A.    I did.

9         Q.    And what did that person say?

10        A.    He refused.

11        Q.    At some point did you learn that the person on the

12   other side of the door was in fact Mr. Maselli?

13        A.    I did.

14        Q.    Okay.  And did you learn that at some point he had

15   recorded at least part of your conversation?

16        A.    I did.

17             MR. CULLEN:  Stacey, do you mind -- just since the

18   detective wasn't here earlier when we played this, I

19   apologize, but could you play Exhibit B for us?

20             (Defendant's Exhibit B begins being played)

21             Can you stop there for a second?

22        Q.    I take it you recognize who's speaking there?

23        A.    I do.

24        Q.    And it's you?

25        A.    It's me.

1              MR. CULLEN:  Keep going, please.

2              (Defendant's Exhibit B continues playing)

3         Q.    Sir, Detective, did your tone ever change after

4    this conversation was recorded?

5         A.    No.

6         Q.    Did you ever become aggressive with Mr. Maselli

7    through the door?

8         A.    No.  Never.

9         Q.    Or after?

10        A.    No.

11        Q.    Did you ever yell at him through the door?

12        A.    No.

13        Q.    When it was clear that he was not going to let you

14   in, did you and Detective Lombardi enter immediately?

15        A.    We did not enter immediately, no.

16        Q.    Why was that?

17        A.    We have kind of a best practice or, you know, kind

18   of like a procedure that we follow at the police department.

19   Based on the totality of what was going on at the time, I

20   notified the patrol supervisor at the time, Sergeant Yurcak,

21   to let him know what was going on and that there was potential

22   evidence inside and that we needed to secure the apartment as

23   a crime scene.

24        Q.    And did Sergeant Yurcak come to the scene?

25        A.    He did.

1      Q.    Okay.  And you had that conversation?  I apologize.

2      A.    We did.

3      Q.    Okay.  Did you then immediately go up and force

4  entry?

5      A.    No.

6      Q.    What did you do collectively?

7      A.    So we learned that the building was owned by the

8  landlord who lived underneath or like a -- the way the

9  building is set up is kind of, like, underneath but, like,

10  towards the back.

11          So instead of just kicking the door in right away,

12  we decided, you know, it would be in our best interest at that

13  time to retrieve the key, which would probably be safer and

14  faster than trying to, you know, kick the door in from the

15  stairwell that we were in.

16      Q.    Okay.  And were you able to get a key?

17      A.    We were.

18      Q.    Did somebody attempt to use the key on the door?

19      A.    Yes.

20      Q.    Prior to doing that, did you let Mr. Maselli know

21  that you were planning to enter?

22      A.    We did.

23      Q.    Did he respond in any way?

24      A.    He said, you know, give him a few more minutes or

25  something like that.

1      Q.    Okay.  Were you willing to do that?

2      A.    No.

3      Q.    When you turned the key in the lock, were you able

4  to open the door?

5      A.    Not all the way.

6      Q.    Okay.  So what happened next?

7      A.    Once the door was unlocked with the key, we

8  discovered that there was a chain, security chain holding the

9  door partially closed.

10     Q.    And so what happens at that point?

11     A.    I believe it was Officer Durden went ahead and

12  kicked the door open.

13          MR. CULLEN:  Stacey, would you mind putting up

14  Exhibit B again?

15     Q.    Showing you again, officer, what's been marked as

16  Exhibit B, this is the stairwell leading up to Mr. Maselli's

17  apartment?

18     A.    Yes.

19     Q.    How many steps are there between the landing that

20  we can see and the door to the apartment?

21     A.    Two or three.

22     Q.    When Officer Durden kicks open the door,

23  whereabouts is he?

24     A.    Officer Durden?

25     Q.    Yes.

1    A.    He's right in front of the door.  So just above the

2  landing.

3    Q.    And who's next behind him?

4    A.    Sergeant Yurcak.

5    Q.    Any specific reason -- this is your case.  Any

6  specific reason it's Officer Durden who gets selected to kick

7  the door?

8    A.    So, again, Officer Durden at that time was wearing

9  a full police uniform.  So he's wearing a uniform, badge

10  pinned to his chest, full duty belt.  You visibly see him as a

11  police officer.  I'm similarly dressed as I am today minus the

12  sport coat.  But whenever we have to force entry into an

13  apartment, it's best procedure to have a uniform go first, and

14  that way when someone goes in -- when we go into someone's

15  apartment, they see a police uniform and they quickly will

16  realize, okay, it's a police officer, not some guy wearing a

17  suit kicking down my door.

18    Q.    Okay.  Where are you relative to the landing when

19  Officer Durden kicks the door in?

20    A.    I'm probably the second or the first step off the

21  landing behind Sergeant Yurcak.

22    Q.    Okay.  So a couple of steps down from the landing?

23    A.    Yes.

24    Q.    When Officer Durden kicks in the door, does he

25  immediately enter the apartment?

```
 1        A.    Yes.

 2        Q.    Do you hear him say anything?

 3        A.    Yes.

 4        Q.    What do you hear him say?

 5        A.    I hear him shout get on the ground.

 6        Q.    Okay.  How long is it before you cross the

 7   threshold yourself?

 8        A.    One or two seconds.

 9        Q.    Okay.  When you arrive, what do you see?

10        A.    I see a male subject facedown on the floor, and I

11   see Officer Durden and Sergeant Yurcak on top of him.

12        Q.    Okay.  At any time did you see -- well, that person

13   who is facedown on the floor, is that Mr. Maselli?

14        A.    Mr. Maselli, yes.

15        Q.    Okay.  At any time did you see Mr. Maselli in sort

16   of a push-up position?

17        A.    No.

18        Q.    Did you ever see him sort of on his hands and

19   knees?

20        A.    No.

21        Q.    With respect to them being on top of him, can you

22   just describe that a little bit more?  Where is everybody

23   physically relative to each other?

24        A.    So Mr. Maselli's feet are towards the doorway.  So

25   he's facing into the apartment kind of straight, you know,
```

1  through the other side.  His feet are facing me or the front

2  door to his apartment, and Sergeant Yurcak is on one side and

3  Officer Durden is on the other kind of on top of him as he's

4  laying down on his stomach and chest.

5       Q.   Okay.  And what do you see take place?

6       A.   I see both Sergeant Yurcak and Officer Durden

7  attempting to place him into custody and attempt to handcuff

8  him.  However, Mr. Maselli's hands are under his chest, and

9  they were not able to get his hands behind his back right

10  away.

11       Q.   Did anybody give him any commands about his hands?

12       A.   Yes.

13       Q.   And what were those commands?

14       A.   I don't know who it was, but I was hearing someone

15  say put your hands behind your back, you know, you're under

16  arrest, put your hands behind your back.

17       Q.   And did it appear that Mr. Maselli willingly

18  complied with that order?

19       A.   Not right away.

20       Q.   Okay.  Did you see either Officer Durden or

21  Sergeant Yurcak apply any physical force besides pulling on

22  his arms to get him into handcuffs?

23       A.   I did not see.

24       Q.   Okay.  Did you assist with getting him into

25  handcuffs?

1          A.    I did.

2          Q.    Did you strike Mr. Maselli at any time?

3          A.    I did not.

4          Q.    Where was Officer Lombardi relative to you?

5          A.    He was in the doorway.  It was a very tight area.

6    So I don't think he was able to quite fit with the three of us

7    kind of kneeling over Mr. Maselli and Mr. Maselli laying on

8    the ground.

9          Q.    Okay.  So is it fair to say you didn't see Officer

10   Lombardi strike him in any way?

11         A.    No.

12         Q.    How long did it take to get him into handcuffs?

13         A.    A few seconds.

14         Q.    Okay.  After he was in handcuffs did you strike him

15   in any manner?

16         A.    No.

17         Q.    Did Officer Durden strike him in any manner?

18         A.    Not that I saw.

19         Q.    Did Sergeant Yurcak strike him in any manner?

20         A.    No.

21         Q.    With respect to -- so what do you do once he's in

22   handcuffs?

23         A.    We lifted him to his feet and he was walked out of

24   the building.

25         Q.    Okay.  Do you recall who walked him out?

```
1        A.    Officer Durden did.

2        Q.    Okay.  What did you do at that point?

3        A.    Myself, Detective Lombardi, and Sergeant Yurcak

4   searched -- well, searched is a relative term, but we cleared

5   the apartment.  So basically we went in and ensured that there

6   were no other people hiding within the apartment.  Once we

7   were satisfied that there were no people within the apartment,

8   we left, and Officer Lauren Collins secured the apartment from

9   the outside basically making sure that nobody entered until we

10  came back with a search warrant.

11       Q.    And did you eventually do that?

12       A.    Yes.

13       Q.    Okay.  With respect to Mr. Maselli, did you see him

14  again later that evening?

15       A.    I did.

16       Q.    Okay.  Did you have a chance to speak with him?

17       A.    I did.

18       Q.    Did he make any complaints to you about the manner

19  in which he had been arrested?

20       A.    No, he did not.

21       Q.    How did he appear physically?

22       A.    Normal.

23       Q.    Did he show any signs of injury?

24       A.    No.

25       Q.    Did he complain of any injury?
```

1          A.    No.

2                MR. CULLEN:  If I could just have one moment, your

3    Honor?

4                THE COURT:  Yes.  Of course.

5                (Pause.)

6                MR. CULLEN:  Thank you, Detective.  I don't have

7    any other questions, but I imagine plaintiff's counsel will.

8                THE WITNESS:  Thank you.

9                THE COURT:  Attorney Bedrick, do you have any

10   questions for this witness?

11               MR. BEDRICK:  Sure.  Thank you, your Honor.

12               THE COURT:  All right.  Go right ahead.

13                         CROSS-EXAMINATION

14   BY MR. BEDRICK:

15        Q.    Sergeant DiTullio, let me just make sure I heard

16   you right.  When you first breached the door did you just tell

17   us that you saw the male subject facedown on the ground?

18        A.    Yes.

19        Q.    Did you see him standing at any point before that?

20        A.    Briefly.

21        Q.    So before that you did see him stand up?

22        A.    Yes.

23        Q.    Okay.  But it was so brief that you said that the

24   first thing you saw was him being on the ground?

25        A.    Yeah, it was very quick.

1    Q.   Did he comply getting down on the ground or did

2  they have to drag him to the ground?

3    A.   Again, it happened very quickly.  From where I was

4  standing or what I was seeing, I heard shouting, get on the

5  ground, and, you know, he was on the ground and the two

6  officers were on top of him.

7    Q.   So is it your testimony today that it was too fast

8  that you couldn't see what was happening?

9    A.   So, like, obviously I could see a little bit

10  from -- again, I was the third person back and, you know,

11  there was Officer Durden, there was Sergeant Yurcak, and then

12  myself, and I was standing slightly below because of the

13  stairs.  But, you know, I initially see him standing there,

14  and then they go into the apartment, they're shouting for him

15  to get on the ground, and then they're on the ground.

16    Q.   So you weren't able to observe to the extent that

17  you would be able to truthfully testify that he was standing

18  up or running away or being dragged to the ground or anything

19  like that?

20    A.   He was initially standing and then he was on the

21  ground.

22    Q.   Okay.  And at the end there of your testimony -- I

23  just want to make sure I got this right.  Did you say that you

24  did not see either defendant Durden or defendant Yurack

25  deliver any strikes to Mr. Maselli?

1    A.   I did not see.

2    Q.   Nothing?

3    A.   No.

4    Q.   Okay.  All right.  So let's go through this then.

5         How's your memory of the event?

6    A.   Pretty well.

7    Q.   Pretty good?

8    A.   Yes.

9    Q.   Independent memory?

10   A.   Yes.

11   Q.   So you didn't need to refresh with your reports or

12   any videos or anything?

13   A.   I mean, I reviewed my reports prior to testimony,

14   but, yeah, I remember it pretty well.

15   Q.   Okay.  And from where you were at the time that

16   this arrest occurred, was the lighting -- how was the

17   lighting?

18   A.   There's a -- I remember being a light in the

19   hallway and there was a light on in the apartment, but it was

20   dark outside.

21   Q.   But were you able to see the events that were going

22   on in the hallway?

23   A.   Yes, yes.

24   Q.   And you said you were refreshing your memory from

25   the reports.  Did you watch any videos?

1         A.    I didn't watch any videos, no.

2         Q.    Did you take any videos?

3         A.    No.

4         Q.    At the time did the Nashua Police Department have

5    video capability -- body camera capability?

6         A.    No, we did not.

7         Q.    Okay.  And so we're sort of relying on you to

8    testify as to your memory and we're relying on that to be the

9    truth, right?

10        A.    Correct.

11        Q.    So you were under oath testifying about these

12   events before, right?

13        A.    Yes.

14        Q.    There was a trial back a couple years ago, right?

15        A.    That's correct.

16        Q.    So why would you say at that trial that Ned Maselli

17   was running away?

18        A.    So, like I said, it happened quickly, and from what

19   I saw he was standing, he was moving, and then he was on the

20   ground.  So --

21        Q.    But you just told the jury --

22        A.    Yes.

23        Q.    -- that you weren't able to observe it well enough

24   to truthfully say that he was running around or doing

25   whatever, right?

1      A.   Yes.

2      Q.   But when you were under oath before, was it the

3  same oath?  Was it a similar oath to what you took today?

4      A.   A similar oath, yes.

5      Q.   To tell the truth?

6      A.   Yes.

7      Q.   And under the pains of perjury, right?

8      A.   That's correct.

9      Q.   And you said to that jury that he was -- actually,

10  let me just make sure I can quote it.

11          So tell me if this is an accurate statement or an

12  accurate reproduction of what your statement was at trial.

13      A.   Okay.

14      Q.   In 2019.  "So the door gets kicked open.  He's

15  standing just a few feet away from the doorway in like a

16  hallway.  He's facing us.  He then turns to run away when

17  Officer Durden yells, police, stop.  He then is now facing

18  away from us running into a different part of the apartment."

19          Was that your statement under oath in 2019?

20      A.   Yes, it was.

21      Q.   Okay.  You understand how that's different from

22  what you said today, right?

23      A.   Yes.

24      Q.   Why is it different?

25      A.   From what I can see in the stairwell, I can see him

1    moving initially, and it's within, you know, one or two

2    seconds.  So it's very quick from when the door was opened to

3    the time he's on the ground.  You know, it's happening in,

4    like, two, four seconds.  He's moving and Officer Durden is

5    the first one in the door, followed by Sergeant Yurcak, who

6    are shouting for him to get on the ground, and then he's on

7    the ground.

8         Q.   Okay.  So why did you say he was running?

9         A.   From -- again, from my point of view at the time,

10   you know, it appeared he was moving.  Whether he was running,

11   walking, doing jumping jacks, that was my recollection at the

12   time that he was -- you know, I said -- he was running is what

13   I said, but he was definitely moving.  I didn't measure his

14   speed at the time or see if he was walking or running or doing

15   whatever, but he was moving away.

16        Q.   But didn't you just tell this jury you didn't have

17   a vantage point that would allow you to accurately or

18   truthfully relay that kind of information to this jury?

19        A.   So, like I said, what I believe I stated was he was

20   standing and then he was on the ground from what I could see.

21        Q.   So then let's talk about the takedown itself, him

22   going down.

23        A.   Okay.

24        Q.   You're telling us that you didn't really see how he

25   went down?

1      A.    So, like I said, you know, Officer Durden and

2    Sergeant Yurcak were in front, they're shouting to get on the

3    ground, and then he's on the ground, and they're on top of

4    him.

5      Q.    Could you tell whether he was complying with the

6    command to get on the ground or if he was being dragged to the

7    ground?

8      A.    I could not tell.

9      Q.    No, you couldn't.  So if you looked at the jury and

10   said, yes, I knew that he was taken down or, yes, I knew that

11   he was being compliant, that would not be true, right?

12     A.    Correct.

13     Q.    So let's go back to 2019, and we'll go to the next

14   question -- or the next answer.  Sorry.  I read you an excerpt

15   a few minutes or seconds ago.  I'm going to read you another

16   one, and you just tell me if this is accurate.

17     A.    Okay.

18     Q.    "At which point we were only a few feet away from

19   him.  Officer Durden quickly grabbed ahold of him from behind,

20   along with Sergeant Yurcak, and brought him to the ground.  So

21   they -- all three of them kind of went to the ground in a

22   heap."  Is that accurate?

23     A.    Yes.

24     Q.    Okay.  So today you said you couldn't see whether

25   he was being compliant or whether he was being dragged down,

1    right?

2         A.    That's correct.

3         Q.    But in 2019 apparently you knew that Officer Durden

4    grabbed ahold of him and that he and Sergeant Yurcak brought

5    him to the ground?

6         A.    Yes.

7         Q.    Is the statement in 2019 different than the

8    statement today?

9         A.    No, it's not.

10        Q.    Tell me, how is that?

11        A.    So I can't tell what, I guess, amount of force

12   they're using on Mr. Maselli.  They grab ahold of him and they

13   go to the ground.  Now, I'm not -- it's not like they're

14   giving me a play-by-play like, okay, I'm pulling him to the

15   ground now.

16             From what my observations are, we go into the

17   apartment, they grab him, and all three of them go to the

18   floor.  So I don't know if Mr. Maselli is going to the floor

19   voluntarily or if they are pulling him to the floor.

20        Q.    Okay.  So if you were to say to a jury that they

21   forced -- that you believe they forced him to the ground, that

22   would be a lie, right?

23        A.    I don't know.

24        Q.    Right, because you don't know.  You wouldn't be

25   able to say that, right?

1       A.    Right.

2       Q.    So you would never say to a jury -- you would never

3  look at them and say I believe they forced him to the ground,

4  right?

5       A.    Well, at the time I didn't know that they forced

6  him to the ground from my observations.

7       Q.    But if you were to look at this jury today and say

8  I believe they forced him to the ground, that would be a lie,

9  right?

10      A.    No.

11      Q.    So you do believe they forced him to the ground?

12      A.    So at the time my initial report was written I

13 didn't know if he was forced to the ground or not, but

14 after -- you know, this has gone on for several years.  After

15 learning, it was that he was forced to the ground.

16      Q.    So the idea that he was forced to the ground isn't

17 coming from your own recollection?

18      A.    No.  It's from the officers that forced him to the

19 ground.

20      Q.    So that's from what other officers are telling you?

21      A.    Yes.

22      Q.    That we had to force him to the ground?

23      A.    That's correct.

24      Q.    So if you said that you observed them forcing him

25 to the ground, that would be a lie?

1    A.    I don't think it would be a lie.

2    Q.    Why not?

3    A.    It would be a misunderstanding.  My observation

4  would be -- whether or not they forced him to the ground or

5  not, again, it's hard to tell.

6    Q.    If someone said -- if you said I believe that they

7  forced him to the ground and someone asked you, is that what

8  you observed, and you said, yes, would that be a lie based on

9  what you just told the jury?

10    A.    No, I don't think that would be a lie.

11    Q.    No, it wouldn't be a lie, because you did observe

12  them force him to the ground?

13    A.    It could be either/or.  I saw them grab ahold of

14  him and they went to the ground.  Whether there was force, I

15  couldn't necessarily tell.  There could have been force, but I

16  didn't know at the time.  Did I testify to that?  Yes.  Yes, I

17  did.

18    Q.    You testified that you knew even though you didn't

19  know?

20    A.    From -- at the time -- during the time I wrote the

21  report I did not know, but at the time I testified I did.

22    Q.    So at the time you wrote -- you wrote your report

23  in 2016?

24    A.    Correct.

25    Q.    You did not know whether you observed them force

1  him to the ground?

2       A.   No, I didn't know if they forced him to the ground.

3       Q.   Right.  I'm asking you if you observed them force

4  him to the ground.

5       A.   I observed them grab ahold of Mr. Maselli and they

6  went to the ground.

7       Q.   Okay.  Did you observe them force him to the ground

8  though?

9       A.   I don't know.  I don't know if it was -- like I

10 said, I don't know -- they're grabbing him and they're going

11 to the ground.

12      Q.   Right.  So you don't know if you observed them

13 force him to the ground, right?  Right?

14      A.   I don't know.

15      Q.   Right.  You don't know.

16           So if you said that you did know on a prior

17 occasion, that would be a lie, wouldn't it?

18      A.   No, because I know it now.  I didn't know it when

19 the report was written in 2016.

20      Q.   Sorry.  You don't know what you observed and what

21 you didn't observe?

22      A.   Yes, I do.

23      Q.   Okay.  You just said you didn't know if you

24 observed it at the time, right?

25      A.   Now I'm confused.

1      Q.    Yes, you are.  Maybe I should back up.

2            Did you or did you not observe Yurack and Durden

3    force Mr. Maselli to the ground?

4      A.    Yes.

5      Q.    You did observe them force him to the ground?

6      A.    I observed them grab ahold of Mr. Maselli and they

7    went to the ground.

8      Q.    I'm asking you if you observed them force him to

9    the ground?

10     A.    I don't know if they forced him to the ground or if

11   they went to the ground all together.

12     Q.    Right.  And in 2019 you said:  I believe that they

13   forced him to the ground.  Right?

14     A.    Yes.

15     Q.    Okay.  And you're saying that's not a lie because,

16   you know, you observed him go down or whatever, but then you

17   said --

18           MR. CULLEN:  Objection, your Honor.  I think we've

19   covered this several times already.

20           THE COURT:  Attorney Bedrick, I'm going to ask you

21   to move on, please.

22           MR. BEDRICK:  If I could just finish reading the

23   last line into the record of what he said in 2019, I can move

24   on from there, if that's okay with your Honor.

25           MR. CULLEN:  Your Honor, the line says he believed.

1    It doesn't say observed.  It says believed.  If he wants to

2    read the rest of the line, that's fine.

3             THE COURT:  All right.  Counsel, I'm going to ask

4    you to put your headsets on.  Let's have a bench conference

5    about this, please.

6             (SIDEBAR)

7             THE COURT:  Attorney Bedrick, I've given you

8    significant leeway to go back and forth with this witness

9    about this point.

10            Can you please read for the Court's benefit what

11   the additional testimony is in that trial transcript that you

12   would like to read into the record?

13            MR. BEDRICK:  So the testimony in 2019 was:  Did

14   the defendant go to the ground kind of willingly or did he

15   have to do it with -- and then it stops.  And he says:  I

16   believe that they forced him to the ground.  And then the

17   question is:  Is that what you observed?  And he says:  Yes.

18            And here every time I get to the point where we're

19   talking about whether he observed, he goes back to believe.

20   So I'm trying to get him to acknowledge that he either

21   observed it or he didn't observe it, and then he starts saying

22   that, well, I observed it at the time but then later I

23   realized he was being forced.

24            So I think he's dodged the question every single

25   time, and I'm trying to rephrase it so that he understands.

1          THE COURT:  Okay.  All right.  I think you've asked

2     him that question so many times now that you just need to get

3     to what he said previously and be done with your impeachment.

4          Attorney Cullen, before I allow Attorney Bedrick to

5     do that, do you have anything that you want to put on the

6     record?

7          MR. CULLEN:  Your Honor, I think that this has been

8     covered.  It's been asked and answered.  I think he's made his

9     point.  He doesn't need to belabor it or read anything

10    further.  I think he's already read this part a couple times

11    at least, if not several.

12         THE COURT:  Okay.  Have you already read over this

13    part of the transcript?

14         MR. BEDRICK:  At this point I don't remember.

15         THE COURT:  Okay.

16         MR. BEDRICK:  I got that last line, is that what he

17    observed.

18         THE COURT:  All right.  So you have one more

19    question for this witness, and you can go over that one

20    section, not the whole thing because you've already asked him,

21    and you've gone over it several times.  So I'm going to ask

22    you to consider whether you think you need to make the point

23    again or whether you've already made it.  If you feel you need

24    to do that, you've got one question and one use of the

25    deposition, and then we're done with this particular area of

 1   inquiry.

 2           MR. BEDRICK:  Thank you, your Honor.

 3           THE COURT:  All right.  Please proceed.

 4           (CONCLUSION OF SIDEBAR)

 5       Q.   So is it accurate for me to say that in 2019 you

 6   told the jury that you observed Durden and Yurack force Mr.

 7   Maselli to the ground?

 8       A.   Yes.

 9       Q.   Okay.  Now, let's go back to 2016.  You did write a

10   report in this case, right?

11       A.   I did.

12       Q.   Right.  And you talked about this incident as well,

13   right?

14       A.   Yes.

15       Q.   Okay.  And you read that report in preparing for

16   this testimony, right?

17       A.   Yes.

18       Q.   So in your report did you write:  Officer Durden

19   grabbed ahold of the male and shouted for him to get on the

20   ground.  The male complied but hid his hands under his chest.

21       A.   I did write that, yes.

22       Q.   Okay.  So when you said the male complied, what are

23   you talking about?

24       A.   Getting to the ground.

25       Q.   So he complied?

1    A.    That was my initial observation, that he complied.

2    Q.    So what is your memory today?

3    A.    That he did not.

4    Q.    Okay.  Why is your memory -- sorry.

5          So in 2016 he did not comply, but sometime after

6    that, but before 2019, you spoke with other people and you

7    determined, oh, I guess he didn't comply?

8    A.    That's correct.

9    Q.    So the substance of your testimony is influenced by

10   what other people are saying, right?

11   A.    Yes.

12   Q.    And so when I asked you if you had an independent

13   recollection of the events, what did you think I meant?

14   A.    I did have an independent recollection of the

15   events.

16   Q.    You did, but do you now?

17   A.    Yes.

18   Q.    So you remember it the way that you remember it,

19   but you also remember it the way that other people told you to

20   remember it, is that how we're --

21          MR. CULLEN:  Objection.

22          THE COURT:  Sustained.

23   Q.    So let's move on to the strikes.

24          All right.  Today your testimony is that in the

25   course of the arrest you did not observe anybody deliver

1    strikes to Mr. Maselli?

2         A.    Correct.

3         Q.    Okay.  Not heel to palm strikes, not knee strikes?

4         A.    I didn't see it, no.

5         Q.    Nothing?

6         A.    No.

7         Q.    In the report you wrote in 2016 did you make any

8    note of whether anyone delivered any strikes to anybody?

9         A.    I don't recall.

10        Q.    No.  Okay.  So then in 2019 at the trial, did you

11   say the same thing or did you -- did that topic come up at

12   all?

13        A.    I don't remember.

14        Q.    Now, when we're talking about strikes, compliant

15   strikes, did you see any compliant strikes at all?

16        A.    I don't remember seeing any compliant strikes.

17        Q.    Okay.  And you understand what I mean when I say

18   compliant strike, right?

19        A.    I do.

20        Q.    And what do I mean?

21        A.    When we're giving a command to an individual to

22   show us his hands or get his hands from underneath his chest

23   or body, we could deliver a palm heel strike or a knee strike

24   to their outer extremities in order for them to release their

25   arms or their hands from underneath their body.  We want them

1    to comply with the order.

2         Q.   Okay.  You're saying that did not happen in this

3    case or you did not see it happen in this case?

4         A.   I don't remember seeing it.

5         Q.   Okay.  So when you were asked to recall what you

6    observed -- back in 2019 you were asked to recall what you

7    observed on the date in question.  If you said that you saw

8    them deliver strikes, would that be a lie?

9         A.   Again, I don't remember saying that or not.

10        Q.   Okay.

11             MR. BEDRICK:  Do you mind if I approach?

12             MR. CULLEN:  Yes, but I would like to just go on

13   the record first.

14             THE COURT:  If you can go back to a sidebar

15   conference, counsel.

16             Attorney Bedrick, if you wouldn't mind moving that

17   microphone so that it's closer to you before we get started,

18   please.  That's great.

19             (SIDEBAR)

20             THE COURT:  All right.  Before we go into this next

21   part of the testimony, would you just clarify for the Court,

22   Attorney Bedrick, where you're headed with this?

23             MR. BEDRICK:  So today he said he did not see

24   anyone deliver any strikes, compliant or otherwise, but in

25   2018 at page 41 of the trial transcript he acknowledged and he

1  made statements.  He says -- he's asked:  Do you recall what

2  you observed and how they were able to do that?  Talking about

3  getting the hands out from under him.  And he says:  So

4  they -- I believe one of the -- then he stops and he says:

5  Officer Durden delivered a knee strike to gain compliance

6  because he was at that point not obeying the commands or

7  putting his hands behind his back.

8          THE COURT:  Okay.  What line are you on, please?

9          MR. BEDRICK:  The question starts at line 1 and

10  then it goes to line 9.

11          THE COURT:  Okay.  All right.

12          Attorney Cullen, do you have that part of the

13  transcript in front of you?

14          MR. CULLEN:  I do, your Honor.  We could share it

15  with you if it's helpful, but the difficulty with this is the

16  questions and answers are not matching up.

17          The question is:  Do you recall what you observed

18  and how you were able to do that?  And the answer is:  I

19  believe that one of them -- and then he goes -- Officer Durden

20  delivered a knee strike.

21          So I think he's testifying consistently that he --

22  you know, as to what he believes happened as opposed to what

23  he observed.

24          And in fact later on, it's on the same page at line

25  14:  Did you watch -- did you see Officer Durden or Sergeant

1    Yurcak punch the defendant at all?  And the answer is:  No.

2    Did you see them kick the defendant at all?  No.

3            So the question of being asked what he observed is

4    not being answered directly.  It's being answered with what he

5    believes happened.

6            Attorney Bedrick is trying to make it out like

7    that's inconsistent.  He's trying to make it out like he

8    testified, and he said, wouldn't that be a lie if you said you

9    saw that, and he's not saying he saw that.  He said he

10   believes that's what happened.

11           THE COURT:  Okay.

12           So, Attorney Bedrick, are you prepared to modify

13   your questions and modify your approach or are you still

14   intending to head in this direction?

15           MR. BEDRICK:  I'm still intending to head in this

16   direction because when he clarified later -- so he says --

17   sorry.  He says:  Officer Durden delivered a knee strike so

18   they -- and stops and says:  I believe -- then he stops, and

19   then he says:  Officer Durden delivered a knee strike to get

20   compliance.  He's then asked:  Did you see them punch, kick,

21   and slap?  And he says no to those, but he says yes to

22   initially what he says was a knee strike.

23           So, you know, the questions are consistent and the

24   answers are consistent with the answers.

25           THE COURT:  All right.

1          So let me ask you this, Attorney Cullen.  To the

2    extent that you think that the transcript and the testimony is

3    consistent with his testimony today or it's based on a belief

4    versus an observation, isn't that something that you can

5    address with this witness on redirect?

6          MR. CULLEN:  Yes, your Honor, but the nature of the

7    questions are improper.  It's asking him to basically say that

8    these things are lies when they're clearly from the testimony

9    not lies, and I think it's improper to address it in that way.

10         THE COURT:  All right, but that's a different

11   issue.

12         Attorney Bedrick, here's what I'm going to ask you

13   to do.  I'll let you engage in this area of inquiry, but I'm

14   going to caution you about characterizing the testimony as

15   lies.  I'm going to ask you to go ahead -- I'm going to

16   sustain the objection as it relates to the question that was

17   posed to the witness.  I'm going to let you rephrase the

18   question and then go on with your impeachment of the witness

19   based on his answer.

20         MR. BEDRICK:  Thank you, your Honor.

21         THE COURT:  All right.  Very good.

22         Attorney Cullen, is there anything else you want to

23   put on the record?

24         MR. CULLEN:  No.  Thank you, your Honor.

25         THE COURT:  All right.  Very good.  Let's proceed.

```
 1                    (CONCLUSION OF SIDEBAR)

 2        Q.    All right.  So, Sergeant DiTullio --

 3              MR. BEDRICK:  Actually, I was going to approach

 4    with this and have him read lines 1 through 9.

 5              MR. CULLEN:  That's fine.

 6              MR. BEDRICK:  May I approach, your Honor?

 7              THE COURT:  Yes.  Please go right ahead.

 8        Q.    If you could, Sergeant DiTullio, start at the top

 9    of page 41 and just read the first nine lines.

10        A.    So it says:  Okay.  Do you recall what you observed

11    and how they were able to do that?  Answer:  So they -- I

12    believe one of the -- Officer Durden delivered a knee strike

13    to gain compliance because he was at this point not obeying

14    the commands of putting his hands behind his back.

15        Q.    Okay.

16        A.    Do you want me to keep reading?

17        Q.    I don't remember where -- you got what I wanted.

18        A.    Okay.

19              MR. BEDRICK:  If I could, your Honor, just have one

20    moment before I move on?

21              THE COURT:  Yes.  Of course.  Take your time.

22              (Pause.)

23        Q.    Okay.  So at some point you testified -- sorry.

24              Were you able to see whether Detective Durden or

25    Sergeant Yurcak pulled Mr. Maselli's arms from under him or
```

1    something?  Were you able to observe anything like that?

2         A.    I assisted in pulling his arms out from underneath

3    him.

4         Q.    Okay.  And so this idea that you pulled Mr.

5    Maselli's arms from underneath him, which arm did you pull?

6         A.    I don't remember.  I believe it was the right, but

7    I'm not a hundred percent sure.

8         Q.    Was anyone else there that pulled his arms from

9    under his chest?

10        A.    Besides Sergeant Yurcak and Officer Durden?

11        Q.    Sure.

12        A.    No.

13        Q.    So it took three people to pull the arms from under

14   Mr. Maselli's chest?  That's what your testimony is?

15        A.    Yes.

16        Q.    You, right?

17        A.    Yes.

18        Q.    Durden, right?

19        A.    Yes.

20        Q.    And Yurack, right?

21        A.    Correct.

22        Q.    Lombardi didn't help at all?

23        A.    No.

24        Q.    In your report you wrote:  With the assistance of

25   Detective Lombardi and myself, we were able to remove his

1   hands from his chest and place him in handcuffs.

2           Is that right?

3       A.   If that's what's written.  I don't remember.

4   That's not how I remember, but if that's what's written down

5   in my report.

6       Q.   If that's what's written down in your report, is

7   that what's true?

8       A.   Yes.

9       Q.   So it took four of you or two of you or what

10  happened?

11      A.   Again, I don't remember.  All I remember is what I

12  said in having him -- you know, helping on one arm, pulling

13  out from underneath his chest.

14      Q.   Okay.  So in your report you said that Detective

15  Lombardi helped pull the arms out from under the chest.  Did

16  you at any other time clarify that Detective Lombardi was

17  assisting in that effort?

18      A.   I don't remember.

19      Q.   Say at trial in 2019, did you mention anything

20  about Detective Lombardi or at that point was it just the

21  three of you?

22      A.   I don't remember.

23      Q.   Okay.  And I think you just read, you know, lines 1

24  through 9 on page 41.

25          Do you remember reading:  Officer Durden and

1    Sergeant Yurcak had to physically grab ahold of his arms and

2    put his hands behind his back?

3          A.    I did not just read that, no.

4          Q.    Oh, here.

5                MR. BEDRICK:  Do you mind if I approach again?

6                THE COURT:  Go ahead.

7          Q.    Lines 7 through 9.

8          A.    And do you want me to start at 7 where it starts

9    with able, the word able, or do you want me to start at 6?

10         Q.    You can start in the middle of 7.

11         A.    "Officer Durden and Sergeant Yurcak had to

12   physically grab ahold of his arms and put his hands behind his

13   back."

14         Q.    No mention of you, right?

15         A.    No.

16         Q.    No mention of Detective Lombardi?

17         A.    No.

18         Q.    Do you know what Detective Lombardi was doing at

19   the time?

20         A.    I do not.

21         Q.    Okay.  I'm just going to quickly ask a couple of

22   final questions.

23                You said you were the first one there, right?

24         A.    Myself and Detective Lombardi were the first ones

25   there.

1    Q.   And what time did you arrive?

2    A.   It was around 8:00 p.m.

3    Q.   You hadn't gone there at any other time?

4    A.   No.

5    Q.   At any time did you get a key?

6    A.   I don't -- I went with I believe it was Detective

7    Lombardi to get a key.

8    Q.   You went with Detective Lombardi to get a key when?

9    A.   About 20 minutes after we were there, 25 minutes.

10   Q.   Okay.  But that was after you had arrived?

11   A.   After we arrived.

12   Q.   Before that you never went to get a key from the

13   landlord?

14   A.   No.

15        MR. BEDRICK:  I've got nothing further.  Thank you.

16        THE COURT:  All right.

17        It's 4 o'clock, but, Attorney Cullen, are you ready

18   to go forward?

19        MR. CULLEN:  I would.  Especially because Detective

20   DiTullio has to go back to training.  If you could just

21   indulge me for two minutes?

22        THE COURT:  That was what I was thinking.

23        So, members of the jury, here's where I ask for

24   your indulgence and allow us to move beyond 4 o'clock so that

25   we might possibly be able to finish with this witness so that

1    he doesn't have to come back tomorrow.  All right?  So thank

2    you.

3              And you may proceed.

4              MR. CULLEN:  Thank you, your Honor.

5                         REDIRECT EXAMINATION

6    BY MR. CULLEN:

7         Q.    Detective, these events took place when?

8         A.    2016.

9         Q.    Okay.  And when you testified in 2019 --

10        A.    Yes.

11        Q.    -- do you recall from rereading the transcript

12   whether you were testifying being asked what you observed or

13   what you believed?

14        A.    What I believed.

15        Q.    Okay.  And was that belief based in part on a

16   subsequent --

17             MR. BEDRICK:  Your Honor, I'm going to object.  Can

18   we please have a sidebar conference?

19             THE COURT:  Attorney Cullen, if you would come to

20   the sidebar, please.

21             (SIDEBAR)

22             THE COURT:  All right.  Attorney Bedrick, what's

23   the basis for your objection?

24             MR. BEDRICK:  Sorry.  The question that he asked

25   was whether he was being asked what he observed or what he

1   believed, and his answer was -- suggesting that somehow he's

2   going to go to a trial and just be asked what he believes I

3   think is misleading only because not only do the questions use

4   the word observed that we just read, but a trial has nothing

5   to do with what he believes and everything to do with what he

6   observed.

7           So I'm not sure -- I think it's a little misleading

8   for him to be able to go up there and just, you know, change

9   what the predicate of each answer was.

10          THE COURT:  All right.

11          Attorney Cullen.

12          MR. CULLEN:  Well, again, I think I corrected it

13  when I asked the question -- I believe I said, did you testify

14  to what you believed or what you observed, and he said, what I

15  believed, which is exactly what he said on page 41 which has

16  already been read to the jury.

17          THE COURT:  What's the question before his answer

18  "I believe"?

19          MR. BEDRICK:  The question is:  Okay.  Do you

20  recall what you observed and how they were able to do that?

21  "So they -- I believe one of the -- Officer Durden delivered a

22  knee strike to gain compliance."

23          Would it be helpful if we just provided you a copy

24  so you could read it?

25          THE COURT:  No.  I'm hearing it so I'm good with

1    that, but thank you.

2            All right.  So what I'm hearing is that -- the

3    point that defense counsel was making was that the question

4    that was responded to with the answer "I believe" is what did

5    you observe.

6            So I'm going to ask you to move on from the line of

7    questioning.  I'm not going to strike the question.  I think

8    the testimony before the jury, Attorney Bedrick, is exactly

9    what you've read into the record.  And his client has now made

10   an additional statement about what his response was.  That it

11   wasn't based on his observation.  It was based on his belief.

12           I think we can leave it there, and I'm going to ask

13   you to move on, Attorney Cullen.

14           So the objection is overruled.

15           MR. CULLEN:  Thank you.

16           MR. BEDRICK:  Thank you, your Honor.

17           (CONCLUSION OF SIDEBAR)

18      Q.    Did Mr. Maselli provide his arms to the officers

19   when they attempted to arrest him?

20      A.    No.

21      Q.    Did you see any officer strike Mr. Maselli after he

22   was handcuffed?

23      A.    No.

24           MR. CULLEN:  Thank you, your Honor.

25           THE COURT:  Attorney Bedrick, do you have any

```
 1    additional questions for this witness?
 2                MR. BEDRICK:  I do not.  Thank you.
 3                THE COURT:  All right.
 4                Sir, you may step down.  Thank you very much.
 5                THE WITNESS:  Thank you, your Honor.
 6                THE COURT:  You're excused.
 7                All right.  So that concludes our testimony for
 8    today, members of the jury.
 9                Until this trial is over, please do not discuss
10    this case with anyone and do not permit anyone to discuss this
11    case with you or in your presence.  Do not discuss this case
12    even with other jurors until all of the evidence in this case
13    has been presented and you have been released by the Court to
14    begin your deliberations.
15                If anyone should attempt to discuss this case with
16    you or approach you concerning this case, you should inform
17    the Court immediately.  Please hold yourself completely apart
18    from the people that are involved in this case, the parties,
19    the witnesses, the attorneys, and the persons associated with
20    them.
21                It is important not only that you be fair and
22    impartial but that you also appear to be fair and impartial.
23                Do not undertake any type of investigation of any
24    fact or matter in this case.  You are to be guided solely by
25    what you see and hear in this trial.
```

1          Do not learn anything about the case from any other

2     source.  And as I've reminded you on multiple occasions, don't

3     engage in any communications of any kind, including any

4     electronic communications, as they relate to this case.

5          With that, I am going to excuse you for the

6     evening.  I am going to ask you to come back tomorrow.

7          I suspect that I'll want to have you come at 9:00,

8     and we may take another longer lunch break tomorrow so that I

9     can hold what's called a charging conference with the

10    attorneys perhaps at a break in the morning or at lunch time.

11         So with that, I thank you very much for your time

12    and attention today and I look forward to seeing you tomorrow.

13              (IN COURT - NO JURY PRESENT)

14              THE COURT:  All right.  So, Attorney Cullen, how

15    many additional witnesses do you expect to call tomorrow?

16              MR. CULLEN:  I expect just to call the

17    two officers.

18              THE COURT:  All right.  So here's what I am

19    thinking.  I will hopefully have the final version for your

20    consideration of the jury instructions tomorrow morning.  I

21    don't anticipate that I'm going to have them for you this

22    evening.  So I will provide them to you tomorrow morning, and

23    we can do one of two things.  We can take a longer break in

24    the morning so that you can have a chance to review those

25    instructions and we can hold the charging conference in the

1    afternoon at the lunch hour just before we take our lunch

2    break.  If you need more time to review them, I'm fine with

3    that, and we can just do that later on in the afternoon, all

4    right, and we'll just see how we go timing-wise with the

5    witnesses and how long they ultimately end up taking.

6              Do you anticipate that you're going to finish

7    tomorrow?

8              MR. CULLEN:  Yeah.  Actually, your Honor, I would

9    think that -- we just spent about an hour with Detective

10   DiTullio.  I don't think we'll be much longer with either of

11   these witnesses.  So even if we don't get going until 9:30, I

12   would expect to be done with the evidence by about 11:30.

13             THE COURT:  All right.  I will do my best to get

14   those for you in the morning.  They should be available on

15   your desks hopefully early enough so that we will be able to

16   talk about them at one of the breaks.

17             MR. CULLEN:  I apologize, your Honor.  Did you say

18   the verdict form as well potentially?

19             THE COURT:  I'll have the verdict form for you as

20   well.

21             MR. CULLEN:  Thank you.

22             THE COURT:  All right.  Is there anything else we

23   need to address?

24             MR. CULLEN:  Nothing from the defense.

25             MR. BEDRICK:  Nothing from us, your Honor.

1          THE COURT:  All right.  So have a good evening, and

2     we'll see you tomorrow.

3               (Jury trial adjourned at 4:10 p.m.)

1                    C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5   foregoing transcript is a true and accurate transcription of

6   the within proceedings, to the best of my knowledge, skill,

7   ability and belief.

8

9

    Submitted:  10-20-22    /s/   Susan M. Bateman _____
10                          SUSAN M. BATEMAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25