*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JANUARY 19, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
EDWARD MASELLI                    *
                                  *
              Plaintiff,          *
                                  *   1:19-cv-1248-AJ
         v.                       *   September 21, 2023
                                  *   8:50 a.m.
THOMAS DURDEN and JOHN YURCAK     *
                                  *
              Defendants.         *
                                  *
                                  *
* * * * * * * * * * * * * * * * * *
```

**EXCERPT**
TRANSCRIPT OF JURY TRIAL DAY 2
BEFORE THE HONORABLE ANDREA K. JOHNSTONE

Appearances:


For the Plaintiff:          Jared Joseph Bedrick, Esq.
                            Champions Law



For the Defendants:         Brian J.S. Cullen, Esq.
                            Cullen, Collimore & Shirley, PLLC



Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            U.S. District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603) 225-1442

**I N D E X**

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **THOMAS DURDEN** | | | | |
| By Mr. Cullen | 4 | | | |
| By Mr. Bedrick | | 29 | | |
| **JOHN YURCAK** | | | | |
| By Mr. Cullen | 38 | | 84 | |
| By Mr. Bedrick | | 68 | | 87 |

| EXHIBITS: | FOR ID | IN EVD. |
|---|---|---|
| (None marked.) | | |

| CLOSING ARGUMENTS | |
|---|---|
| By Mr. Cullen | 108 |
| By Mr. Bedrick | 123 |

1                    (Following is an excerpt of proceedings.)

2                         WITH THE JURY PRESENT

3              THE COURT:  Good morning, everyone.  Please be

4    seated.

5              All right.  So, members of the jury, my apologies

6    for the delay in getting started this morning.  That was my

7    fault.  There were a number of things I wanted to address with

8    counsel this morning in the hopes that that would facilitate a

9    smoother rest of the day in terms of trial.  So thank you for

10   your indulgence.  I appreciate that.

11             So it's almost 9:30 now.  What I anticipate doing is

12   hearing testimony this morning, probably until about quarter of

13   11:00 or eleven o'clock, and then we'll take a short recess and

14   then perhaps we'll go a little later if there's additional

15   testimony in the late morning and maybe take our lunch break

16   later, depending on how things go.  We may find ourselves with

17   an earlier lunch, depending on testimony, but that's my general

18   thinking right now.

19             All right.  So, Attorney Cullen, I'm going to ask

20   you to call your next witness, sir.

21             MR. CULLEN:  Thank you.  The defense calls Thomas

22   Durden.

23             THE COURT:  All right.  Thank you.

24             THE CLERK:  Please raise your right hand.

25             **THOMAS DURDEN**, having been first duly sworn,

1    testified as follows:

2              THE CLERK:  Please be seated.

3              Please state your name and your last name for the

4    record.

5              THE WITNESS:  My name is Thomas Durden and Durden is

6    spelled D-u-r-d-e-n.

7                        DIRECT EXAMINATION

8    BY MR. CULLEN:

9         Q.   And Mr. Durden, Officer Durden, you've been

10   COVID-tested this morning?

11        A.   I have.

12             MR. CULLEN:  And --

13             THE CLERK:  It came back negative.

14             THE COURT:  It's negative.  Thank you.  You can

15   remove your mask, sir.

16        Q.   And I notice that you've got your earpieces in this

17   morning, Officer.  Everything okay?

18        A.   I do.  I have two ruptured eardrums, so I have

19   difficulty hearing.

20        Q.   All right.  Congratulations.

21             Now, you've got 16-month old twins, right?

22        A.   I do.

23        Q.   Aren't they the ones that are supposed to get the

24   ear infections?

25        A.   They are.

```
 1          Q.    Okay.  Tell us a little bit -- and if for any reason
 2     you can't hear us, let me know, and we'll --
 3          A.    Okay.
 4          Q.    -- we'll do the best we can.  And, also, if it feels
 5     like I'm shouting, just -- you can turn that down a little.
 6                Officer Durden, just tell me a little bit about
 7     yourself.  Did you grow up here in New Hampshire?
 8          A.    I did not.  I grew up in Massachusetts.
 9          Q.    And -- I'm sorry to hear that.
10                Where did you go to school?
11          A.    Norton, Massachusetts.
12          Q.    Okay.  And when did you graduate?
13          A.    I graduated in 2007.
14          Q.    All right.  And when you graduated, what did you do?
15          A.    I went to community college in Bristol -- Bristol
16     Community College in Fall River, Massachusetts.
17          Q.    What did you study there?
18          A.    Criminal justice.
19          Q.    And for how long was that?
20          A.    Two years.
21          Q.    Okay.  And did you obtain a degree there?
22          A.    I got my associate's degree.
23          Q.    And when you finished your degree, what did you do
24     for work?
25          A.    About the same time, I got on part time as a police
```

1  officer in Norton, Massachusetts.

2       Q.   Okay.  And what did that involve as far as training?

3       A.   I went to a reserve intermittent basic academy in

4  Plymouth, Massachusetts, and then I had a field training

5  program.

6       Q.   At some stage you moved your employment to

7  New Hampshire?

8       A.   Correct.

9       Q.   To Nashua?

10      A.   Yes.

11      Q.   And how did that come about?

12      A.   I was looking for full-time employment.  It was

13  difficult to get a job in Massachusetts with civil service and

14  I applied in Nashua and I got hired.

15      Q.   Okay.  And what year was that?

16      A.   2012.

17      Q.   Okay.  And when you came on, was the training you

18  had had in Massachusetts sufficient to just waive you into

19  New Hampshire?

20      A.   It was not.

21      Q.   What did you have to do?

22      A.   I went to the full-time academy in New Hampshire.

23      Q.   Okay.  Now, we heard a little bit about that from

24  Detective DiTullio yesterday, so I don't want to repeat the

25  whole thing, but focusing in on -- I think he mentioned it was

1    16, 17 weeks.  Is that consistent with your recollection?

2         A.    Approximately, yes.

3         Q.    Okay.  And there was a section he told us about, use

4    of force training?

5         A.    Yes.

6         Q.    Focusing primarily in on that aspect of the -- of

7    the -- of the training, what did you learn with respect to the

8    various levels of force that might be available to a police

9    officer?

10        A.    So we went over this.  Approximately, I think it's

11   either -- five levels of force.  It's officer presence, verbal

12   compliance, verbal noncompliance, soft hand control techniques,

13   which would be joint manipulation or pressure points, hard

14   control techniques, which could be knee strikes, palm heel

15   strikes, kicking someone, less lethal use of force, baton,

16   impact weapons, and then lethal force.

17        Q.    Did you learn about use of Tasers?

18        A.    We did.

19        Q.    And how about use of something we call OC spray?

20        A.    We did.

21        Q.    Can you just tell the jury what OC spray is?

22        A.    It's oleoresin capsaisin.  It's basically pepper

23   spray.

24        Q.    And what -- when you learned this, this series of

25   levels of force, what did you learn with respect to whether you

1   had to start at the beginning and work your way all the way

2   through or that type of thing?

3        A.    Each situation's different.  Some situations we

4   might go in and it might immediately be a lethal force and we

5   don't necessarily have to start saying, obviously, please put

6   the gun down.  So each situation is different and you can start

7   at one and jump three ahead or start at a high one and as soon

8   as they comply, go down to just say put your hands behind your

9   back and it's done.

10       Q.    And with respect to the amount of force used to do

11  an arrest, were you -- or to effectuate an arrest, what were

12  you trained on with respect to that?

13       A.    As soon as, obviously, the subject was compliant,

14  the force was to stop.

15       Q.    Have you had to use force beyond voice commands in

16  arrests prior to 2016?

17       A.    Yes.

18       Q.    Have you ever had situations where you've had to use

19  OC spray or pepper spray?

20       A.    I have.

21       Q.    Have you been in situations where you've had to use

22  your Taser?

23       A.    I have.

24       Q.    Have you been in situations where you've had to draw

25  your weapon?

1          A.    I have.

2          Q.    How common is it that you have to use a level of

3    force above voice commands in an arrest?

4          A.    It's not that common.

5          Q.    All right.  When you finished at the academy -- we

6    heard a little bit about field training from Detective

7    DiTullio.  So did you go through that also?

8          A.    I did.

9          Q.    And could you just remind the jury what that

10   consisted of?

11         A.    I was partnered with what they considered a senior

12   officer and they kind of show us the ropes.  We go into how

13   Nashua operates because when we go to the academy, everybody in

14   the state goes.  So our SOPs are slightly different than maybe

15   New Hampshire State Police or other agencies.  So they have us

16   kind of just show how Nashua handles everything.

17         Q.    And you said SOPs.  What's an SOP?

18         A.    I apologize.  A standard operating procedure.

19         Q.    Is that essentially the rules and guidelines for the

20   city?

21         A.    Correct.

22         Q.    Now, in addition to the training at the academy and

23   the training through the FTO, do you get additional training on

24   the use of -- proper use of force in Nashua?

25         A.    We do.

1    Q.    And how does that work?

2    A.    Annually we have to get use of force training and

3  then patrol tactics as well.  And they kind of coincide with

4  each other.

5    Q.    Do you do any -- you know, is this all book training

6  or are there practical skills or simulations or anything like

7  that?

8    A.    Both.  So we have to take a test every year and then

9  we also have practicals, whether it's essentially getting in a

10  fight and try to subdue someone in a RedMan suit or having to

11  use a Taser on -- we have almost like a dummy that you have to

12  shoot the dummy to make sure that the Taser deploys correctly.

13    Q.    Okay.  I'm sorry.  A RedMan suit, what's that?

14    A.    It's a suit that someone can wear and it completely

15  covers their whole body so if they try to resist and we have to

16  hit them with a baton or we have to strike them with a knee,

17  they don't get injured.

18    Q.    I want to -- and what's your current position?

19    A.    Currently, I'm a detective.

20    Q.    Okay.  In 2016, you were a patrol officer?

21    A.    Correct.

22    Q.    And what did your general duties consist of as a

23  patrol officer?

24    A.    Mainly respond to calls of service and enforce any

25  motor vehicle or criminal infractions I saw in my presence.

1     Q.    And would you be in a patrol car?

2     A.    Yes.

3     Q.    A marked car?

4     A.    Correct.

5     Q.    Okay.  October 2nd, 2016, we understand that was a

6  Sunday.  Were you working that day?

7     A.    I was.

8     Q.    Do you recall what your approximate hours were?

9     A.    It was either -- we have two separate roll calls for

10 every shift.  It was second shift.  It was either 2:00 to 10:00

11 or 3:00 to 11:00.

12    Q.    What are the other shifts then?

13    A.    First shift would be 7:00 to 3:00 and 8:00 to 4:00

14 or, sorry, 6:00 to 2:00 and then third shift would be 11:00 to

15 7:00 and 10:00 to 6:00.

16    Q.    That's the proverbial midnight shift?

17    A.    Yes.

18    Q.    On this particular day you were working the second

19 shift.  Did you get a call with reference to 51 Kinsley Street?

20    A.    I did.

21    Q.    And what -- what did you do when you got that call?

22    A.    I responded to 51 and a half Kinsley Street.

23    Q.    Okay.  And did you go there, I assume, in your

24 cruiser?  Were you on your own in your cruiser?

25    A.    I was.  I was running solo.

1      Q.    All right.  Is that normal?

2      A.    Usually, yes.

3      Q.    Had you ever been to 51 Kinsley Street before?

4      A.    Not that I recalled.

5      Q.    Okay.  Had you ever met or seen Mr. Maselli before

6   that day?

7      A.    No, I did not.

8      Q.    What were you -- what were you wearing on that

9   particular day?

10      A.    The uniform of the day, which is -- I believe it was

11   a short-sleeve uniform.  I had a badge on my shirt, two Nashua

12   Police patches on either side of my shoulder, and then a full

13   duty belt.

14      Q.    And we talked a little bit about the duty belt, but

15   are you righty or lefty?

16      A.    I'm a righty.

17      Q.    Okay.  So could you just explain to the jury how the

18   duty belt works and where the different pieces of equipment

19   are?

20      A.    Yup.  So I have my firearm on my right side, OC,

21   which is the pepper spray, and then on the left side I have

22   handcuffs -- I believe it was that order -- and then a Taser, a

23   baton, my radio, and then gloves on the back and another set of

24   handcuffs.

25      Q.    When you arrive at 51 or 51 and a half Kinsley

1    Street, do you meet up with other officers?

2        A.    I did.

3        Q.    Okay.  And what -- what did you do then?

4        A.    I was briefed with -- I ended up meeting up with

5    Sergeant Yurcak and then Detectives DiTullio and Lombardi were

6    there as well.

7        Q.    Did you go into the stairwell?

8        A.    Eventually.

9        Q.    Okay.  When you say eventually, what -- how long was

10   it before you went into the building itself?

11       A.    I don't recall.  We kind of briefed outside near the

12   sidewalk.

13       Q.    At some point -- well, what did you understand your

14   purpose being there was?

15       A.    I understood that there was -- detectives were on

16   scene and they were trying to seize an apartment pending a

17   search warrant and there was someone inside that was not being

18   compliant.

19       Q.    Did you hear anybody yelling at the person who was

20   inside?

21       A.    I did not.

22       Q.    Did you hear anybody using an aggressive tone

23   towards the person inside?

24       A.    I did not.

25       Q.    I don't know if you could hear it yesterday with the

1   ear infections, but were you able to hear the tape that was

2   played, the audiotape?

3       A.   I was.

4       Q.   Was that consistent with the tone that Detective

5   DiTullio used throughout the time that you were there?

6       A.   Yes, it was.

7       Q.   Okay.  I want to show you an exhibit.

8            Stacy, could you bring up Exhibit B, please?

9            Do you recognize this exhibit or at least what is

10  depicted within it?

11      A.   I do.

12      Q.   And what is that?

13      A.   It's the stairway leading up to 51 and a half

14  Kinsley Street apartment.

15           MR. CULLEN:  All right.  And then, Stacy, could we

16  switch over to C, please.

17      Q.   And do you recognize this?

18      A.   I do.

19      Q.   It looks to me as though there's no -- and I

20  apologize; I'll just come to the other microphone.

21           It looks like there's sort of a very tiny maybe

22  six-inch step between the top stair and the door level.

23      A.   Correct.

24      Q.   Are you able to stand on that when the door's shut?

25      A.   No, you are not.

1  Q.  Okay.  When -- at some point you're given an

2  instruction to kick this door open, is that right, or open it?

3  A.  Correct.

4  Q.  And who gives you that instruction?

5  A.  Sergeant Yurcak.

6  Q.  Okay.  When that happens, am I right in saying that

7  other than the -- where the stair -- the door is, there's

8  really just two stairs to the landing?

9  A.  Correct.

10  Q.  And then the -- the step into the apartment would be

11  the third?

12  A.  Yes.

13  Q.  How tall are you?

14  A.  Six-two.

15  Q.  How did you get the door open?

16  A.  I ended up kicking it more than one time before it

17  broke open.

18  Q.  And when you're doing that, are you standing on

19  the -- on the landing or the stairs or -- I mean --

20  A.  I don't recall.  I believe it was either the landing

21  or the first step.  It was tough trying to get leverage, but I

22  couldn't really go any higher.

23  Q.  Okay.  Now, stopping you there, before you opened

24  the door, do you know for sure the identity of the person

25  inside the door?

1      A.    I did not.

2      Q.    Do you know -- do you know if that person is armed

3  or if there are any weapons in the house?

4      A.    I do not.

5      Q.    Do you even know how many people might be in the

6  apartment?

7      A.    I do not.

8      Q.    Okay.  Did you give any commands or make any

9  statements before you hit the door?

10     A.    I did.

11     Q.    And what was that?

12     A.    We announced "police" numerous times and then we

13  told the person on the other side that we were going to kick

14  the door down.

15     Q.    Okay.  And once you -- the door physically opens, do

16  you make any further statements?

17     A.    Again, I announced "Nashua Police."

18     Q.    Are you sure?

19     A.    I'm positive.

20     Q.    How are you so sure?

21     A.    Anytime we force entry -- unfortunately, this isn't

22  the first time I've had to open or force entry -- we're trained

23  to announce "Nashua Police" and that way someone on the other

24  side of the door doesn't think it might be someone trying to

25  rob them or break down their door.

1       Q.    And is that something you do every time?

2       A.    Absolutely.

3       Q.    When the door swings open, are you able to see the

4  plaintiff?

5       A.    I was.

6       Q.    Okay.  Where -- where is he, by your recollection?

7       A.    He's slightly in front and almost to the right a

8  little bit, approximately three feet away from me.  An accurate

9  representation was yesterday when he put the X on the door or

10  on the photo that you had up.

11       Q.    That was accurate?

12       A.    Yes.

13       Q.    Okay.  Was he standing there with his hands up as he

14  demonstrated yesterday?

15       A.    He was not.

16       Q.    Was he standing there with his hands to his sides as

17  he testified?

18       A.    No.

19       Q.    Okay.  What -- what -- what was he doing?

20       A.    So it all happened within a quick probably 10,

21  15 seconds, but as soon as the door opened up and I announced

22  our presence, I saw Mr. Maselli.  And then he looked at me and

23  then he turned away, like he was going to run away, and that's

24  when I grabbed on to him.

25       Q.    Okay.  And when you grabbed on to him, did you give

1    him any further commands?

2         A.    I did.

3         Q.    And what were they?

4         A.    Again I told him, police, put your hands behind your

5    back.

6         Q.    Okay.  What -- what happened next?

7         A.    We -- I believe Sergeant Yurcak was the one directly

8    behind me and we ended up grabbing on to him and we brought him

9    to the ground.

10        Q.    Okay.  He testified yesterday that when you said

11   stop, go to the ground, he just stopped and started doing a

12   push-up towards the ground.  Did that happen?

13        A.    No, that did not.

14        Q.    And he testified yesterday that once he got to the

15   ground that nobody touched him before he went to the ground.

16   Was that true?

17        A.    That was not true.

18        Q.    He testified yesterday that the -- that he

19   voluntarily put his hands behind his back and that was the

20   first time any officer laid hands on him.  Is that true?

21        A.    That is not true.

22        Q.    Why don't you -- could you tell us what actually

23   happened?

24        A.    Yes.  Once the door swung open, I saw Mr. Maselli

25   approximately two or three feet away from me.  He was just on

1    the outside of the swing of the door.  And he looked at me -- I

2    gave him commands that we were the police department and to

3    stop and put his hands behind his back.  He turned away as if

4    he was going to start running, and I grabbed on to him

5    immediately and then Sergeant Yurcak also grabbed on.  And as

6    you saw, it's a small area and we ended up bringing him to the

7    ground, at which point he tucked his hands underneath his body.

8         Q.    Okay.  And does the fact that he tucks his hands

9    under his body have any importance to you?

10        A.    Yes.

11        Q.    And what's that?

12        A.    I -- at the point -- at that point in time I didn't

13   know who he was, I had no ideas what his intentions were, if he

14   was armed, if he had a gun or weapon in his appendix area.  So

15   that -- it's a big concern of mine.

16        Q.    In addition to guns, there are other weapons that

17   are available to people inside a house, I assume?

18        A.    Correct.

19        Q.    Knives, razor blades, box cutters?

20        A.    Yes.

21        Q.    When -- what -- are you trained with respect to sort

22   of the importance of the hands?

23        A.    Yes.  We're trained that what's going to hurt you is

24   your hands; whether someone shoots you with a gun or punches

25   you or stabs you, it's going to come from their hands.  So our

```
 1   first priority is to get ahold of someone's hands.  That's why
 2   with use of force there's hand control techniques.  Our goal is
 3   to get control of someone's hands.
 4        Q.    Did you attempt to pull his hands out?
 5        A.    I did.
 6        Q.    And how did that go?
 7        A.    I had some control of one of his hands and that's
 8   when he pulled away and tucked it under his body further.
 9        Q.    Okay.  What did you do at that point?
10        A.    I delivered a knee strike to him.
11        Q.    Okay.  And how does that work?
12        A.    It's -- you basically kind of -- I'm sure, as you
13   would imagine, I wound my knee up and I just delivered with the
14   tip of my knee to his torso area.
15        Q.    And when you say torso area, are you able to just
16   stand up and give an approximation of where you --
17        A.    Yes.  I don't recall which side I was on, but it was
18   in this general area.
19        Q.    Incidentally, while you're still standing, if you
20   don't mind, Officer, can you put your hands behind your back in
21   the position they would be when they're cuffed?
22        A.    Yes.
23        Q.    Okay.  You saw yesterday Mr. Maselli indicate that
24   he had been hit right in that sort of kidney punch area.  Is
25   that possible to do once he's handcuffs, to hit that spot?
```

1       A.      No.  I would have been hitting his arm.

2       Q.      Okay.  You can sit now.  Thank you.

3               I believe in your -- in your report or at some point

4   you mentioned -- you mentioned today that he started to run.

5   Do you know, did he actually get running?

6       A.      I didn't give him a chance to.  I know he spun away.

7   I didn't know if he was going to run away or walk away.  I just

8   grabbed on to him immediately.

9       Q.      Does it matter to you whether he was actually

10  running or about to run or starting to run?

11      A.      No.  My job is obviously to get control of his hands

12  and make sure he didn't go further into the apartment.

13      Q.      Now, Detective DiTullio testified yesterday that

14  there were four officers in the apartment with Officer Lombardi

15  perhaps being closer to the door.  Any reason that you just

16  didn't continue to pull out his hands instead of delivering the

17  knee strike?

18      A.      Again, I didn't know if he had a weapon and we --

19  time wasn't on my side.  Because if I had -- if he did have a

20  weapon and had the opportunity to grab it, obviously that would

21  have been a bad day.

22      Q.      Now, you had OC spray, right?

23      A.      I did.

24      Q.      Why didn't you use that?

25      A.      We try not to use that in small confines.  There's a

1    lot of almost like backwash where if we spray a subject with it

2    and we're in close proximity, we're all going to get sprayed

3    with it.

4         Q.    And you had a Taser as well, right?

5         A.    I did.

6         Q.    Did you use that?

7         A.    I did not.

8         Q.    Why not?

9         A.    I didn't have time to grab it.

10        Q.    Okay.  With respect to -- did you strike him more

11   than one time?

12        A.    I did not.

13        Q.    Did you ever punch him?

14        A.    I did not.

15        Q.    Did you ever kick him --

16        A.    No, I did not.

17        Q.    -- with your boot?

18        A.    No.

19        Q.    Use any other force than the force you've already

20   described to us?

21        A.    Correct, I did not.

22        Q.    Okay.  Was the knee strike effective?

23        A.    It was.

24        Q.    How so?

25        A.    I was able to get the hand that I was trying to grab

1    released from under his body.

2         Q.    Okay.  Now, when you're focused on that hand, are

3    you watching what everybody else in the room is doing?

4         A.    No.  My sole job is to just get that hand behind his

5    back.

6         Q.    After he's handcuffed, did you strike him in any

7    manner?

8         A.    No, I did not.

9         Q.    Did you see anyone else strike him in any manner?

10        A.    I did not.

11        Q.    You heard Mr. Maselli testify yesterday that after

12   he was handcuffed for approximately 45 to 60 seconds, officers

13   delivered a series of blows to either side of his body.  Did

14   that happen?

15        A.    It did not.

16        Q.    Did officers stand and mockingly say stop resisting?

17        A.    No, they did not.

18        Q.    Did they laugh at him?

19        A.    No, they did not.

20        Q.    What did happen once he was in handcuffs?

21        A.    He was pulled up, I pat frisked him to make sure he

22   didn't have any weapons on him, and he was brought down to my

23   cruiser.

24        Q.    When you say he was brought down, did you bring him

25   down?

```
 1        A.    I did.

 2        Q.    Did he appear to be hurt at that time?

 3        A.    He did not.

 4        Q.    Did he tell you that he was hurt?

 5        A.    He did not.

 6        Q.    Did he complain to you about the use of force that

 7   you used to take him into custody?

 8        A.    No, he did not.

 9        Q.    You were the one who drove him to the station?

10        A.    Correct.

11        Q.    And about how long a drive is that?

12        A.    Maybe five, ten minutes.  It's a short distance

13   away.

14        Q.    With respect to that drive, did he make any

15   complaints during that drive?

16        A.    No, he did not.

17        Q.    When you -- when you get to the station, we talked a

18   little bit about a booking process.  Can you just tell the jury

19   what a booking process is?

20        A.    So when someone gets arrested, we have our own

21   detention area at Nashua Police Department.  We bring the

22   suspect or the defendant in.  They have -- they get asked a

23   bunch of questions; their name, date of birth, and it's a whole

24   list of questions they have to get -- they get -- pat searched

25   again to make sure there's no weapons or contraband on them,
```

1    they get their photograph taken and fingerprinted.

2        Q.    Were you present for Mr. Maselli's booking?

3        A.    I was.

4        Q.    And why is that?

5        A.    I was the arresting officer.

6        Q.    Okay.  Did he at any time during that process tell

7    you that he was in an incredible amount of pain?

8        A.    He did not.

9        Q.    Or that -- a monumental amount of pain?

10       A.    He did not.

11       Q.    Okay.  About what time did the booking take place?

12       A.    I believe it was around nine o'clock, but I'd have

13   to look at my report.

14            MR. CULLEN:  Okay.  I tell you what.  Can we --

15   Stacy, do you mind bringing up Exhibit G, which I believe is

16   the booking video.

17                          (Video played.)

18            MR. CULLEN:  Madam Court Reporter, is that better or

19   too loud?

20            Stacy, pause there a second.

21       Q.    Do you recognize that person front and center of

22   this with the Suffolk Law School --

23       A.    I do.

24            MR. CULLEN:  Okay.  You can keep it freeze framed.

25   I'm sorry.

1    Q.    And who's that?

2    A.    That's Mr. Maselli.

3    Q.    And there's a person behind him.  Who's that?

4    A.    That's me.

5    Q.    Okay.  So that was the uniform you were wearing,

6    describing to the jury earlier?

7    A.    That's exactly what I was wearing.

8    Q.    Okay.  You were right about the short sleeves.  Warm

9    October day?

10    A.    Yes.

11    Q.    I'm going to ask that Stacy just play this through

12    for us, through the end, and then I'll ask you some questions

13    about it.

14          It does look like there may be a time stamp on that.

15    Is that accurate?  Is there a time stamp on that?

16    A.    Yes.

17    Q.    And what time does that say?

18    A.    I can't tell right now.  It looked like it was

19    2120 -- 2120.

20    Q.    Okay.  And in normal people speak, what's that?

21    A.    9:20 p.m.

22          MR. CULLEN:  Okay.  Stacy, if you don't mind, if you

23    could just play it start to finish.

24                    (Video played.)

25          MR. CULLEN:  Can you stop there for a second,

1  please.

2      Q.    So, sir, in the booking process, do you ask people

3  their names and their dates of birth and their social security

4  numbers?

5      A.    Yes.

6      Q.    And is that what's dubbed out on this?

7      A.    Yes.

8            MR. CULLEN:  Okay.  Continue, please.

9                        (Video played.)

10     Q.    What's taking place off screen here?

11     A.    They're photographing his booking photos right now.

12  The camera is kind of off to my side and he's standing to the

13  left of the screen.

14           MR. CULLEN:  Okay.  Thank you.

15           If you could resume, please.  Thank you, Stacy.

16                       (Video played.)

17     Q.    You looked a bit younger in 2016.

18     A.    It's been a rough six years.

19     Q.    You didn't look particularly angry.  Were you angry?

20     A.    No.

21     Q.    Were you angry with Mr. Maselli at any time during

22  this?

23     A.    I was not.

24     Q.    Okay.  And is that how he appeared to you throughout

25  the evening after his arrest?

1          A.    Yes.

2          Q.    Never complained to you about the incredible amount

3     of pain he's testified he was in?

4          A.    He did not.

5          Q.    Never flinched or winced when you patted him down to

6     indicate to you that he was in pain?

7          A.    He did not.

8          Q.    What did you do after the booking?  Did you have to

9     fight -- fill reports, stuff like that?

10         A.    I wrote my incident report.

11         Q.    Okay.  There's also something called an excess force

12    report; is that right?

13         A.    Use of Force.

14         Q.    I'm sorry.  Use of Force report.  What's a Use of

15    Force report?

16         A.    Anytime we use force on a subject, we have to

17    document it at the police department.

18         Q.    Okay.  Did you do that this particular evening?

19         A.    I did.

20         Q.    Why?

21         A.    Because I used force on Mr. Maselli.

22         Q.    And what force was that?

23         A.    The knee strike.

24         Q.    Okay.  That's something you reported even though

25    there was no complaint about it?

1      A.    Correct.

2      Q.    What happens to that Use of Force report?

3      A.    It's submitted through our chain and ultimately our

4  Professional Standards Bureau reviews it to make sure we're in

5  compliance with our training.

6      Q.    Did you ever get disciplined over your conduct on

7  that evening?

8      A.    I did not.

9      Q.    Did you see at any time anybody use what you would

10  consider to be excessive force on Mr. Maselli?

11      A.    I did not.

12      Q.    Did you see anything in the course of his arrest

13  that you felt was improper?

14      A.    I did not.

15            MR. CULLEN:  Thank you, Detective.

16            THE COURT:  Attorney Bedrick.

17            MR. BEDRICK:  Thank you, your Honor.

18                        CROSS-EXAMINATION

19  BY MR. BEDRICK:

20      Q.    Good morning.  It's Detective Durden, right?

21      A.    Good morning.  Yes.

22      Q.    Okay.  So let's just go right back into October 2nd,

23  2016.  You were dispatched over there to Kinsley Street?

24      A.    Correct.

25      Q.    Do you remember who was there first?

1    A.    Detectives Lombardi and DiTullio were there and I

2  believe Sergeant Yurcak.

3    Q.    Okay.  Were you made aware of about how long they

4  had been there already?

5    A.    I knew it was some time.  I don't know how -- how

6  long they were there.

7    Q.    And then the time between you arriving and kicking

8  in the door, do you know about how long that was?

9    A.    Approximately maybe 20 minutes.  It was, again, some

10  time.

11    Q.    Fair to say about 30 minutes?

12    A.    Sure.  That sounds about right.

13    Q.    Sure.  Now, that's not the first door you kicked in,

14  right?

15    A.    No, it was not.

16    Q.    But this was a unique situation, wasn't it?

17    A.    Yes.

18    Q.    It was unique because you had a person on the other

19  side who just didn't want to let you in, right?

20    A.    Correct.

21    Q.    And then ultimately you kicked the door in.  How

22  long between once you kicked the door in and when you make the

23  first contact with Mr. Maselli?

24    A.    One or two seconds.  As soon as the door opened, I

25  announced myself and I grabbed on to him.

1        Q.    All right.  How far did he make it?

2        A.    Not that far at all.

3        Q.    Did his feet even move?

4        A.    He spun his body and started to move and we ended up

5    on the ground within probably a foot of where he was standing.

6        Q.    Started to move -- I'm sorry.  Can you just be more

7    descriptive about --

8        A.    Yes.

9        Q.    -- what kind of movements he made?

10       A.    Yeah.  So he was facing me, and then once I

11   announced "police," he turned his body and faced the opposite

12   direction.

13       Q.    Now, fair to say it's a pretty tight little hallway

14   there, right?

15       A.    It is.

16       Q.    If he were to lay down on the ground just right

17   where he was standing, where would his head and feet end up?

18       A.    His head and feet?

19       Q.    Yes.

20       A.    His -- approximately the same position he was.

21       Q.    Well, if I represent to you that he's about

22   five-foot-seven --

23       A.    Yup.

24       Q.    And how far away from the threshold of the door was

25   he?

```
 1          A.    Approximately three feet.

 2          Q.    Okay.  So he'd have to do some kind of maneuvering

 3   in order to get on the ground and lay flat, right?

 4          A.    Correct.  I didn't tell him to get on the ground.

 5          Q.    Okay.  Is it -- is it -- do you appreciate when

 6   people get on the ground for you?

 7          A.    No.

 8          Q.    No?  Why not?

 9          A.    Because I don't know what their intentions are.

10   Normally if -- when people are compliant, they stand there.

11   And if he just turned around and put his hands behind his back,

12   we -- this wouldn't have happened.

13               MR. BEDRICK:  Oh, sorry.  Kathy, am I negative?

14               THE CLERK:  Yes.

15               MR. BEDRICK:  Okay.  Sorry.  If you don't mind --

16               THE COURT:  Not at all.  I'm sorry, Attorney

17   Bedrick.

18               MR. BEDRICK:  I forgot about that --

19               THE COURT:  I should have told you that a long time

20   ago.

21               MR. BEDRICK:  -- until I started feeling the sweat

22   pile up.

23               THE COURT:  That's all right.

24          Q.    Did anyone say get on the ground?

25          A.    I don't recall.  I know I did not.
```

1      Q.    Okay.  And so he's in front of you three feet from

2   the threshold of the door.  Are you able to see him at that

3   point?

4      A.    Yes.

5      Q.    And is he well lit?

6      A.    He was not well lit.  There was -- the light in the

7   stairway that we were on had a light so when the door opened

8   up, it illuminated the kitchen.

9      Q.    So when you were able to see when you opened that

10  door?

11     A.    Yes.

12     Q.    Okay.  And you were able to see where his hands

13  were, right?

14     A.    So as soon as the door -- it happened very quickly,

15  but as soon as the door opened up, he started spinning around

16  so I wasn't able to see his hands.

17     Q.    When you say spinning around, are you talking about

18  circles, 360 degrees, or --

19     A.    No.  As I stated, he was facing me and he spun in

20  the opposite direction.  So like it's 180 degrees.

21     Q.    So he turned fully around, completely, 100 percent?

22     A.    Yes.

23     Q.    Okay.  And was he -- did he have to move his feet to

24  do that?

25     A.    He did.

1    Q.    Did he take a step at all?

2    A.    I don't recall.

3    Q.    Did he start to run?

4    A.    It was my impression that he was going to, but,

5    again, it happened very quickly and as soon as I saw his body

6    face away from me, I just grabbed on to him.

7    Q.    Okay.  So you couldn't say whether -- what he was

8    trying to do at that point?

9    A.    He wasn't complying with me.

10   Q.    But, now, when I asked you about the hands, you told

11   me he was spinning around.  Hands up, down, by his side?

12   A.    Again, I didn't see his hands.  I saw his torso --

13   his whole body move and I couldn't see his hands.  I don't have

14   a recollection of where they were.

15   Q.    You said you grabbed him at that point?

16   A.    I grabbed on to his arm.

17   Q.    Which arm?

18   A.    I don't remember.

19   Q.    Now, was it Yurcak that was behind you?

20   A.    It was.

21   Q.    Okay.  And was he able to make it in the space?

22   A.    He was.

23   Q.    Was he able to grab an arm?

24   A.    He was.

25   Q.    Did anyone else grab an arm?

1      A.    I did not notice anybody else grab an arm.

2      Q.    Well, you were here yesterday when Sergeant DiTullio

3  testified, right?

4      A.    Yes, I was.

5      Q.    Didn't he testify that he grabbed an arm?

6      A.    Again, I didn't notice anybody else grab an arm.

7  Whether he grabbed an arm or not, I didn't notice that.  I was

8  focused solely on getting his arm behind his back.

9      Q.    So you get to the ground and you said that you had

10 to issue a compliance strike or a knee strike?

11     A.    Yes.

12     Q.    And you -- could you characterize that as a

13 compliance strike?

14     A.    Exactly.

15     Q.    And that's the kind that you talked about you do

16 training for, right?

17     A.    Correct.

18     Q.    In fact, you said that you do training with a person

19 in, what did you call it, a RedMan suit?

20     A.    Yes.

21     Q.    Thank you.  What does the RedMan suit look like?

22     A.    It's a bunch of foam padding and it covers their

23 whole body.

24     Q.    And you said you did that so that the person doesn't

25 get injured?

1        A.    Correct.

2        Q.    So a knee strike, when you're practicing it, you'd

3    want it to be on a person with a RedMan suit to make sure that

4    they don't get injured, right?

5        A.    So the injury -- because they're training with

6    probably 10 or 15 guys each time we're training, so if they get

7    10 to 15 knee strikes, it's a high probability they get

8    injured.

9        Q.    Is it fair to say a knee strike has the potential to

10   injure somebody, right?

11       A.    Absolutely.

12       Q.    Because it's not a -- it's not just a -- the type of

13   contact that you would get someone's attention with; it's the

14   kind of thing that you intend to cause pain with, right?

15       A.    It's a pain compliance technique, correct.

16       Q.    You said pain compliance.  Can you just tell me a

17   little bit more about pain compliance.

18       A.    It's something to elicit pain so they end up

19   complying with our --

20       Q.    And, now, on the use of force continuum, where does

21   this fall?

22       A.    This would fall underneath active resistance.

23       Q.    Okay.  So you're using pain compliance with active

24   resistance?

25       A.    Correct.

37

1          Q.    Is there any reason to use a pain compliance

2     technique such as the knee strike once the person has already

3     submitted?

4          A.    No.

5          Q.    So fair to say if someone is already in handcuffs

6     and on the ground that you would not issue a knee strike?

7          A.    Correct.

8          Q.    That would be considered excessive, wouldn't it?

9          A.    Yes.

10               MR. BEDRICK:  May I just have a moment, your Honor?

11               THE COURT:  Of course.

12               MR. BEDRICK:  I'm all set.  Thank you, your Honor.

13               THE COURT:  All right.  Attorney Cullen, do you have

14    any additional questions for this witness?

15               MR. CULLEN:  I do not.

16               THE COURT:  All right, sir.  You can step down.

17    Thank you very much.

18               THE WITNESS:  Thank you.

19                          (Witness excused.)

20               MR. CULLEN:  Defense would call John Yurcak.

21               THE COURT:  All right.  Very good.  Sir, if you'd

22    please come forward.

23               THE CLERK:  Good morning.  Please raise your right

24    hand.

25               **JOHN YURCAK**, having been first duly sworn, testified

38

1  as follows:

2          THE CLERK:  Please be seated.  Please state your

3  name and spell your last name for the record.

4          THE WITNESS:  My name is John Yurcak.  Last name is

5  Y-u-r-c-a-k.

6                     DIRECT EXAMINATION

7  BY MR. CULLEN:

8      Q.    And, Sergeant Yurcak, have you been COVID-tested

9  this morning?

10     A.    This morning, yes.  Correct.

11         THE COURT:  Sir, you can take your mask off.  Thank

12 you.

13         THE WITNESS:  Thank you, your Honor.

14         THE COURT:  The test was negative.

15         MR. CULLEN:  Thank you, your Honor.

16     Q.    Good morning.

17     A.    Good morning.

18     Q.    I called you sergeant.  You're retired now, right?

19     A.    I am.  That's correct.

20     Q.    Sergeant still okay for you?

21     A.    That's fine.

22     Q.    Okay.  Tell me a little about yourself.  Now, I know

23 you did grow up in Nashua.

24     A.    I did.

25     Q.    Okay.  When -- did you go to high school there?

```
 1        A.    I did.  I graduated high school in Nashua.

 2        Q.    Okay.  And when was that?  Sorry.

 3        A.    1983, so --

 4        Q.    Okay.

 5        A.    -- a little while ago.

 6        Q.    Okay.  That was back when it was a single school,

 7   right?

 8        A.    Correct, yeah.  One big school.  Only three grades.

 9   Graduating classes over 800.

10        Q.    Okay.  Wow.  But not a one-room schoolhouse then?

11        A.    No.

12        Q.    Okay.  What did you do after you graduated from high

13   school?

14        A.    I went to the University of New Hampshire.

15        Q.    Okay.  And did you graduate from there?

16        A.    I did.

17        Q.    When was that?

18        A.    1987.

19        Q.    Okay.  What was your degree?

20        A.    In political science.

21        Q.    And have you had further education since then?

22        A.    I have.

23        Q.    And what's that?

24        A.    I obtained a master's degree.

25        Q.    And what did you get your master's in?
```

1      A.    In forensic science.

2      Q.    And approximately when was that?

3      A.    I graduated in '93.

4      Q.    And where was that?

5      A.    That was in San Diego, California.

6      Q.    Okay.  Did you physically go out there?

7      A.    I was.  I was living in San Diego at the time.

8      Q.    Okay.  What were you doing in San Diego then?

9      A.    I was on active duty.

10     Q.    Okay.  So let's backtrack a little.

11           When you were -- when did you -- when you say active

12     duty, obviously the service.  You were in the Marines?

13     A.    Correct.

14     Q.    Okay.  When did you join the Marines?

15     A.    Technically in 1984.

16     Q.    '84?

17     A.    Correct.

18     Q.    While you were in college?

19     A.    Yes.

20     Q.    And when you say technically, what do you mean?

21     A.    Well, you get sworn in when you enter the officer

22     candidate training.  So if you're going to go for officer

23     training, they swear you in.  At that point in time, you are

24     now part of the armed services because then when you go to your

25     actual training, you're now subject to the UCMJ and everything

1   else that goes with that.

2        Q.   I'm sorry.  What's the UCMJ?

3        A.   Uniform Code of Military Justice.  It's just

4   basically how the military operates itself, regulates itself.

5        Q.   So starting in '84, you're subject to the UCMJ?

6        A.   Yes, while I'm in -- not while I'm in college, but

7   while I'm doing Marine Corps things, I guess --

8        Q.   Okay.

9        A.   -- the training they have you going through.

10       Q.   Okay.  Does UNH have an ROTC program, ROTC program?

11       A.   No, they have an ROTC program for Army and

12   Air Force, but not for -- there's no Marine Corps ROTC.  It's

13   only Navy and then you can -- if you're Navy ROTC, you can opt

14   for Marine Corps for a commission, but UNH did not have one at

15   the time, no.

16       Q.   Okay.  So what did you do to complete your officer

17   training program?

18       A.   The program they did offer was called Platoon

19   Leaders Class and what that was was essentially your training

20   is broken down to two six-week summers.  So between your

21   sophomore and junior year and then your junior and senior year,

22   you go to Quantico and do basically your training there for six

23   weeks.  So it's broken in half.  And the training's really just

24   kind of enough to do evaluations and to do screening, really.

25       Q.   Okay.  So basically 12 weeks split over two?

1       A.    Correct.

2       Q.    So you get a break halfway through your training?

3       A.    Yes.  Yeah.

4       Q.    Does that work out well?

5       A.    It can.  It's -- it's not great knowing you have to

6  go back to the same training you just left, but -- it's not the

7  most fun activity.

8       Q.    Fair enough.

9             So in the summer of '87, you complete that program.

10  Does that make you a commissioned officer --

11      A.    Well, it --

12      Q.    -- at that time?

13      A.    No.  You have to -- you complete -- I completed the

14  platoon leaders course in '86, went to my final year, my senior

15  year, '86 to '87.  Upon getting my degree, then you're

16  commissioned as an officer.

17      Q.    Okay.  And how long did you stay on active duty?

18      A.    I did seven years.

19      Q.    And did that include any tours or assignments?

20      A.    It did.  I did a one-year tour over in Okinawa, did

21  deployments in Okinawa which is in Japan, southern Japan.

22      Q.    Okay.  So you did your master's while you were in

23  active service?

24      A.    I did.

25      Q.    Okay.  In San Diego.  Not a bad place.

1      A.    Not a bad place at all.

2      Q.    When you finished up your seven years, was that it?

3  You're up and out and gone?

4      A.    For a brief period, yes.

5      Q.    Okay.  How brief?

6      A.    Probably eight months.

7      Q.    What did you do in that 18 -- in that eight months?

8      A.    I got a job offer from Nashua and then moved back to

9  New Hampshire -- the Nashua Police Department --

10     Q.    Okay.

11     A.    -- and was hired by the Nashua Police Department.

12     Q.    So if my math's right, I'm scribbling notes, we're

13  around 1994?

14     A.    So I was going through the hiring process in '94,

15  yes.

16     Q.    Okay.  And hired in '95 then?

17     A.    It was actually --

18     Q.    Thereabouts?

19     A.    -- December 23rd.

20     Q.    Okay.  So you mentioned, though, that -- I think you

21  referenced you went back to the Marines after you were hired in

22  Nashua?

23     A.    I did.

24     Q.    In what capacity?

25     A.    So while I was -- you have an original agreement for

1    eight years and it could be any combination of active duty and

2    reserve duty.

3              So I originally did three, I extended another year,

4    got another three-year extension, left active duty, but still

5    have one year on your contract.

6              Now, you don't have to go to a drilling unit or

7    anything like that.  You just have to kind of muster once a

8    year, make sure you're medically physically fit, and they kind

9    of check your records, that sort of thing.

10             But at that time I opted to go into the what they

11   call the SMCR, Select Marine Corps Reserve, and that's when you

12   actually go to the -- you know, people see the drilling

13   Reservists, right, do one weekend a month, two weeks a year,

14   that sort of thing.

15        Q.    And that's what you were doing in the Reserves?

16        A.    Correct.  So in August I was able to obtain an

17   assignment.

18        Q.    Now, within that time in the Reserves, did you get

19   called up again or deployed?

20        A.    I did.

21        Q.    And where was that to?

22        A.    That was to Iraq.

23        Q.    And what did you do there?

24        A.    I was in charge of police reconstruction in the

25   western portion of the country.  So this was post-2003.  We got

1    there early 2005.  There was really no police presence

2    whatsoever in the western portion of the country through about

3    three provinces, and my assignment was to create a unit that

4    could go out and rebuild the Iraqi police services.

5         Q.   And I won't ask if that was successful or not, but

6    did you -- how long did that take?

7         A.   It was a project in progress, let's say.  So we --

8    we really got the ball rolling.  There wasn't really an

9    academy, functioning academy.  We basically built, staffed the

10   academy.  I wound up interviewing police officers from around

11   the country that were Marine Reservists.  I needed very -- this

12   was not a typical Marine Corps mission.

13             Marine Corps mission, typically you think of

14   artillery and infantry and that sort of thing.  But they really

15   needed police reconstruction, so I was allowed to basically

16   canvas the Marine Corps Reserves and look for people that had

17   police skills, looking for medium- to large-size departments,

18   five or plus years, anybody with academy experience.

19             I was able to get somebody who actually ran a police

20   academy in California, and that's what we used as the nucleus

21   of my -- my cadre.  And then we were also augmented by private

22   contractors that were police officers.  So they were

23   international police liaison officers and they also kind of

24   assisted my team.

25         Q.   And approximately how long did this project go for

1    you, for your part of it?

2         A.    The entire year I was there, start to finish, and we

3    handed it over to the forces that were coming in to relieve us.

4         Q.    And I know once a Marine always a Marine, but are

5    you still active?

6         A.    I am not.  I reached the end of my career in 2017.

7         Q.    Okay.  And do -- at that time do you retire or are

8    you discharged, what happens?

9         A.    You're retired at that point and basically your

10   status is retired awaiting pay.

11        Q.    Okay.

12        A.    They can still reach out and grab you until age 59

13   and a half, but hopefully that doesn't happen.

14        Q.    I think you've got a couple years to go, it looks

15   like.

16        A.    I do.  So I've got to, you know, cross my fingers, I

17   guess.

18        Q.    Okay.  You mentioned -- what rank were you when you

19   retired?

20        A.    I was a colonel.

21        Q.    Colonel in the Marine Corps?

22        A.    Correct.

23        Q.    So is it okay if I call you sergeant?

24        A.    That's fine.

25        Q.    Okay.  You were a sergeant when this incident

1   occurred --

2       A.   Correct.

3       Q.   -- in the PD?

4       A.   Yes, I was.

5       Q.   Okay.  So when you went to the police station, to

6   Nashua, you obviously had a lot of experience.  Did you,

7   nevertheless, have to go to the police academy that we've heard

8   from the other police officers?

9       A.   I did.

10      Q.   And you heard a little bit about the use of force

11  training.  You went through that as well?

12      A.   Correct.

13      Q.   You've stayed with Nashua throughout your career as

14  a law enforcement officer?

15      A.   I did.

16      Q.   In addition to -- you heard about the training at

17  the police force and Detective Durden talked to us a little bit

18  about the use of force continuum training and in Nashua itself

19  at the department.  Can you tell us a little bit more about

20  that?  Do you do any of that training; do you give training?

21      A.   I wasn't a trainer, per se, in the use of force, but

22  everyone goes through the use of force training.  And that's --

23  he mentioned a patrol tactic, which is kind of an augmentation

24  to that.

25              But a lot of the -- so the use of force is typically

1    like a -- a training day would include time on the range.  We

2    would cover deadly force, the statute in New Hampshire and the

3    laws that cover the use of force in the state of New Hampshire,

4    and then do qualifications on the range, do some range drills,

5    and then typically move to another training facility and then

6    we would run through use of force and defensive tactics.  So we

7    would practice different types of strikes, holds, takedowns,

8    those sorts of things.

9          Patrol tactics are somewhat similar; however,

10   there's not the more formal portion of it.  The use of force we

11   also do the OC spray.  But the patrol tactics, you would be

12   given situations, scenarios, and then you, maybe alone or with

13   another officer, would walk in and that would require

14   decisions.  Right?

15         So you'd walk into a situation; what level force do

16   I use, do I engage the person.  Then they have role players,

17   right, that -- they're wearing protective gear.  So we have

18   what they call Simunitions guns.  They fire like little paint

19   pellets.  And you would have to use the appropriate amount of

20   force because it's not a static situation, like a target,

21   right; you have a real person.  They're reacting, they may

22   comply, and then in the act of compliance, then they may change

23   their tactics.  So you'd have to escalate, deescalate

24   appropriate for the situation and they just try to reinforce

25   that training.

1    Q.    And how often do you go through that?

2    A.    The use of force and patrol tactics is once a year.

3 So each one is done in the same calendar year.

4    Q.    In addition to your -- your training there, do you

5 also teach anywhere?

6    A.    I did.

7    Q.    Okay.  Where was that?

8    A.    A couple different locations, but predominantly was

9 at the University of Massachusetts Lowell.

10    Q.    And what did you teach there?

11    A.    I taught in their -- in the CJ program.  Because of

12 my background, I taught a variety of courses.  They could have

13 been Homeland Security, emergency management, terrorism.  But I

14 also taught on the criminal justice side.  It would be --

15 taught courses on hate crimes, Introduction to Policing, and

16 then Criminal Justice Ethics.

17    Q.    Okay.  So when you say the CJ program, that's the

18 criminal justice program?

19    A.    Criminal justice program, yes.

20    Q.    Okay.  October of 2016, you were a sergeant, I think

21 we talked about?

22    A.    Yes.

23    Q.    Okay.  And what were your general responsibilities

24 as a sergeant at the time?

25    A.    I was in the patrol division, uniformed patrol

1    operations, uniformed field operations bureau, which is what

2    you would think of police officers.  Right?  Uniformed officers

3    in marked cars patrolling the city, responding to calls.

4         Q.    And how is your situation or your position different

5    than Patrolman Durden's?  As a sergeant, do you have different

6    responsibilities?

7         A.    Correct.  In addition to, I would -- I can stop

8    cars, I could back up officers and get involved in those sorts

9    of things.  But the primary role is to supervise out there,

10   providing guidance and advice to officers in their situations,

11   just do general supervisory things, make sure the paperwork is

12   done properly, those sorts of things.

13          But I wasn't -- I wouldn't be in a situation where

14   I'd be dispatched to a call, although I'm not precluded from

15   volunteering to go to a call.  Sometimes we get very, very

16   busy --

17          THE COURT REPORTER:  I'm sorry.  I need you to slow

18   down.

19          THE WITNESS:  I'm sorry.

20          There may be situations where supervisors, up to and

21   including the captain on the shift, would have to be on the

22   street just because it gets so busy sometimes.  So, typically,

23   like I said, I would be handling investigations, but I would --

24   I could certainly assist at calls.

25        Q.    We've -- did you respond to assist at a call on

1    51 Kinsley Street?

2         A.   I did.

3         Q.   And once you get there, are you the ranking officer?

4         A.   I am.

5         Q.   How does that work with respect to the detectives

6    who are investigating the underlying crime?  What's your

7    relationship with them?

8         A.   I'm not their direct supervisor, so I really don't

9    have a lot of say in the investigation itself, but I'm there to

10   provide assistance in my capacity as a patrol supervisor.

11            So they might need things from the patrol side of

12   the house during the investigations like transporting witnesses

13   back to the station, securing crime scenes, those sorts of

14   things.

15        Q.   Without going into the details, were you briefed on

16   the situation at hand?

17        A.   I was.

18        Q.   Okay.  And what -- what decisions did you personally

19   make with respect to how to proceed?

20        A.   So given the circumstances at the time -- the

21   detectives had been there a while.  We had been on scene quite

22   some time as well.  And during the course of our interaction

23   there, it was apparent that the person inside the apartment was

24   neither going to allow us entry nor exit the apartment.

25        Q.   And why was it important that one of those two

1  things happen?

2      A.    When I'm there, I'm informed by the detectives that

3  they're investigating a serious felony and that the location

4  needs to be secured as a crime scene.  So obviously you can't

5  have people inside the crime scene for, you know, undetermined

6  amount of time.  The -- the reason for securing crime scene,

7  obviously, is to preserve the scene as best you can at the time

8  it's secured, make sure no evidence is removed, destroyed,

9  altered and that no one enters there.  We've actually had crime

10  scenes that were secured where people tried to get back into a

11  crime scene.

12      Q.    When you -- there was testimony yesterday about

13  getting a key.  How did that come about?  I think there was

14  testimony from Detective DiTullio that at some point someone

15  went to the landlord and secured a key to the --

16      A.    Yes.

17      Q.    -- upstairs?

18      A.    I'm not familiar with the apartment, but I'm

19  familiar with the -- the building itself and the landlord,

20  having worked in Nashua for some time.

21          So it felt it was easier -- given the situation with

22  the stairs and the door, it would just be easier to make entry

23  given -- with a key.

24      Q.    If that -- the key unlocks a dead bolt or what -- do

25  you know what type of lock that is, a pop lock I think it was

1    referred --

2         A.    I don't know.

3         Q.    -- to?

4              Where were you in relation -- and maybe, Stacy,

5    could you just bring up Exhibit B?

6              Looking at the stairwell here, where are you in

7    relation to this when Officer Durden kicks the door open?

8         A.    I am going -- I'd say I'm near the top of the

9    stairs.

10        Q.    The ones that we can see?

11        A.    Yes.  There's not a lot of room up there and he

12   needed a little bit of room to do what he needed to do, so I'm

13   probably not at that landing.  I might have, you know, one foot

14   on the landing and one foot on another one of those steps.  But

15   it's just a small area.

16        Q.    Why does Durden go first?

17        A.    Well, typically we have a uniformed officer, if

18   they're going to make entry.  They're in a full uniform; they

19   have a protective vest, a ballistic vest, and detectives don't

20   normally wear those vests.  So we want -- if someone is going

21   to make entry into a location, we want to have a uniformed

22   presence there.

23        Q.    Did you hear anybody make any announcements before

24   the door was breached?

25        A.    Announcements?

1      Q.    Did anybody make any statements or did anybody

2   announce that you were going to open the door forcibly?

3      A.    Yes.  We told -- whoever was in there, we told them

4   that we were going to make entry into the apartment at that

5   time when we had the key.

6      Q.    And was there any response from the other side of

7   the door?

8      A.    There was.

9      Q.    What was that?

10     A.    The person -- the person inside just said give me a

11  couple minutes.

12     Q.    Did you give that person a couple minutes?

13     A.    We did not.

14     Q.    Why not?

15     A.    It's an officer safety issue.  We've already kind of

16  tipped our hand that we're making entry at this point in time;

17  we know the person's by the door.  We're not going to give

18  somebody a couple minutes to either, you know, arm themselves,

19  get rid of some evidence, exit the apartment another way we

20  don't know.  We don't know the exact layout when we're going in

21  there.  There may be a way to -- you know, back stairs down to

22  the basement.  There's a lot of unknowns and we just don't want

23  to have all that time elapse between when we announce we're

24  making entry and we actually make entry and get control of the

25  situation inside the apartment.

1          THE COURT:  Sir, I'm going to ask you just to slow

2    down ever so --

3          THE WITNESS:  Sorry.

4          THE COURT:  -- slightly --

5          THE WITNESS:  Okay.

6          THE COURT:  -- because I'm watching our court

7    reporter work very hard to --

8          THE WITNESS:  All right.

9          THE COURT:  -- keep up with you.  Please.  Just take

10   an extra breath.

11          Thank you.

12          THE WITNESS:  I will, your Honor.  Thank you.

13          MR. CULLEN:  I appreciate it, because I'm usually

14   the one getting in trouble.

15     Q.    When -- now, you guys -- officers in some capacity

16   have been there for upwards of an hour before you make this

17   breach.  Were there concerns about weapons or things during

18   that time?

19     A.    During the time that they were there?

20     Q.    Before you actually entered, presumably the -- the

21   occupant could still do any of those things you were worried

22   about before you breached the door.  Is that fair?

23     A.    That's -- yes, that's fair to say.  It's possible.

24     Q.    Okay.  Once you've -- once you've made the

25   announcement to enter, though, you're going straight in?

1      A.    Correct.

2      Q.    All right.  What are you able to see when the door

3  eventually opens?

4      A.    There is some light going -- it's not well lit

5  inside the apartment, but I can kind of make out a narrow area.

6  Officer Durden moves in.  I'm somewhat behind him because I've

7  got to go up those steps now, but I can see him reaching out

8  towards a subject.

9      Q.    Okay.  And what did you do?

10     A.    I went to assist Officer Durden.

11     Q.    And how did you physically do that?

12     A.    By the time -- it's kind of a little bit tough to

13  explain, but as I get in there, he's already -- I can see him,

14  he's holding grabbing on to someone there, and they're going to

15  the ground.  To say that I assisted him was probably not

16  accurate, but we all wind up on the floor.

17     Q.    Okay.  And what do you do once you get to the floor?

18     A.    I'm trying to focus, so as we go down I am on the

19  right side of the subject.  Officer Durden's to my left.

20     Q.    Now, just -- sorry.  Stopping you there, you heard

21  yesterday while you were in the courtroom Mr. Maselli say that

22  he, you know, immediately complied and went into a push-up

23  position.  Did you see that at all?

24     A.    I did not.

25     Q.    Did that happen?

1    A.    Not that I saw, no.

2    Q.    Okay.  You heard Mr. Maselli say that once he was

3  asked to give his hands, he voluntarily put them behind his

4  back to be handcuffed.  Did that happen?

5    A.    That's not correct, no.

6    Q.    Okay.  What actually happened?

7    A.    He had his arms tucked up underneath him while he

8  was on the floor.

9    Q.    Now, you've done training -- have you done training

10  on getting people's hands unclenched?

11    A.    Yes.

12    Q.    Okay.  Is there anything in particular about having

13  them under the body and clenched up that makes it difficult to

14  pull them out?

15    A.    With a contracted muscle like that, it's extremely

16  difficult to get someone's arm out from underneath them that

17  doesn't want to give up the arm.  In fact, part of that

18  training was techniques on how to get people's arms out from

19  underneath them other than just, you know, sheer force and

20  trying to rip their arm out from underneath.  Very difficult.

21    Q.    And -- and why is it so important to get those arms

22  out?

23    A.    That's what -- in our training, that's where the

24  threat comes from, right?  So any danger to the officer, the --

25  the likelihood of it coming from the hands is great, right?  So

1    that's where a weapon's going to be, that's where they're going

2    to strike you from.  That's where the danger is and we're

3    trained to focus on the hands.

4         Q.   Were you able to get his hands behind his back just

5    simply by pulling on them?

6         A.   I was not.

7         Q.   Okay.  Are you on the same side as Officer Durden or

8    the opposite side -- of Mr. Maselli, do you recall?

9         A.   As I recall it, Officer Durden is to my left.

10        Q.   Okay.  And what did you do to attempt to compel

11   Mr. Maselli to release his arms?

12        A.   So I used what's often known as a palm heel strike,

13   which is basically holding your hand like this and using the

14   meaty portion of your palm, and that's the striking surface

15   right there.  And I administered --

16        Q.   What -- sorry.  Go ahead.

17        A.   Sorry.  And I administered a palm heel strike to his

18   torso.  I don't remember exactly.  I mean, everything happened

19   very, very quickly.  But it was in the torso area --

20        Q.   And why --

21        A.   -- along the side.

22        Q.   And why did you do that?

23        A.   To see if I could gain compliance and get the arm

24   out from underneath him.

25        Q.   And did -- was it successful?

 1          A.    It was.

 2          Q.    Was he already in handcuffs when you administered

 3   that palm heel strike?

 4          A.    He was not.

 5          Q.    Did you ever strike him after he was in handcuffs?

 6          A.    I did not.

 7          Q.    Okay.  Are you -- in all the training you've

 8   received, did you -- whether in the military or at the police

 9   station, did you get training in first aid?

10          A.    I do.

11          Q.    Okay.  Did Mr. Maselli ever indicate to you that he

12   needed any sort of treatment?

13          A.    He did not.

14          Q.    Did he make any complaints to you about the type of

15   force that had been used on him?

16          A.    He did not.

17          Q.    Did anybody strike him that you observed after he

18   was handcuffed?

19          A.    No.  I didn't see anything like that.

20          Q.    Once you got him in handcuffs, is that something you

21   would see, if somebody was sitting there for 45, 60 seconds

22   after he's in handcuffs, hitting him?

23          A.    Yes, definitely, I would have seen that.

24          Q.    And what would you have done?

25          A.    I would have stopped it.  As a supervisor, that

1    can't be allowed.

2        Q.    Now, we heard Detective Durden say that he also had

3    OC spray available to him and a Taser.  Do you carry either of

4    those tools?

5        A.    I don't carry a Taser.  I do carry pepper spray and

6    a baton.

7        Q.    Okay.  And did you use either of those tools?

8        A.    I did not.

9        Q.    And why not?

10        A.    They weren't appropriate for the situation.  As

11    Officer Durden talked about, the OC spray in confined -- OC

12    spray works well, but it has its drawbacks.  And typically it's

13    not uncommon, if you deploy OC spray, especially in -- inside

14    someplace, you're going to get a dose of OC spray.  And

15    obviously it's meant not to be pleasant, so you wind up getting

16    exposure, eyes burning, up in the nose, coughing, difficulty

17    breathing.  It's just not uncommon in closed spaces like that.

18            So we try to avoid using it.  It's one of the

19    reasons even at the station -- we have special pepper spray for

20    inside the station that's a foam, so it doesn't create more of

21    a mist and cloud.  It cuts down on that contamination.

22        Q.    You sound like somebody who's been exposed to pepper

23    spray.

24        A.    I have.  Everyone's required to get pepper-sprayed

25    at the academy before you're certified and you have to get

1  pepper-sprayed.

2      Q.    Wow.  That sounds more like hazing than training.

3            Does the -- was the use of force that you used

4  consistent with the training that you've received?

5      A.    It was.

6      Q.    The -- we went over the -- this again, but plaintiff

7  said that he was there for 45 seconds to a minute with people

8  laughing at him in the background.  Did you -- did that happen?

9      A.    No, it did not.

10     Q.    He said yesterday that he -- that people were

11  mockingly saying, you know, stop resisting, in a mocking tone.

12  Did that happen?

13     A.    It did not.

14     Q.    He said yesterday that for a period of 40 (sic) to

15  60 seconds, unknown officers continued to hit him after he was

16  in -- well, not just continued; he said no hands were laid on

17  him until he was actually handcuffed.  Do you recall him saying

18  that?

19     A.    In yesterday's testimony?

20     Q.    Yeah.

21     A.    I do.

22     Q.    And is that true?

23     A.    No, it's not.

24     Q.    Okay.  And then he said that people beat him for --

25  or struck him several times for a period of 45 seconds after he

1    was in handcuffs, 45 to 60 seconds, I think he said.  Did that

2    happen?

3         A.    It did not.

4         Q.    Were you able to see Mr. Maselli once he was brought

5    to his feet?

6         A.    I'm sorry?

7         Q.    Were you able to see Mr. Maselli once he was brought

8    to his feet after he was handcuffed?

9         A.    Yes.

10        Q.    Did he appear to be in an intense amount of pain?

11        A.    He did not.

12        Q.    Did he say to you that he was in an intense amount

13   of pain?

14        A.    Nothing that I heard.  I didn't hear any complaints

15   of that nature.

16             MR. CULLEN:  Okay.  Just give me one moment, your

17   Honor.

18             THE COURT:  Certainly.

19             MR. CULLEN:  Thank you, sir.  I don't have any other

20   questions for you right now.

21             THE COURT:  All right.

22             Attorney Bedrick, we have two choices.  I'm going

23   to give you the option of either taking a break now and

24   reconvening in about 15 minutes or giving -- we can finish with

25   this witness.  How would you like to proceed?

1          MR. BEDRICK:  I think 15 minutes would be best, your

2    Honor.

3          THE COURT:  Pardon me?

4          MR. BEDRICK:  I think 15 minutes would be best, your

5    Honor.

6          THE COURT:  All right.

7          So, members of the jury, we're going to take a brief

8    morning recess.  We're going to recess for about 15 minutes.

9          I want to just remind you again, and I'm going to do

10   it in a more summary fashion right now, the instructions that I

11   have shared with you now several times.  And please, again,

12   bear with me.  It's not because I don't think you're paying

13   attention, but it's my responsibility to remind you.  Do not

14   talk about this case amongst one another, don't do any

15   research, don't communicate about the case in any way,

16   electronically or otherwise.  Okay?

17         So I'll see you again in 15 minutes.  Thank you very

18   much.

19         THE CLERK:  All rise for the jury.

20                   (Jury excused.)

21         THE COURT:  All right.  Why don't we just have a

22   seat for a moment and I'll tell you what my thinking is out

23   loud.

24         I'm going to give you the next 15 minutes to take a

25   break.  When you get back from that break, on your tables -- if

1    not before you get back from your break, on your tables --

2    should be revised language as it relates to the request for a

3    double -- no double recovery or no double award language that I

4    intend to insert into the jury instructions.

5           I'll also have an updated special verdict form that

6    comports with what the parties stipulated to and submitted to

7    the Court.

8           I may also have a full set of updated instructions

9    for you by then to review.  If not, I'll have them for you at

10   the lunch break.  All right?  So what I expect is that we'll

11   finish this witness and then I will send the jury for a long

12   lunch hour.  All right?

13          MR. CULLEN:  Thank you, your Honor.

14          THE COURT:  Okay.  Very good.  Thank you.  Let's get

15   you a break.

16          THE CLERK:  All rise.

17       (Recess taken from 10:43 a.m. until 11:14 a.m.)

18                  WITHOUT THE JURY PRESENT

19          THE COURT:  All right.  Please be seated.

20          THE CLERK:  This court is now in session.

21          THE COURT:  All right.  So I have a couple of

22   housekeeping things that I'd like to address with counsel and

23   then I understand that there's a matter, Attorney Bedrick, that

24   you would like to address with the Court.

25          So I just need a clarification from you, Attorney

1   Cullen, on your request as it relates to the jury instructions

2   that the Court provided the parties with and that we addressed

3   in the earlier charging conference.

4          You asked the Court to strike the last sentence in

5   paragraph 2 and if the Court were to do that, Attorney Cullen,

6   does that eliminate your need or request that the Court add

7   some additional language to the instruction from the *Everett*

8   *vs. GE* case?

9          MR. CULLEN:  No, I think we would still request the

10  wanton and reckless conduct element be given as an immunity

11  defense.

12         THE COURT:  All right.  Thank you.  I appreciate

13  that.  It wasn't clear in my notes and so I wanted to just

14  clarify that.

15         All right.  So thank you.  That was all I needed to

16  ask right now.  I intend to take up all of those additional

17  issues later, either this morning or early afternoon.

18         Okay.  Attorney Bedrick, I understand there's a

19  matter that you'd like to address with the Court.

20         MR. BEDRICK:  Thank you, your Honor.

21         Yes, I was just wondering if there was any way that

22  we could hear or read or, you know, anything, some testimony

23  from yesterday.  I just want to make sure that I've got it

24  right before I start talking about it on cross-examination.

25         THE COURT:  All right.  So there are two things.  If

1   you want a daily transcript of the proceeding, that's something

2   that you work out with the court reporters.  If there's

3   something about testimony from yesterday that you want to

4   highlight for the jury, they -- they heard the testimony.  The

5   witnesses were here.  The witness that was on the stand was

6   here.  And so there's an opportunity for you to inquire about

7   that without the need for you to use hearing transcript.

8           MR. BEDRICK:  I didn't intend to use it in front of

9   the jury, only just to view it myself to make sure that I was

10  recollecting correctly is all.

11          THE COURT:  What's your position on that, Attorney

12  Cullen?

13          MR. CULLEN:  I think -- I think it would be unusual

14  to go back and read the -- at this stage, particularly given

15  that -- the timing.

16          I trust that plaintiff's counsel will use his best

17  efforts to recall it correctly and if I think otherwise, I can

18  object and tell you what I think happened.  And you probably

19  have a transcript, so you'll be able to fix it either way.

20          THE COURT:  Yup.

21          MR. CULLEN:  But my sense is that, you know, I

22  certainly examined other witnesses with Mr. Maselli's

23  testimony.  I characterized it as best I could.  I think that

24  same format should work here.

25          THE COURT:  So here's what I'll tell you.  It would

1    not be our normal protocol to do what you've just asked.  If

2    you wanted a daily transcript, that was something that you

3    needed to ask for from the court reporters and you would have

4    gotten it this morning from the day prior.

5              So here's what I'm going to suggest that you do.

6    I'm going to suggest that you confer with Attorney Cullen about

7    what your recollection is to the extent that you prefer to do

8    it that way.  Otherwise, you can inquire of the witness as to

9    whether or not he recalls the testimony the same way that you

10   do.

11             MR. BEDRICK:  Okay.

12             THE COURT:  All right?

13             MR. BEDRICK:  Certainly.

14             THE COURT:  Okay.  All right.

15             MR. CULLEN:  Thank you.

16             THE COURT:  All right.  Very good.

17             Are we ready to proceed?

18             MR. BEDRICK:  Well, if I could just confer with

19   Attorney Cullen.

20             THE COURT:  All right.  Why don't you guys just step

21   out and do that before we bring the jury back in.  Thank you.

22                  (Discussion between counsel.)

23             MR. CULLEN:  Thank you, your Honor.  We're all set.

24             MR. BEDRICK:  Yes, thank you, your Honor.

25             THE COURT:  All right.  Very good.

1                Okay.  So do you need a few minutes, Attorney

2    Bedrick, before we bring in the jury or are you ready to

3    proceed?

4                MR. BEDRICK:  No, I am ready to proceed, your Honor.

5                THE COURT:  All right.  So why don't we bring the

6    jury in, please.

7                THE CLERK:  All rise for the jury.

8                        WITH THE JURY PRESENT

9                THE COURT:  All right.  Please be seated.

10               MR. CULLEN:  I assume we want to put the sergeant

11   back on the stand.

12               THE COURT:  Yes, sir.  Would you please come back

13   up?  And just as a reminder, you remain under oath, sir, and

14   you can remove your mask.

15               THE COURT:  Go ahead, sir.

16               MR. BEDRICK:  Thank you, your Honor.

17                        CROSS-EXAMINATION

18   BY MR. BEDRICK:

19        Q.    It's still morning, right, so good morning --

20        A.    Good morning.

21        Q.    -- Sergeant Yurcak.  And I think you've been made

22   aware so far that this case has been going on for a while and

23   we've mispronouncing your name for quite some time.

24        A.    Yes.

25        Q.    And I apologize if I don't get over my old habit

1    there.

2              So going back to October 2nd, 2016, right?  How's

3    your memory of that day?

4         A.    I mean, it's been close to six years now, but --

5         Q.    Yeah.  I mean, it's natural that your memory --

6         A.    Sure.

7         Q.    -- fades over time, right?  In fact, that's one of

8    the reasons why police write reports, right?

9         A.    Correct.

10        Q.    And you're trained to write reports?

11        A.    I am.

12        Q.    And you're trained to put, you know, as much

13   pertinent detail as you can into those reports?

14        A.    Yes.

15        Q.    And most of all, even if you can't remember every

16   detail, what's important as well is that they're accurate.

17        A.    Yes.

18        Q.    Whatever detail you do put in, you want to make sure

19   that's right?

20        A.    Correct.

21        Q.    And in these reports, you're not reporting on what

22   other people saw necessarily, are you?

23        A.    No, not necessarily.

24        Q.    I mean, most of the time it's so that you can relay

25   to other officers what you saw, right?

1    A.    Correct.

2    Q.    Yeah.  In fact, you relied on those reports to help

3    you remember what happened --

4    A.    I did.

5    Q.    -- before testifying, you know, six years later,

6    right?

7    A.    Yes.

8    Q.    So let's talk about October 2nd and what you do

9    remember about that.  Okay?

10         Did you say on direct that the first you heard of

11   this investigation was at eight o'clock p.m. that day?

12   A.    No.  Not the investigation itself, just the

13   situation over on Kinsley Street.

14   Q.    Okay.  So you heard the investigation was ongoing

15   before this, right?

16   A.    Correct.

17   Q.    About for how long?

18   A.    I'm not sure the timing.  I knew it occurred early

19   in the day.  I can't remember if I was briefed by the outgoing

20   supervisors or patrolmen that were on duty at the time that

21   were the initial officers for the investigation.

22   Q.    So it sounds like it might have been somewhere

23   around shift change?

24   A.    Early afternoon, early to midafternoon, somewhere

25   around there.

1       Q.   All right.  So early to midafternoon, what's that to

2  you, like 2:00, three o'clock?

3       A.   Thereabouts, yes.

4       Q.   Okay.  P.m.?

5       A.   Correct.

6       Q.   And so you hear about this situation at, what,

7  8:00 p.m.?

8       A.   Probably a little bit later than that.

9       Q.   8:30-ish?

10      A.   That sounds about right.

11      Q.   Okay.  So there were -- you know, the investigation

12  was there and going, you know, at least six hours prior to --

13  or, you know, at least five hours, sorry, prior to you becoming

14  aware that they were approaching Mr. Maselli's apartment,

15  right?

16      A.   Correct.

17      Q.   In that time, did you make any efforts to secure a

18  key to the apartment?

19      A.   Once I was there?

20      Q.   No, prior to being there but after learning of the

21  investigation.

22      A.   No.

23      Q.   You didn't speak with the landlord?

24      A.   I did not, no.

25      Q.   You said you were familiar with the building, right?

1      A.    Correct.

2      Q.    When you say familiar with the building, are you

3  talking about the inside or are you talking about the --

4      A.    No, I'm familiar -- there's a -- on the first floor

5  there's a tailor shop that a lot of police officers use, so I'm

6  familiar with the people that run the tailor shop and the fact

7  that one of the relatives of the person who owns and runs the

8  tailor shop lives at the apartment.  They own the building.

9  They own the entire building and that one person lives on the

10 premises.

11     Q.    Is that Olga?

12     A.    I'm sorry?

13     Q.    Is that Olga or -- I forget her name.

14     A.    No, that's the bridal shop that used to be downtown.

15 I think she's on Amherst Street.  That's Marika's, used to be

16 Demitri's, was her dad.  Marika's owns it now.

17     Q.    Yes.

18     A.    She does good work.

19     Q.    I know, yes.  Yes.  Okay.  I know what you're

20 talking about.

21           So you're familiar with it because there was a

22 business there that you and other officers had frequented,

23 right?

24     A.    Correct.

25     Q.    It wasn't that you'd been to the apartment?

1      A.    No, I'd never been upstairs.

2      Q.    And when you are positioning yourself before Officer

3  Durden breaks through the door, can you just tell how many

4  officers were there at the time?

5      A.    At the time he was making entry?

6      Q.    Yes.

7      A.    It would have been myself, Officer Durden,

8  Detectives DiTullio and Lombardi.

9      Q.    And in order, it would be Durden at the front,

10  right?

11      A.    Correct.

12      Q.    You're next?

13      A.    Yes.

14      Q.    And then on the stairs behind you would have then

15  been DiTullio and Lombardi, right?  Not necessarily in that

16  order, but they were behind you?

17      A.    They were behind me.  I don't know which order they

18  were in at the time.  There was some shifting around on the

19  stairway while we were there.

20      Q.    Okay.  So when that door, I guess -- what's the

21  phrase that the police use?  When the lock was defeated, okay,

22  the door swings open, right?

23      A.    Yeah.

24      Q.    At that time, were you able to directly see

25  Mr. Maselli?

1    A.    No.

2    Q.    And so do you know when he made it to the ground?

3    A.    Shortly after I make entry and I'm trailing behind

4    Officer Durden, they're in the process of going to the ground.

5    Q.    Okay.  How long did that take?

6    A.    Seconds.

7    Q.    One to two seconds?

8    A.    Yeah, if that.  Yeah, one to two seconds,

9    three seconds at the absolute most.  It was like one continuous

10   action of entering and going to the ground.

11   Q.    Okay.  So at the moment that Durden kicked open the

12   door, what was Mr. Maselli's position like?  How was he

13   positioned?  Where was he facing?

14   A.    I couldn't -- I couldn't see that.  When the door's

15   kicked open, I couldn't see that.

16   Q.    So you couldn't see where he was facing when the

17   door was kicked open?

18   A.    No.

19   Q.    Were you able to see him, what, a second later?

20   A.    I was able to see what was going on when I made it

21   up those couple steps and made entry into the apartment.

22         Some -- I'm down below Officer Durden.  We're close

23   to each other.  I'm basically looking at Officer Durden's back

24   as he's making entry.

25   Q.    Right.  So did you see Mr. Maselli start to run?

1    A.    When I finally get into the apartment, I see Officer

2    Durden move towards the subject that appeared to be moving away

3    from him and then grab on to the subject.

4    Q.    So he's down on the ground within one to two, maybe

5    three seconds of --

6    A.    Yes.

7    Q.    -- the door getting knocked in.

8          You're able to get up those stairs and see that he's

9    still -- he's still up?  You were able to get up the those

10   stairs in the one to two to three seconds?

11   A.    Yes.

12   Q.    And you said that he -- you see him spinning around?

13   A.    I don't see him spinning around.  I see Officer

14   Durden reaching for somebody who's moving away from him and

15   they both go to the ground.

16   Q.    When you say moving away from him, did the person's

17   feet move at all?

18   A.    Not that I could see.  I'm gauging that off of

19   Officer Durden is moving into the apartment or he's making, you

20   know, forward movement towards the person.

21   Q.    All right.  But you'd agree with me in order to

22   determine if someone's running, you'd have to see what their

23   feet are doing, right?

24   A.    If you're going to say they are running, yes.

25   Q.    Right.  In fact, if you're just going to say they're

1    starting to run, you have to see their feet, you know, starting

2    to run at some point, right?

3         A.    Yes.

4         Q.    Did you answer interrogatories in this case?

5         A.    I did.

6         Q.    And could you just help us out and tell us what

7    interrogatories are and what you understand interrogatories to

8    be?

9         A.    Kind of like a disposition -- a deposition where

10   you're answering questions.

11        Q.    On paper, right?

12        A.    Correct.

13        Q.    So you get a -- a question that's submitted to you

14   and then you answer it in writing?

15        A.    Yes.

16        Q.    And under oath?

17        A.    Yes.

18        Q.    Okay.  And so were you asked about what

19   Mr. Maselli's position was when you were at the top of the

20   stairs and the door got knocked in?

21        A.    I'm not sure.  It's been a while.

22        Q.    Do you remember writing under oath that the

23   plaintiff ran from officers as we entered the apartment?

24        A.    I don't recall specifically.  It's possible.

25        Q.    I'm sorry.  I didn't catch that.

```
 1        A.    It's possible.  I -- I don't -- you're looking at

 2    the -- the -- I'm sure the actual interrogatory, correct?

 3               MR. BEDRICK:  May I approach, your Honor?

 4               THE COURT:  Yes.  Go right ahead.

 5               MR. BEDRICK:  Attorney Cullen, it is number 9.

 6               MR. CULLEN:  Thank you.

 7        Q.    Go ahead and just read this to yourself, if you'd

 8    like.

 9        A.    Okay.

10        Q.    Number 9 starts -- here's the question and that's

11    the objection, that's the answer.

12        A.    Okay.  The -- you want me to read the paragraph 9?

13        Q.    Just to yourself --

14        A.    Okay.

15        Q.    -- or really just the first sentence.

16        A.    Okay.

17               Okay.

18        Q.    So did you write "the plaintiff ran from officers as

19    we entered the apartment"?

20        A.    Did I read the right portion?  I read the bottom

21    there.

22               MR. BEDRICK:  Sorry.  May I approach again, your

23    Honor?

24               THE COURT:  Yes.  Why don't we just give the witness

25    enough time to read the whole question and answer.
```

1          And when you're done, sir, just let us know.

2          THE WITNESS:  Okay.

3     Q.   This is your answer right here.

4     A.   Okay.

5          Okay.  Yes.

6     Q.   Okay.  So did you have enough time to read that?

7     A.   I did.

8     Q.   And did you state under oath "the plaintiff ran from

9     officers as we entered the apartment"?

10    A.   I did.

11    Q.   Okay.  Sorry.  I've got the wrong papers here.

12         You also testified at a trial in this matter, right?

13    A.   I did.

14    Q.   All right.  One of the issues at that trial was

15    whether Mr. Maselli was resisting the arrest?

16    A.   I believe so, yes.

17    Q.   So it was --

18    A.   That was one of the charges, yes.

19    Q.   Okay.  So the -- the idea of where he's going and

20    what he's doing at that time that the door gets knocked in,

21    that, you would acknowledge, is an important part of that

22    trial, right?

23    A.   Yes.

24    Q.   And that trial was 2019, right?

25    A.   I believe so, yes.

1      Q.    The interrogatories were last year?

2      A.    I think last summer.

3      Q.    If I said May, would that sound right?

4      A.    Yeah.

5      Q.    And in the 2019 trial -- sorry.  This is a little

6   confusing.

7            Did you say that Mr. Maselli was retreating at the

8   time that you -- the door was knocked in?

9      A.    I don't recall specifically.

10     Q.    Okay.  I'll get to that in a second.

11           Did you say that he was moving away from Officer

12  Durden, continuing down the hallway towards the part -- towards

13  the other part of the apartment?

14     A.    That sounds correct, yes.

15     Q.    Okay.  So it was your testimony in 2019 that he was

16  continuing down the hallway?

17     A.    Yes.

18     Q.    And that he was retreating?

19     A.    Yes.

20     Q.    And just to wrap that one up, that trial was in

21  front of a jury, right?

22     A.    Yes.

23     Q.    And it was under oath?

24     A.    Yes.

25     Q.    And, now, you come inside the apartment, and I think

1    I heard you on direct say something to the effect of it

2    wouldn't be accurate to say you assisted with the -- with the

3    takedown maneuver or something like that.

4         A.   Correct.

5         Q.   So it would not be accurate to say that you assisted

6    in bringing Mr. Maselli to the ground?

7         A.   No, it -- as I'm getting there, it -- they're

8    already in motion.

9         Q.   Okay.  And, now, you've already told us that it's

10   important to write reports, right?

11        A.   Yes.

12        Q.   It's important to be accurate when you include

13   detail in those reports?

14             And you did -- I'm sorry.  You have to answer first.

15        A.   Yes.

16        Q.   And you did, in fact, write a report in 2016, right?

17        A.   Yes.

18        Q.   Would you agree with me that your recollection of

19   the events was better in 2016 than it is today?

20        A.   Yes.

21        Q.   Did you state in your report that you assisted in

22   bringing down Mr. Maselli?

23        A.   I did.

24        Q.   But that's not accurate?

25        A.   So when you -- I have contact with Mr. Maselli as

1    he's going down.  Whether or not I'm assisting bringing him

2    down or not, it's difficult to tell because they're already in

3    motion.  I mean, I have physical contact with him, but whether

4    or not it's -- you know, they're falling, he's bringing them

5    down, I'm physically holding on to him and we're going down to

6    the ground at this point.

7         Q.   So you are physically holding on to him?

8         A.   Yes, I have physical contact with him at this point.

9         Q.   But it wouldn't be accurate to say you were

10   assisting in bringing him down?

11        A.   That was tough to gauge at the time, right?  It's

12   happening very quickly.  I have physical contact with him.

13   Whether my physical contact is assisting with bringing him down

14   or it's Officer Durden entirely or we're -- or Officer Durden's

15   falling, we're all falling, that's tough to gauge.  We all

16   just -- you have to quickly -- we're through the door, we're

17   down on the ground.

18        Q.   Were you under some kind of pressure to write your

19   report?

20        A.   No.

21        Q.   So sometime in between when you wrote your report in

22   2016 and now, six years later, you've looked back and said,

23   well, gee, maybe that wasn't so accurate?  I mean, I'm using

24   accurate as your term, right?

25        A.   Yeah.

1    Q.    Okay.  So maybe that wasn't so accurate; is that the

2  reflection over six years?

3    A.    It's possible.  I'm looking at it from the

4  standpoint when we're there to -- you're asking me to gauge my

5  involvement in assisting Officer Durden in bringing Mr. Maselli

6  to the ground.  It's just a difficult thing to gauge.

7    Q.    You were here yesterday, right?

8    A.    Yes.

9    Q.    You heard the testimony yesterday?

10    A.    I did.

11    Q.    You recognized -- it's Sergeant DiTullio now when he

12  took the stand?

13    A.    Yes.

14    Q.    Do you have any reason to believe he was not telling

15  the truth when he took the stand?

16    A.    No.

17    Q.    And did you hear him testify or, sorry, do you

18  remember when he testified that as the door was opening, Durden

19  yelled, down on the ground?

20    A.    I did.  I remember the testimony, yes.

21    Q.    So he testified that Durden said, down on the

22  ground, and one to two seconds later, the male subject was on

23  the floor?

24    A.    I did.

25    Q.    Was that accurate?

```
 1        A.    I did not hear that.

 2        Q.    You did not hear that in 2016?

 3        A.    No.

 4        Q.    But you heard that yesterday?

 5        A.    Yes.

 6        Q.    And then when Mr. Maselli's on the ground, you

 7   administered a palm heel strike.  Is that what you called it?

 8        A.    Correct.

 9        Q.    And I think you even held up your hand and

10   demonstrated the palm of your hand?

11        A.    Yes.

12        Q.    Is that a pain compliance technique?

13        A.    It is.

14        Q.    And you've heard the testimony with Detective Durden

15   about pain compliance, right?

16        A.    Yes.

17        Q.    And how it's designed to hurt the person, right?

18        A.    Correct.

19        Q.    And not only is it designed to hurt the person, but

20   it poses the potential that the person gets injured, right?

21        A.    There is potential, yes.

22        Q.    And you did that intentionally, right?

23        A.    Yes.

24        Q.    I guess the only loose end is did you have any

25   trouble seeing Mr. Maselli as you entered the door?
```

1      A.    As I entered the door?

2      Q.    Yeah, the doorway.  You said you didn't see him

3 until you got through the door, but once you got up to the

4 doorway and you got through, you were able to see him, right?

5      A.    He was partially obscured by Officer Durden who was

6 between me and Mr. Maselli.

7      Q.    There was no issue with the lighting, seeing -- you

8 know, seeing him, right?

9      A.    It wasn't the greatest lighting inside the

10 apartment.

11      Q.    But not pitch black?

12      A.    No, it wasn't pitch black.  Nothing requiring a

13 flashlight, nothing like that.

14      Q.    And no one had their flashlight out either, right?

15      A.    No.

16            MR. BEDRICK:  Okay.  I have no further questions.

17            THE COURT:  Attorney Cullen, do you have any

18 additional questions?

19            MR. CULLEN:  Just a -- just briefly, your Honor.

20            THE COURT:  All right.  Go right ahead.

21                     REDIRECT EXAMINATION

22 BY MR. CULLEN:

23      Q.    Sergeant, Exhibit B is in front of you.  Are you

24 able to see -- it's on the screen in front of you, sorry.

25            Are you able to see at the top of the ceiling, is

1    there a light bulb -- a light up there?

2         A.    There's a light fixture there, yes.

3         Q.    When you guys were all gathered in the hallway or in

4    the stairwell getting ready to go into this apartment, were you

5    standing there in the dark or was that light on?

6         A.    No, I recall there was lighting in the hallway.

7         Q.    Okay.  And was this overhead light on when you --

8    when you were standing in this stairwell?

9         A.    I believe that one was, yes.

10        Q.    Okay.  With respect to the palm heel strike, was

11   that effective?

12        A.    It was.

13        Q.    Okay.  And once you administered that, were you able

14   to secure Mr. Maselli into handcuffs or was somebody able to

15   secure Mr. --

16        A.    Somebody was.  I wasn't -- I did not have the

17   handcuffs, but I was able to bring the arm around into a

18   position where it could be cuffed.

19        Q.    And, again, after he was handcuffed, you never saw

20   anybody strike him in any fashion?

21        A.    No.

22        Q.    And when you were just asked about your trial

23   testimony back in 2019, I was taking notes.  Did you get shown

24   a copy of the trial transcript or just the interrogatories?

25        A.    Just the interrogatory.

1          MR. CULLEN:  Yeah, may I approach, your Honor?

2          THE COURT:  Yes.  Go right ahead.

3     Q.    So just showing you your testimony from that trial

4  and I'm looking at 218.  Your testimony gets interrupted, but

5  it starts at 16.  Could you just read 16 through 23 and then

6  over to the next page for me, please, sir.

7          THE COURT:  Attorney Cullen, just so we're clear,

8  you're asking him to read it to himself?

9          MR. CULLEN:  To himself.  I apologize.

10         THE COURT:  That's quite all right.

11         MR. BEDRICK:  I'm sorry.  Could you give me the

12  line?

13         MR. CULLEN:  Line 16, page 118 (sic).

14    A.    (Witness complied.)

15    Q.    Does reading that refresh your recollection as to

16  what your testimony was in 2019, Sergeant?

17    A.    It does.

18    Q.    And did you -- did you actually say that Mr. Maselli

19  was retreating or did you say that it appeared that he was

20  retreating?

21    A.    He appeared to be retreating.

22    Q.    And is that consistent with your recollection today?

23    A.    It is.

24    Q.    And did you also indicate at that time that he was

25  moving away from Mr. Durden?

1          A.   I did.

2          Q.   And is that consistent with your recollection today?

3          A.   It is.

4               MR. CULLEN:  Just one moment, your Honor.

5               THE COURT:  Certainly.

6               MR. CULLEN:  I don't have any further questions,

7     your Honor.  Thank you.

8               THE COURT:  All right.  Attorney Bedrick?

9               MR. BEDRICK:  Just briefly, your Honor.

10              THE COURT:  Certainly.

11                          RECROSS-EXAMINATION

12    BY MR. BEDRICK:

13         Q.   Just to touch on this point, in that portion that

14    you read, you said that he appeared he was retreating, right?

15         A.   Yes.

16         Q.   That's the clarification you want to make.  But then

17    you were asked right after that, can you describe what you saw

18    the defendant doing when you entered, what you saw Mr. Maselli

19    doing.  So the follow-up question wasn't asking you what he

20    appeared to be doing; the follow-up question was asking you

21    what he was doing, right?

22         A.   Yes.

23         Q.   And your response was that he was moving away from

24    Officer Durden, right?

25         A.   Yes.

1      Q.    But you continued on and you said, continuing down

2  the hallway towards the other part of the apartment.

3      A.    Yes.

4      Q.    Did he continue down the hallway toward another part

5  of the apartment?

6      A.    He did not.

7            MR. BEDRICK:  Nothing further.

8            THE COURT:  Attorney --

9            MR. CULLEN:  Nothing, your Honor.

10           THE COURT:  -- Cullen?

11           MR. CULLEN:  No.  Thank you, your Honor.

12           THE COURT:  All right.  Sir, you can step down.

13  Thank you.

14                          (Witness excused.)

15           THE COURT:  Attorney Cullen, do you have any

16  additional witnesses that you wish to call?

17           MR. CULLEN:  I do not, your Honor.

18           THE COURT:  All right.

19           MR. CULLEN:  I would just like to make sure that

20  each of our exhibits is -- has been --

21           THE COURT:  I'm going to give all of you an

22  opportunity to do that in just a minute.

23           MR. CULLEN:  Thank you.

24           THE COURT:  So, yes, I will not forget.  And if I

25  do, please, counsel, remind me.

1            All right.  So having no additional witnesses,

2   Attorney Cullen, are there any additional witnesses -- are

3   there any exhibits that you want to move into evidence that

4   haven't been moved into evidence yet?

5            MR. CULLEN:  Your Honor, I believe we've moved them

6   all in, but we do have Exhibits A through H, and I guess to the

7   extent that any of those which have been agreed upon in advance

8   were not moved in, I'd ask that they be moved in now.

9            THE COURT:  All right.  And, Attorney Bedrick, do

10  you have an objection to that?

11           MR. BEDRICK:  No objection, your Honor.

12           THE COURT:  All right.  So we're moving all of the

13  exhibits, A through H, into evidence as agreed to.

14           MR. CULLEN:  Thank you, your Honor.

15           THE COURT:  All right.  Very good.  All right.

16           Here's what I propose that we do.  I propose that we

17  release the jury now for lunch and that the jury plan on coming

18  back -- I'm going to give you a long lunch period in the hopes

19  that I can get all of the things done that I need to get done

20  for this trial in the next two hours.

21           So my plan would be to have the jury come back at

22  two o'clock.  Is there any objection to that from counsel?  I

23  think that gives you time to have a break and for us to do some

24  of the things we need to do before the jury returns.

25           MR. CULLEN:  I have no objection.  I think that's

1 plenty of time.

2          MR. BEDRICK:  I agree.  Thank you.

3          THE COURT:  All right.  So, members of the jury, I'm

4 going to ask that you do your best to get back here by two

5 o'clock.  I know that probably feels like a long lunch period

6 to you but, respectfully, I think that we need that time in

7 order to make the most efficient use of time when you get back

8 and also to use that time while you're out at lunch.

9          So we are taking our lunch break now.  I want to

10 again remind you of the instructions that I've given you

11 earlier.

12          Until the trial is over, please do not discuss this

13 case with anyone, including your fellow jurors, any members of

14 your family, anyone that's involved in the trial, or anyone

15 else.  If someone approaches you and tries to talk about the

16 case, do not tell your fellow jurors, but advise me about that

17 immediately.

18          Do not use any technology or social media or any

19 other types of media or otherwise to communicate with anyone

20 about this case.

21          Do not read or listen to any news reports about the

22 trial and do not conduct any type of research or inquiry or

23 investigation about the trial, the parties, et cetera.

24          Please keep an open mind until all of the evidence

25 has been received and you have heard the views of your fellow

1    jurors.

2              And, again, if there's something that you need to

3    address with the Court, please do not hesitate to let one of

4    the court staff know or to address it with me directly.

5              All right.  So we are adjourned for lunch and I look

6    forward to seeing you at two o'clock.  Thank you.

7              THE CLERK:  All rise for the jury.

8                        (Jury excused.)

9              THE COURT:  All right.  We can all be seated.  I'm

10   happy to have folks remove their masks.

11             All right.  So, Attorney Cullen, you've indicated

12   that you don't intend to call any witnesses.  Do you rest?

13             MR. CULLEN:  I do rest, your Honor.

14             THE COURT:  All right.  Thank you.

15             Are there any motions that the parties wish to make?

16             MR. CULLEN:  There is for me, your Honor.

17             I'd like to renew my motion for directed verdict,

18   although I don't think it's actually called that anymore, but

19   for judgment.

20             This case is an unusual posture.  The plaintiff has

21   testified that he wasn't hit by any officer, or any other

22   person for that matter, prior to being put in handcuffs, so his

23   case rests on his claim that he was struck six to seven times

24   after being handcuffed.

25             He was unable to identify any officer who delivered

1    those alleged blows and each of the officers has testified that

2    they did not do so.  Nobody has identified who delivered the

3    blows on which the plaintiff's excess force case and battery

4    claims rest and for that reason, I think he has not sustained

5    his burden and does not -- this case should not be going to a

6    jury under, as I say, the sort of unusual facts of this case.

7            His case rests on specific allegations, his own

8    testimony, and he was not able to identify who -- who delivered

9    those alleged blows.

10           THE COURT:  All right.  Anything else, Attorney

11   Cullen, before I turn it over to Attorney Bedrick?

12           MR. CULLEN:  No, thank you.

13           THE COURT:  All right.

14           Attorney Bedrick.

15           MR. BEDRICK:  Thank you, your Honor.

16           We obviously object.  Mr. Maselli testified that

17   there were blows coming from two sides as his head was buried

18   into the ground.  He testified that it was impossible, I think

19   was the word he used or implausible or something to the like,

20   that it would be coming from two people, given the amount of

21   force or, I'm sorry, that it would be coming from a single

22   person, given the amount of force that was required from each

23   side.

24           He was able to identify one of the officers who came

25   in first.  We've got two officers who have testified that they

1    came in and I guess went down with Mr. Maselli -- I guess it

2    doesn't really matter whether Sergeant Yurcak had actually

3    assisted or not, but the testimony from the defense is

4    consistent that the two other officers, Lombardi -- or, sorry,

5    detectives -- Lombardi and DiTullio, were stepped back.  I

6    guess there is one discrepancy that DiTullio says he also came

7    to the ground.

8             But there is testimony from both of those officers,

9    Yurcak and Durden, that they delivered strikes and they

10   delivered specific kinds of strikes, knee strikes and a hand

11   strike, a palm heel strike.  Mr. Maselli said that he felt a

12   knee on one side and, you know, a hand or a fist, I guess is

13   what he described it as, on the other side.

14            And so the jury does have enough evidence to

15   conclude that those two officers were the ones that were

16   striking, that those two officers had done the things that they

17   had -- that they admitted that he they did with the knee and

18   with the hand, and that's sufficient identity to allow them to

19   render a verdict on the excessive force claim and the battery

20   claim.

21            THE COURT:  Okay.  All right.  Thank you.

22            Counsel, I'm going to continue to take that motion

23   under advisement and we will proceed.  All right?

24            So here's what I'm thinking.  I am going to go back

25   and do some additional work on the jury instructions based on

1    the arguments that were made earlier this morning in the

2    charging conference.  We're going to continue that conference.

3    What I'd like to do is give you a lunch break, which I'm not

4    always very good about doing.

5              So here's what I propose.  I propose that if you all

6    could come back here at quarter to 1:00, I think we'll be ready

7    by then to give you some additional materials.  I think we

8    probably may even have those materials before you step away for

9    lunch.

10             Is that right, Laurie?

11             THE LAW CLERK:  Yeah, I just have to run upstairs

12   and get them.

13             THE COURT:  All right.  So I'm going to ask you not

14   to break for lunch yet.  Let's get those materials to you.  And

15   why don't I give you a full hour for lunch, that way you'll be

16   able to look at those documents, and we'll convene at

17   one o'clock.

18             MR. CULLEN:  Thank you.

19             THE COURT:  We'll have a follow-up charging

20   conference.

21             Yes, Attorney Bedrick?

22             MR. BEDRICK:  Could I clarify which issues remain

23   for the charging conference?  I know there was the double

24   recovery --

25             THE COURT:  There's double recovery language that

1    you -- that I have given you a copy of.  You'll need to let me

2    know if that's okay.

3            MR. CULLEN:  After look -- since there's a change in

4    the jury -- I apologize.  I'm interrupting --

5            THE COURT:  That's all right.

6            MR. CULLEN:  -- you, your Honor.

7            Given the change in the verdict form, I'm

8    withdrawing my request now that somebody, Laurie perhaps, has

9    typed up the double recovery.

10            THE COURT:  All right.  So we will take that

11    language out.  If it's in the draft you get, we won't go

12    forward with that.  Okay?

13            MR. CULLEN:  I apologize for that, your Honor.

14            THE COURT:  So there's been a request that the Court

15    consider adding qualified immunity language as it relates to

16    the battery count and I have not issued a ruling on that.

17            MR. BEDRICK:  It was the *Everett* immunity, right?

18            THE COURT:  The *Everett* immunity, yes.  Excuse me.

19    *Everett* immunity.

20            MR. BEDRICK:  And so that's the sole issue

21    remaining?

22            THE COURT:  I believe it is, and also a request to

23    take one sentence out of the battery instruction.

24            MR. BEDRICK:  Okay.

25            THE COURT:  All right?

1          MR. CULLEN:  Thank you.

2          THE COURT:  Do you agree that that's all that's

3   left?

4          MR. CULLEN:  Yes, though I'll have to look at the

5   new form.

6          THE COURT:  Yes, you will, and I'll give you a

7   chance to raise issues, and I have some other housekeeping

8   things, since we didn't go through the instructions in my usual

9   style of each page.  So we'll just need to wrap some things up

10  as it relates to that as well.

11         MR. BEDRICK:  Okay.  And the -- the form that we

12  received, the special verdict form that we received prior to

13  this testimony, is the one that we're working off of at this

14  point, right?

15         THE COURT:  That is your form as submitted to the

16  Court as being agreed upon.  The only thing that's changed is

17  we've added the Court's caption, as I understand it.

18         MR. BEDRICK:  Okay.

19         THE LAW CLERK:  Names --

20         THE COURT:  Yes, names, instead of defendants.

21         THE LAW CLERK:  -- instead of defendants.

22         THE COURT:  Thank you.

23         All right.  Anything else?

24         MR. CULLEN:  No, your Honor.

25         MR. BEDRICK:  No, your Honor.  Thank you.

1      THE COURT:  Okay.  Very good.  So we'll see you back

2   here at one o'clock.

3      Thank you.

4      MR. CULLEN:  Thank you, your Honor.

5      THE CLERK:  All rise.

6      (Lunch recess taken from 11:58 a.m. until 1:04 p.m.)

7                    WITHOUT THE JURY PRESENT

8      THE CLERK:  All rise for the Honorable Court.

9      THE COURT:  Good afternoon.  Please be seated.

10      MR. CULLEN:  Good afternoon, your Honor.

11      THE COURT:  All right.  So hopefully we won't need a

12   whole hour to go through what we have left to talk about and

13   you'll actually get another little bit of a break before we

14   resume trial.

15      So let me begin by just making sure that everyone

16   received at this last break, the updated jury instructions and

17   the special verdict form.  That is the form that was jointly

18   agreed to and submitted by the parties to the Court and that

19   the modification that the Court made was to use individuals'

20   names in the place of plaintiff and defendant throughout.

21      Do the parties have those two documents?

22      MR. CULLEN:  Yes, your Honor.

23      MR. BEDRICK:  Yes, your Honor.

24      THE COURT:  All right.  Very good.

25      So let me begin with the special verdict form and

1    just make it clear again for the record that this is the

2    verdict form with those modifications that was submitted as the

3    jointly agreed-to statement or, excuse me, the jointly

4    agreed-to special verdict form.

5              Am I correct that with those amendments it reflects

6    what the parties agreed to and submitted to the Court?

7              MR. CULLEN:  Yes, your Honor.

8              MR. BEDRICK:  Yes, your Honor.

9              THE COURT:  All right.  So I am proceeding with the

10   understanding that any objections to this special verdict form

11   are waived.  If that's not the case, then I'm going to ask

12   counsel to put their objections on the record.

13             MR. CULLEN:  For the defense, I have no objection.

14   I do have a typo that I wanted to --

15             THE COURT:  That we should fix.

16             MR. CULLEN:  It's not so much a typo, but on the --

17   at the end of question 2 it says if you answered yes to both

18   questions or either, turn to the next page, but the actual next

19   question is on the same page.  I think we just need a hard stop

20   to flip the page.

21             THE COURT:  At -- in between question 1 and question

22   2 or section 1 and section 2 --

23             MR. CULLEN:  Correct.

24             THE COURT:  -- page break.  All right.  I will add

25   that page break when we finish here.

1             And Attorney Bedrick.

2             MR. BEDRICK:  Nothing, your Honor.  Thank you.

3             THE COURT:  All right.  Very good.

4             Now, as it relates to the jury instructions that I

5    have before you, I am turning to what's page 16.

6             There is an instruction there, it's instruction F,

7    section -- subsection F entitled Double Recovery Prohibited.

8    My understanding is that that was a request made by the

9    defendants and it's been withdrawn by you, Attorney Cullen; is

10   that correct?

11            MR. CULLEN:  That is correct, your Honor.

12            THE COURT:  All right.  And, Attorney Bedrick, are

13   you in agreement with that withdrawal?

14            MR. BEDRICK:  I am, your Honor.

15            THE COURT:  All right.  That is withdrawn by

16   agreement of the parties.

17            Now I'd like to turn our attention to the battery

18   instruction.  It starts on page 12 and it continues on to page

19   13.

20            We did add a word that I want to identify for you.

21   In the section just before section D, Official Immunity, three

22   lines up from that we added the word "however" so that it would

23   flow.  So I just want to make sure you were aware of that.

24            And we did remove the final sentence from that

25   section.  As you requested, Attorney Cullen, after I read it

1   again, I concluded that it was redundant with the other

2   information that was in the instruction already.

3           MR. CULLEN:  Thank you, your Honor.

4           THE COURT:  All right.  With regard to the

5   defendants' request for what they proposed in document number

6   42 as instruction number 6, the Court intends to include that

7   instruction.  The Court notes that there was no written

8   objection filed to this instruction by the plaintiff and

9   plaintiff's submissions included no alternate battery

10  instruction except for a request for enhanced damages as it

11  relates to battery.

12          Having had an opportunity to review that additional

13  language, Attorney Bedrick, do you wish to put any objections

14  on the record?

15          MR. BEDRICK:  I'm sorry.  Which instruction was

16  that?

17          THE COURT:  The official immunity instruction on

18  pages 13 and 14 that relate to battery.

19          MR. BEDRICK:  Yes, I agree with this instruction,

20  your Honor.  Thank you.

21          THE COURT:  Okay.  Very good.

22          Attorney Cullen, do you have anything you want to

23  add as it relates to the way that the Court has handled that

24  request?

25          MR. CULLEN:  No, thank you, your Honor.

1          THE COURT:  All right.  Very good.

2          All right.  So before I turn to a housekeeping issue

3    that I need to do for the record, is there anything else as it

4    relates to the jury instructions as they've been provided to

5    you at the noon break that we need to address?

6          MR. CULLEN:  I did have one -- one matter, your

7    Honor.

8          On page 7, under the definition of claims, you have

9    repeated the stipulations that were entered into by the

10   parties.

11         Although those are accurate, I think they're just

12   like any other piece of evidence and I don't see why they would

13   be highlighted by pulling them out and reading them again to

14   the jury.

15         THE COURT:  All right.  What's your position on

16   that, Attorney Bedrick?

17         MR. BEDRICK:  I mean, I don't think the plaintiffs

18   are entitled to have them in that area, so I would leave it to

19   the Court.  If the Court believes that it's helpful in

20   determining what the scope of the claims are that the -- or

21   what's left of the claims that the jury is to decide, then we

22   could leave it there, but ...

23         THE COURT:  It's been read into evidence.  I don't

24   think it's necessary.  And since there's no objection to

25   removing them, we'll remove them.

1          MR. CULLEN:  Thank you, your Honor.

2          THE COURT:  All right.  Is there anything else?

3          MR. CULLEN:  Nothing from the defense, your Honor.

4          MR. BEDRICK:  Nothing from the plaintiff.

5          THE COURT:  All right.  So let me tell you what my

6     intention is next unless you request me to do something

7     different.

8          I don't intend to go through each one of the jury

9     instruction requests that you've submitted.  Instead -- unless

10    you ask me to.  My inclination otherwise would be to simply

11    indicate that as to the parties' requests for jury instructions

12    and any other filings related to jury instructions that have

13    been made in advance of this trial that they are granted to the

14    extent that they are consistent with the instructions as we've

15    just agreed to them and that they're denied to the extent that

16    they're inconsistent with what we've just agreed to are the

17    jury instructions that will be read to the jury in this case.

18          MR. CULLEN:  That's satisfactory to the defense,

19    your Honor.

20          MR. BEDRICK:  Likewise.  Thank you, your Honor.

21          THE COURT:  All right.  So that is my order and I

22    will again just ask to the extent that counsel have any

23    additional objections that they want to put on the record as

24    they relate to the special verdict form or the jury

25    instructions before I read them to the jury, now would be the

```
 1    time to do that.

 2              Nothing?

 3              MR. CULLEN:  No, your Honor.

 4              MR. BEDRICK:  Nothing, your Honor.

 5              THE COURT:  All right.  So I want to give you a

 6    little bit of time to regroup, but before I do that, let me

 7    just ask one other housekeeping thing.

 8              Do we expect any rebuttal witnesses?

 9              MR. BEDRICK:  No, your Honor.

10              MR. CULLEN:  No, your Honor.

11              THE COURT:  All right.  So here's what I plan on

12    having us do.  I don't think there's anything else we need to

13    address and if we don't, my intention would be to excuse you.

14    We'll get these documents ready to go.  I'll give the jury a

15    copy to read along when I give them their instructions.

16    They'll leave that document -- those copies on their chairs.

17    There'll be a copy given to them or waiting for them in their

18    deliberation room as well.

19              So we'll get back together at two o'clock, we'll do

20    closings, and then I will instruct the jury and they can

21    deliberate.

22              MR. CULLEN:  Thank you, your Honor.

23              MR. BEDRICK:  Thank you.

24              THE COURT:  All right.  Very good.  Thank you.

25    Enjoy the rest of your break.
```

1          THE CLERK:  All rise.

2          (Recess taken from 1:13 p.m. until 2:08 p.m.)

3               WITHOUT THE JURY PRESENT

4          THE COURT:  Good afternoon.  Please be seated.  All

5     right.

6          THE CLERK:  This court is now in session.

7          THE COURT:  So, counsel, I have some additional

8     changes that I wanted to highlight for you as you went through

9     another read-through of the special verdict form.  I concluded

10    that there were some additional adjustments that were

11    appropriate that I wanted to review with you.

12         So the first one is -- I'm going to recommend that,

13    and you'll see this on page 2, in the section where we instruct

14    the jury as to what they should do if they award nominal

15    damages, I added a reminder to them that that amount may not

16    exceed one dollar.

17         The other -- and I did that in two places.  I did

18    that on page 2 and I did that on page 3 in the same section

19    that deals with nominal damages as to Sergeant Yurcak.

20         The other thing that I did, and this is another

21    pagination issue, but it required me to make a text change.

22         On page 3 in the second bold section under question

23    7, it originally read:  If you answered yes to either question

24    7 or 8 or both, please turn to the next page and respond to the

25    questions, and the section on damages to be awarded against

1   John Yurcak, that's on the same page.  So what I did was I

2   struck the words "turn to the next page" and just said please

3   respond to the questions.  All right?

4              Okay.  So are there any objections to the special

5   verdict form with those additional modifications?

6              MR. BEDRICK:  No, your Honor.

7              MR. CULLEN:  No, your Honor.

8              THE COURT:  All right.  Very good.

9              The other thing that you should have in front of you

10  is a cleaned-up version of the jury instructions.  Is there

11  anything else that we need to address as it relates to those?

12             MR. BEDRICK:  When you say cleaned-up, your Honor,

13  you mean the final version?

14             THE COURT:  Correct.

15             THE CLERK:  Kathy was still grabbing those.

16             THE COURT:  So she hasn't given those --

17             MR. CULLEN:  I don't think we have those yet.

18             THE COURT:  I'm sorry.  You should have those, and I

19  guess they haven't come up get.  I'm going to give you a minute

20  to look at those.

21             If she could just bring us up the two copies for

22  counsel, that would be fine.  Otherwise, I'm just going to go

23  make a copy.

24             THE LAW CLERK:  I was going to say I have copies

25  upstairs.

1          THE CLERK:  I have a printer right here.

2          THE COURT:  Oh, we're going to print two right here.

3          THE CLERK:  Oh, okay.

4          THE COURT:  Thank you.  Sorry about that.  I thought

5   you already had them.  That's -- my apologies.

6          THE CLERK:  It's a small printer, so just --

7          THE COURT:  That's all right.

8          So why don't we do this.  I'm going to come off the

9   bench so that counsel doesn't have to have me standing over

10  them while they're trying to read through those.  I'll step

11  away.  After you've had a chance to look at them, if there's

12  something that we need to address, just let my case manager

13  know so that I'm prepared for it to be a little longer.

14         If you're -- if you've reviewed them and you're in

15  agreement that there's nothing else we need to discuss, just

16  let her know that.  I'll come out, we'll put that on the

17  record, and then we'll proceed with closings and charging the

18  jury.

19         MR. CULLEN:  Is there a specific area that you'd

20  want us to focus on, your Honor?

21         THE COURT:  I think that it's really just the things

22  that we went through.  I want to just make sure that you're all

23  good with it as -- before we read it to the jury.  All right?

24         Ah, there we go.

25         I'm going to step away.  Thank you.

1           (Recess taken from 2:12 p.m. until 2:17 p.m.)

2                   WITHOUT THE JURY PRESENT

3               THE CLERK:  All rise.

4               THE COURT:  Please be seated.

5               THE COURT:  All right, counsel, just before I

6       stepped away or after I stepped away, I believe that you

7       received the final Court's version of the jury instructions and

8       also the special verdict form.

9               We've already gone over the special verdict form and

10      counsel have indicated that there are no objections or concerns

11      or additional requests as it relates to the jury instructions.

12              Is there anything we need to address?

13              MR. CULLEN:  No, your Honor.

14              MR. BEDRICK:  No, your Honor.

15              THE COURT:  All right.  Very good.

16              So as is my practice, again, just so that you know,

17      what I intend to do is to have you do your closings.  I will

18      then pause for a moment, I'll ask my case manager to provide

19      the jurors with a copy of the instructions so that if they wish

20      to read along that they can.  I'll do it in that sort of

21      take-one-and-pass-it-down style and then once the jurors are

22      situated, I will give them my instructions and then they will

23      deliberate, they'll adjourn to deliberate.  All right?

24              MR. BEDRICK:  Yes.

25              THE COURT:  Okay.  Is there anything else we need to

1   address?

2              MR. CULLEN:  No, your Honor.

3              MR. BEDRICK:  No, your Honor.

4              THE COURT:  Okay.  Very good.  We can get the jury,

5   please.  And we should mask.  Thank you.

6              THE COURT:  All rise for the jury.

7                    WITH THE JURY PRESENT

8              THE COURT:  Please be seated.

9              Members of the jury, we are at that place in the

10  trial where counsel will give their closing arguments, and I

11  will ask Attorney Cullen to proceed.

12             MR. CULLEN:  Thank you, your Honor.

13             Good afternoon.  It's been a long time waiting for

14  you guys.  I'm sure we all appreciate that, so I'll try to keep

15  my comments relatively short.

16             I told you at the beginning of the case yesterday

17  that I thought this would be a short trial and I think you can

18  agree that that was true.

19             I also told you yesterday that I thought this was an

20  important trial and particularly important for Officer Durden

21  and Sergeant Yurcak.  And I believe that's true, too.

22             And plaintiff's counsel told you that this case

23  really was going to come down to who do you believe.  And

24  that's also true.

25             The plaintiff told you his story.  He told you that

1   he was -- you know, as soon as the officers came into the door,

2   he was standing there with his hands either up or to the sides.

3   I think he said it was to his sides.  He testified his sides,

4   but he held them up.  But he told you that he did that and that

5   he was ordered to the ground and that he immediately complied.

6          He told you he's not bringing a claim based on them

7   bringing him to the ground because he says that didn't happen.

8   And he says he's not bringing a claim based on them

9   administering a knee strike or a palm strike while he was being

10  handcuffed because he says that didn't happen.

11         His entire claim is that after he was laying on the

12  ground with his hands cuffed, these two officers punched or

13  kneed him several additional times in combination over the next

14  45 seconds while someone else in the room laughed and mocked

15  him by saying, stop resisting.  That's -- that's his case.

16         And if you believe that and you believe that he's

17  provided proof that these two officers did that -- and,

18  remember, he says he didn't even see who it was supposedly did

19  that -- then, look, that's not appropriate and that would be

20  excessive force.

21         The officers tell you that's not what happened.

22  They told you that when the door opened, Mr. Maselli's not

23  standing there like this.  When Durden goes through, he sees

24  him turn to the side.  When Officer Yurcak -- when Sergeant

25  Yurcak comes through, they're already to the side, going to the

1    ground.  And when Detective DiTullio comes through, they're on

2    the ground.

3          And that -- and they testified that, you know, he

4    wouldn't give his hands, we had to administer a palm heel

5    strike, I think it was called, and a knee strike to get him to

6    release those hands, and that the whole thing took place in

7    seconds.  I think the plaintiff said three to four seconds.

8    Officer Durden, I think, said maybe 15 seconds.  But seconds.

9    As Sergeant Yurcak said this morning, it was just one

10   continuous movement; open the door, plaintiff goes this way,

11   they grab him, they go to the ground.

12         So obviously those two stories can't be both true.

13   They just can't.  So your decision ultimately is to try to

14   determine who's telling the truth.

15         And how do you do that?  Well, the judge is going to

16   give you instructions on credibility of witnesses and as you

17   listen to them, I think what you'll conclude is it's the same

18   thing do you every day.  You do it in your business, you do it

19   in your home life, you do it when you're deciding if your kids

20   are telling you the truth over who broke the PlayStation or the

21   Xbox, or whether you're buying a car.  Decisions of credibility

22   every day.

23         You look at things like does the story make sense?

24   Did the person have a bias?  Did they have -- you know, how did

25   they appear to you on the stand?  Did they look at you and talk

1    to you or -- and did -- did they come across as credible?

2    Those are the same things you do every day.  It's not -- it's

3    not magic and you don't have to leave that in a box someplace,

4    your day-to-day routine.

5           So -- so let's look at the testimony.  Mr. Maselli

6    testified that he had no idea why the police were there that

7    day.  No idea.  And yet when the police asked him who he was,

8    he immediately refused to even give his name.  Is that

9    consistent with somebody who has no idea why the police were

10   there, not even to give his name?  And he said when they

11   explained to him, he said that they changed their tone when

12   they realized he wasn't going to cooperate with them and they

13   started getting more aggressive.

14          And we played the tape for you of that that he

15   recorded himself.  And I said, well, was that -- so did he

16   change his tone after that or during that?  He said during

17   that.  He said, do you hear that part where he says he -- you

18   know, he said, I don't really care right now?  That's the tone

19   that he is claiming is aggressive and aggravated.  It's that

20   tone.  And that's what he tells you.  And you heard it, so you

21   don't have to speculate on what might have happened because he

22   told you that's the tone.

23          Well, you saw Detective DiTullio testify yesterday

24   and, you know, throughout examination and cross-examination

25   his -- you know, did he seem aggravated or elevate his tone or

1  did he sound like it on the -- on the -- on the tape?  You can

2  consider that.

3          And then perhaps the most complicated part of this

4  is Mr. Maselli says once they decide to open the door -- now,

5  remember, he hasn't complied with the request to talk to them

6  and he doesn't have to.  He hasn't complied with the request to

7  leave, though, and he hasn't complied with the request to open

8  the door and let them in.  But now he says he's completely

9  compliant when the guys come in.  Now he's -- now it's not the

10 officers that have changed their tone.  He's changed his tone.

11 Now he's completely compliant, doing everything he's told.  He

12 tells you he's just standing there in the dark.

13         And if you remember the back-and-forth while we

14 talked about this, like were the lights on inside?

15         Well, there might have been a hallway light.

16         Well, let's see the video.  What does it look like?

17         Well, I might have had my finger over the -- over

18 the phone.

19         And then you saw there's a little sliver where he

20 said -- I mean, it's up to you, but doesn't that look like --

21 that little sliver look like it's a doorway or something as

22 opposed to his finger coming off the thing?

23         And I said, well, look, if you're standing there,

24 trying to make sure -- and this was his testimony; I was there

25 with my hands by my sides and -- because I didn't want them to

 1    think I was resisting.

 2            And I said, wouldn't the smart thing to do, if

 3    you're trying not to -- if you're trying to show the police

 4    officers that you're not resisting, to turn on the light?

 5    Isn't that what some of us teach our kids, if you get pulled

 6    over at night, turn on the dome light so the police can see

 7    inside?  Not because the police are inherently dangerous, but

 8    because the situation is inherently dangerous for the police.

 9            They come into an apartment that's dark.  They --

10    they've got -- intentionally dark, according to the plaintiff,

11    and they have to make split-second reactions.  And that's going

12    to be important when you get your jury instructions, to keep in

13    mind split-second reactions they have to make.

14            And then he said, well, there's ambient light coming

15    in from outside.  And we talked about that, too, with the

16    window.

17            I said, well, you know, there's one window there.

18            He said, well, there are two.

19            I'm like, well, they're together, right?

20            Yeah.

21            And when you look out that window, you're facing the

22    parking lot.

23            He said, well, no; I mean, you can see the street.

24            I said, well, if you look at it at an angle, you can

25    see the street; is that what you're telling me?

1          He said, well, I'm not sure what you mean by angle.

2          I said, well, you know, Mr. Maselli, you went to law

3    school, right?  You know what an angle is.  He said, they

4    didn't teach us much about angles in law school.

5          Does that sound -- does that exchange improve your

6    perception of Mr. Maselli's credibility?  He's standing there

7    in the dark, according to him.

8          And then he says the police never touched him until

9    his hands were behind his back and only then did they start --

10   apparently somebody who's unnamed at this point starts kicking

11   and punching him.

12         Well, you saw the two officers he's accused of doing

13   that today.  You saw them on the stand.  And you have to make

14   your own assessment.  When they looked at you today and told

15   you they didn't do that, did that strike you as honest

16   testimony?  Does it comport with the fact of this case?

17         If Mr. Maselli is compliant on the ground, why --

18   why would they do this?  There's no indication that they knew

19   him before.  They -- I think that -- the detective said that

20   they didn't -- they hadn't been to the house before.  He hasn't

21   testified that, oh, you know, I knew these guys; they had it

22   out to get me.

23         And then what does he say happened?  He said he was

24   in an intense amount of pain from the blows.  Intense amount of

25   pain.  And his counsel went over with him, and you're a boxer,

1    right?

2              Yes, I was.

3              An accomplished boxer.

4              Yes, I made it to the semifinals in I think it was

5    the Golden Gloves.

6              How does this differ from when you get hit in

7    boxing?

8              Monumentally different, he said.  Monumentally

9    different.  He said, I didn't see these ones coming.  Boxing,

10   you've got gloves, they're glancing blows.

11             He made it crystal clear to you that this was

12   intense pain that he was suffering.

13             Now, the officers all testified they didn't see any

14   evidence of that, but you don't have to believe the officers on

15   that because you have the booking video.  And the booking video

16   is at 9:21 and the arrest is just after 9:00, 20 minutes after

17   this incident, 20 minutes after this supposed beat-down by the

18   officers.  Did he look to you like somebody who was in intense

19   pain?  Did he look on that video like somebody who was scared

20   of Officer Durden who's back there?  Did Officer Durden look to

21   you like somebody who had just administered some sort of a

22   beating to this arrestee and now was -- was, you know, booking

23   him into office.  Is that what it looked like on that video?

24             I can't tell you.  It's your decision.  But look

25   at -- looking at this video which you just saw this morning, is

1  that how it appeared or did Mr. Maselli appear to be somebody

2  who's asking Officer Durden questions like, you know, okay, how

3  does this process work?  How do I get bail?  What -- and

4  Officer Durden's responding to him, well, you know, I can tell

5  you it's a $40 fee to have the bail commissioner come here.

6          Did that interaction 20 minutes after this supposed

7  beat down, did that look like two people who had been in a --

8  who had, you know, been in the situation where he struck him

9  multiple times when handcuffed and mocked him and laughed at

10  him?  Is that -- 20 minutes later, is that what that looked

11  like?

12          Now, he admits that he went to see his primary care

13  physician three weeks later and he didn't mention anything

14  about this.  He saw a counselor a week after that.  He didn't

15  mention anything about this.  He -- in fact, he admits that he

16  didn't file a complaint with the police or any other person

17  until he filed this case three years after the fact.

18          Now, the officers -- three officers testified.

19  Detective DiTullio testified yesterday to the preliminary, why

20  they were there.  They were investigating a serious felony.

21  They checked the downstairs door.  The downstairs door was open

22  and unlocked.  They came in to what they believed was a common

23  room and went up.

24          And he testified to you to a series of facts that

25  really aren't contested.  I asked him if he talked to me.  He

1  wouldn't.

2          I asked him his name.  He refused to answer.

3          I asked him why he was there or whether he had a

4  purpose in the apartment.  You know, he didn't answer.

5          I talked to him about -- like I asked him to step

6  out of the apartment.  He refused to do that.

7          Again, you don't have to really even think too much

8  about the testimony because you heard all of that on the tape

9  as well.  That was all consistent.

10          And plaintiff's counsel spent most of the

11  cross-examination picking apart DiTullio's 2019 testimony about

12  a 2016 event, saying, well, you know, you said in here ran; you

13  said in here -- you know, did you actually see him run?

14          No, I didn't actually see him run.

15          But you said you saw him run.

16          Well, you know, I believed he ran.  Based on what I

17  saw when I came in the door, I believed he ran.

18          You know, there was a lot of back and forth there.

19          What didn't you hear in all that cross-examination?

20  Was there ever a point where Detective DiTullio at any point

21  said, yeah, you should see what these guys did after we

22  handcuffed him.  Was that part of the cross-examination?  Or

23  were we just picking on threads of something from a testimony

24  in 2022 about testimony in 2019 about testimony in 2016.  Were

25  any of those things really, really important to the case?

1          Let's talk about the two people who were actually

2     important to the case, the two guys who are actually accused

3     the excessive force, of violating somebody's Fourth Amendment

4     rights, and of battery.

5          They both testified today and Officer Durden told

6     you about his experiences, the fact that he is trained, the

7     fact that he has OC spray, the fact that he has a Taser.  He

8     didn't use any of those.  He used a single knee strike.  Why?

9     Because he said, I've got to see the guy's hands.  Why does he

10    want to see the guy's hands?  Because -- he didn't then, but

11    Officer Durden has 16-month-old twins at home and he wants to

12    go home.  And he -- you heard they want to see his hands.  Why?

13    Officer -- Sergeant Yurcak told you.  The hands are what are

14    dangerous.  They're dangerous because that's where people punch

15    officers, that's where people hold weapons.  Get the hands out

16    as quickly as you can.  You get the hands secure, everybody can

17    breathe out and they stand him up and they take him to the

18    station.

19         And he says Officer -- he said, he didn't complain

20    to me about any injuries in the car, didn't complain to me

21    about any injuries at the station.  And, again, you saw the

22    booking, so we don't have to sort of go back through that.

23         And then what does Officer Durden do?  He goes and

24    he writes his report and he writes a Use of Force report.  And,

25    yeah, I administered a knee strike.  Because that's what

1   they're supposed to do.

2           Now, Sergeant Yurcak testified and he talked to you

3   a little bit about his background and his training.  He teaches

4   ethics in -- in criminal justice and he told you about his role

5   as sergeant coming on to the scene and how he assessed the

6   scene and agreed that they needed to freeze the scene and enter

7   the apartment at that time.

8           Now, he's -- you know, maybe he's on the scene

9   20 minutes, I think, if I'm doing the math right.  Maybe it's a

10  half an hour.  But they try to get a key to the door.  They're

11  trying it make this as easy as possible.  But eventually you

12  have to get in and try to secure -- secure it -- secure the

13  scene.  And they do.  And he tells you what he sees from when

14  he's back on that landing.

15          And when he gets up, he says, well, when I turned

16  the corner, by then Officer Durden -- your memory controls, so

17  if I'm saying something that doesn't comport with your memory,

18  it's what you remember that matters.

19          But if he -- he says he sees him, he grabs him, and

20  he goes to grab him as well and they go to the ground.

21          Now, again, plaintiff's counsel cross-examined him

22  like, well, back in 2016 when you wrote your report, you said

23  you assisted him, you assisted Officer Durden down to the

24  ground.  Did you assist him?

25          And he's like, I don't know.  I -- I grabbed ahold

1  of him.  We went to the ground.  Is that assisting?

2          I mean, he says that didn't even happen and they're

3  nitpicking over whether that's assisting or not.

4          And like Officer Durden, Sergeant Yurcak admits --

5  he's like, yeah, I hit him with my heel -- palm strike and he

6  explained to you why.

7          You know, if they were -- I guess if they were lying

8  about this they could have just said they never used any force

9  at all.  There's certainly no indication that they used force.

10  There's no bruises, no injuries, no signs of -- no medical

11  records, nothing like that.  If they were going to lie about

12  this, why not go the whole lie and just say I didn't do

13  anything.

14          The judge is going to instruct you on the claims, so

15  I'll be brief on this.  There are two claims that are going to

16  be before you, an excessive force claim, which is a

17  constitutional claim, and a battery claim.  And there are some

18  subtle distinctions between the two, but they both really come

19  down to, you know, did the officers use excessive force or

20  unreasonable force.

21          And the judge is going to tell you, in particular

22  with respect to the constitutional claim, I think -- I think

23  she'll instruct you that, you know, this is a matter of looking

24  at it from the officers' perspective, from split-second

25  decisions, not 20/20 hindsight, not, you know, Monday morning

1   quarterback, hey, I would have run the ball, I wouldn't have

2   passed.  You know, just, like, what did the officers take at

3   this time, what's in their mind.

4          And the Court will also provide with you -- provide

5   you with some factors that you can consider, things like the

6   seriousness of the crime that's under investigation, the extent

7   of the injuries, whether he's actively resisting arrest.  And

8   here we know that they're investigating a serious felony and we

9   know that the extent of the injuries is, at best, minimal and

10  the officers say that he was resisting arrest.

11         You're going to get a special verdict form and on it

12  you're going to see that you get to decide those questions of

13  liability first, you get to determine whether or not the

14  plaintiff has proven the case.  Because at the end of the day,

15  really, you don't even have to -- although we say they can't

16  both be telling the truth, at the end of the day you don't even

17  have to say that Mr. Maselli came in here and lied to you.  The

18  question is did he prove his case; did he prove by a

19  preponderance of the evidence.  That's -- that's the only real

20  question before you.

21         If you're, like, I don't know, then he hasn't proven

22  his case.  If you're convinced that he's not telling you the

23  truth, then he certainly hasn't proven his case.

24         But you're going to get those questions at the

25  beginning about, you know, do you find by a preponderance of

1    the evidence that he used excessive force; do you find by a

2    preponderance of the evidence that he proved his case of

3    battery.  If the answers to those cases -- questions are no,

4    that he didn't carry his burden, you don't have to go any

5    further.  You don't have to discuss damages.

6              But the plaintiff is going to -- counsel will likely

7    discuss damages, so just briefly, again, I'd just ask you to

8    really pay attention to the instructions on that.  Think about

9    the real damages here, if any.

10             I won't -- I don't get to get up again after

11   plaintiff's counsel.  I'm sure you're all relieved about that.

12   So, you know, I can't rebut anything that he's going to say,

13   but I would suggest that he's going to spend a lot of time

14   talking about DiTullio's cross-examination and, you know,

15   different factors like that.  I think he's going to spend very

16   little time talking to you about what his client testified to.

17   And -- but we'll all -- we'll all wait and see.

18             Plaintiff goes last because he has the burden of

19   proof.  I would ask that at the end of the case when you've

20   assessed all of the evidence, the testimony, the exhibits, the

21   booking video, the credibility of the plaintiff's story, that

22   you return a favor -- a verdict in favor of the defendants.

23             And I thank you for your time.

24             THE COURT:  Attorney Bedrick.

25             MR. BEDRICK:  Thank you, your Honor.

1          THE COURT:  Please proceed.

2          MR. BEDRICK:  Thank you, everyone.  I know that it's

3   always tough when you hear this is the last thing and you want

4   it just to be over with so you can start deliberating and talk

5   about the case already with each other.  I get it.  So I will

6   be brief as well.

7          And I -- I don't think that this -- this isn't the

8   longest trial in the world where we have to talk about, you

9   know, weeks' worth of testimony and dozens of different

10  witnesses and things like that.  We've got three witnesses on

11  one side, we've got one on the other.

12         And the issue comes down to a pretty critical fact.

13  You've got the excessive force claim; you've got the battery

14  claim.  Attorney Cullen explained to you what those are.  The

15  judge is about to explain that to you as well.  So I'll try to

16  boil it down very simply.

17         Our claim is that the blows that Durden and Yurcak

18  admit that they struck came after the handcuffs were applied.

19  If you believe by 50 percent plus any amount, you know, that

20  the scales tip ever so slightly in favor that that is likely

21  possible -- or likely true, sorry, then the force is

22  unreasonable, that we've proven excessive force, and that we've

23  proven battery.

24         But Attorney Cullen and his clients contend

25  nonetheless that it's reasonable to strike those blows only to

1   get the cuffs on.  Okay?  That's the -- that's the reason why

2   we are postured the way we are.  That's the reason why this

3   dispute about when the handcuffs come on is so important.

4   Because he also has a burden on the battery claim of proving

5   that the force was reasonable.

6           All right.  But enough of that.

7           Everyone seems to agree that this is a testimony

8   case.  Okay?  You've got a little bit of video.  That doesn't

9   tell you much.  You've got about a minute and a half or two

10  minutes of a one-hour, I guess, negotiation or confrontation in

11  between the doors, a door.

12          And so what happened there, right?  You're tasked

13  with determining who's telling the truth.  There's no body cam,

14  there's no security footage, there's no, you know, phone call

15  that's recorded.  None of that, nothing to sort of break the

16  tie.  So what do we rely on when we have to break that tie?  We

17  rely on memories, witness memories, and here's what we learned

18  from those witness memories.

19          The police were investigating a serious felony for,

20  you know, at least five hours before they came to 51 and a half

21  Kinsley Street.  They came to the door to see if Ned was

22  involved.  When they got there, Ned was in bed.  It was dark

23  out.  He came out of his bed from a sleep, heard the knocks on

24  the door, came down a hallway until you get to the kitchen

25  area.

1             You've got this door, the door's across from an

2    office, and there's Officer DiTullio talking through the door:

3    We want you out of this place.  We can't come in without your

4    consent or a warrant, but we want you out of this place.  Okay?

5             So Ned testified that he had a reaction that you're

6    all allowed to believe is pretty reasonable; I'm not -- I don't

7    know what's going on, I'm not telling you who I am, I'm not

8    letting you in.  And he has this encounter and he has, you

9    know, the -- the exchange that you heard on the audio where

10   they're saying, oh, you know, at first it's pretty -- you know,

11   will you agree to come out, things like that, and then you'll

12   hear a little bit of shift in the tone.  You'll hear a little

13   bit of frustration in DiTullio's voice because he's no longer

14   saying, will you come out or, you know, asking; he's now

15   saying, well, I don't care; we're coming in anyway.  Okay?

16            And that's just -- that's just near the beginning.

17   This is a whole hour, you know.  Well, up to an hour, I guess.

18   Some testified between 20 and 30 minutes before the backup

19   arrives and then it's about 20 to 30 minutes after the backup

20   arrives.

21            So Ned didn't tell you that it escalated or that the

22   frustration grew just in that period of time and that's when

23   the tone shifted and that's -- that's as -- as heated as it

24   got.  No, it continued to get heated.

25            And while that's happening, he's spooked because, as

1    he told you, they already breached two doors that he believed

2    were locked.  And so he steps away from the door for a little

3    bit and calls an attorney, talks -- I think he said, what,

4    about a five-minute conversation, comes back to the door.  He

5    says he's got a little bit of law school experience, so he

6    knows that he can assert his right not to talk to the police.

7    That's his right.

8              But after 20 or 30 minutes, things -- the police are

9    seeing they're not getting anywhere and they're getting

10   frustrated.  Why are they getting frustrated?  Well, we heard

11   from Officer Durden today that this is a unique experience.

12   Yeah, he's come and knocked down doors before, but he said it

13   was unique this time because they've got someone on the other

14   door saying, no, you can't come in, asserting their rights.

15             And so finally they force their entry and this is

16   where the stories start to drift.

17             Durden is the first one into the apartment.  I don't

18   think anyone disagrees with that.  But what does he say?  His

19   testimony today was he said stop -- I didn't want him to get on

20   the ground; I wanted him to stop right where he was.

21             What did DiTullio say he remembers hearing Durden

22   say?  Get on the ground, right?

23             Now, if DiTullio is right -- I'm sorry -- if Durden

24   is right, it's, I guess, dangerous to have them get on the

25   ground somehow; you know, he'd rather have him standing up.

1   You know, I think anyone can use their common sense and realize

2   that someone standing up in front of you is much more likely or

3   has much more ability to flee, to strike you, to do any kind of

4   thing like that, whereas someone on the ground has a lot harder

5   time getting away, right?

6          And then Durden says that Ned starts to turn to the

7   side.  But then we heard another witness say Ned turned

8   180 degrees all the way around.  And I've got -- I've got

9   Exhibit E.  I don't have my own Vanna White, so I have to do

10  this.

11         You remember the X mark that Attorney Cullen had put

12  here on the ground and, you know, Ned is standing here in front

13  of the office, facing the door.  Well, the door busts in and

14  we're told by one witness that he's continuing down a hallway.

15  But if he's 180 degrees, he's in the office or he's in the

16  kitchen.  Sorry.  But if he's 30, 45 degrees, as Ned says, he's

17  in the kitchen.

18         And why is this important?  It's important because

19  this is a very small area.  So in order for Ned to comply with

20  the command that he got to get on the ground, it makes sense

21  that he would have to turn so that he's not directly facing the

22  door and get on the ground, which explains the turn, but it

23  doesn't explain going down a hallway.  It doesn't explain a

24  180-degree turn.

25         And some of those observations were coming from

1    people who said they couldn't even see the feet.  Yurcak said

2    he wasn't able to see his feet, but somehow he was able to

3    determine that he was running or that he had started to run and

4    that he had turned 180 degrees around.

5             So Attorney Cullen sort of fluffed off this idea,

6    oh, well, these people, they've said other things.  Okay.  They

7    said something else in 2019; they said something else in 2016.

8    But when all we have is testimony, the police have to get their

9    story straight.  Okay?

10            Did Ned get impeached with any evidence that showed

11   that he had told a different story on a different occasion?  He

12   told the same story every time.  Told the story to you that

13   makes sense and it's up to us to show that the police get all

14   their facts straight.  Why?  Because they're making some of it

15   up.

16            DiTullio says that he helped Yurcak and Durden take

17   Ned down, that he had an arm.  Think of that small hallway in

18   Exhibit E, that small area.  Would three large men -- I mean,

19   these aren't small men.  Ned's five-seven, not the biggest guy

20   in the world, but, you know, Durden's six-foot-two.  I mean,

21   these are big guys.

22            But then he acknowledges in his report that he wrote

23   it was him and Lombardi.  Well, that's sort of an important

24   fact, who's taking him down.  Would you remember if you had

25   taken a person down or if you had stood back and watched two

1   other people take him down?

2           And then the same thing with Sergeant Yurcak you

3   heard today.  You know, he says he went down with him, but he

4   didn't assist.  Now he says that.  He said it wasn't accurate

5   to say he was assisting.  But even though he's trained in

6   writing police reports and he's only supposed to put details

7   that are accurate in his police reports, back in 2016 when this

8   was fresh, supposedly, he wrote that he did assist in taking

9   him down.  Why the change in the story?  Is this nitpicking or

10  are these things that a police officer would remember?  Are

11  these things that shouldn't change over time?  Aren't these the

12  most important things?  How consistent is your story?

13          Ned's story is consistent.  He said he got on the

14  ground, that he was obeying.  He was twisting to obey.  They

15  asked for his hands; he gave them to him.  Is it impossible

16  that he took a knee strike after that, a palm strike, just

17  because his arms were up on his back?  Isn't the fleshy area he

18  described still exposed to a palm or a knee strike?  Of course

19  it is, especially if he's lying on the ground and you've got

20  people on either side of him.  They were 45 to 60 seconds

21  trading blows.  And that's what they did.

22          Now, I should go back a second because I do need to

23  credit Officer DiTullio or, sorry, now it's Sergeant DiTullio.

24  He did tell you something that -- that was very interesting.

25  Okay?  Over time, between 2016, 2019, 2022, his story changed.

1    Officers' stories have changed.  And we have this

2    back-and-forth about, you know, what did you observe back then,

3    what did you observe now, and he told us, well, his

4    observations have changed.  Why?  Because of things that people

5    told him.  Over time, observations changed because things that

6    people told him.

7              Have any of you ever experienced a time when you

8    believed something or you saw something and then in your mind

9    your observation changed over time because someone else told

10   you that something else happened?  That doesn't sound like an

11   independent memory.  What it sounds like is he's changing his

12   story to make it more like Officer Durden's.  That sounds like

13   Sergeant Yurcak is changing his story to make it sound more

14   like Officer Durden's.

15             And why would that happen?  What do these people

16   want do that for?  Well, you've heard from Attorney Cullen

17   twice that this is particularly important to them.  He didn't

18   say it was important to Ned.  He said it was particularly

19   important to them.  More important to them than it is to Ned.

20   That's their position.  And he told you why on his opening;

21   that their reputation is on the line.  These are police

22   officers.  They need to protect their reputation in this

23   courtroom.  They need to protect themselves from you issuing a

24   verdict of excessive force against them.  Ned, he's just John

25   Q. Public.  That's their position.  He's just John Q. Public.

1   This isn't as important to him.

2          So that's why over the course of six years, officers

3   would talk to each other, stories would change, and now all of

4   a sudden they're here in 2022 telling you a much different

5   story than they did in 2019 to another jury, in 2016 to those

6   who would be reading their reports.  That's how "get on the

7   ground" becomes "stop."  That's how turning his body becomes

8   180 degrees in a crowded area; that's where, you know, starting

9   to run down a hallway becomes he didn't go anywhere; that's

10  where three officers grabbing his arms becomes one officer with

11  another assisting which becomes, really, just one officer and

12  then in one account it's two different officers.

13         So just to reiterate, they're trying to align their

14  stories with Durden's because they don't want you to find that

15  police officers violated Ned's constitutional rights and

16  battered him.  But that's exactly what they did.  That's

17  exactly what they did when they put him in cuffs and they beat

18  him over the course of 45 to 60 seconds.

19         Now, he was frustrating them.  They kicked down the

20  door and they came in to send him a message.  Okay?  What

21  message?  The message was strikes on his left side and his

22  right side while his face was buried into the kitchen floor.

23         Now, the -- the defense likes to point out that

24  Ned's not able to prove who delivered what strike.  But they're

25  totally glossing over the fact that two officers came in and

1    told you what their positions were, one on one side, one on the

2    other, and they minimized -- they said it was just one strike

3    and it was, you know, before we put cuffs on.  Oh, well, we had

4    to get his arms.  But we know that these strikes are coming

5    from -- the palm strikes are coming from Yurcak, the knee

6    strikes are coming from Durden, because they told you, because

7    it's the only thing that makes sense.  And then Attorney Cullen

8    tells you that there aren't any damages here.

9          Now, they said, oh, well, if the police officers

10   were going to lie, why don't they -- why don't they just, you

11   know, lie even more; why don't they say, well, we never even

12   touched him in the first place, that kind of stuff.  Well, the

13   bigger the lie, you know, maybe the more exposure they have,

14   right?

15         But the same could be said for Ned.  He could have

16   gone to the hospital the next day and said, I've got a

17   concussion; oh, I really hurt bad.  He could have gone to the

18   doctor and said, oh, you know, I think -- I think they roughed

19   me up real bad and I'm -- you know, he could have made bruises

20   on himself or something.  He could have gone the whole way and

21   lied, too.  But he didn't.  He could have ginned up medical

22   bills.  He could have gone to the counselor and said, oh, this

23   is so distressing, and stretched it out for years saying he

24   needs therapy for PTSD or something.  He didn't.

25         He's not asking you, you know, to give him money for

1    medical bills that he didn't incur.  He's not asking you to

2    give him money for counseling that he didn't need.  He's coming

3    here and asking you to fairly compensate him for the pain and

4    the mental anguish that he suffered when he was struck in the

5    side by two officers.  And you'll see in the damages

6    instruction that that is one of the things you're allowed to

7    compensate him for.  Those are damages.

8              And these aren't just taps on the right side and

9    then the left side.  These are hard strikes.  This is pain.

10   Sure, it didn't send him to the hospital, but he's asking for

11   Tylenol 18 hours later.  I mean, that's not something that's

12   just insignificant.  That's not a slap in the back of the head.

13   That's not something that you leave and, you know, you just --

14   you get over it in the next two minutes.  That's 18 hours and

15   then he's still asking for Tylenol.  That is the kind of

16   contact that's made in reckless disregard of a person's

17   constitutional rights.  Okay?  That's wanton behavior.

18             And you'll read in the jury instructions that that

19   is what entitles Mr. Maselli to enhanced compensatory damages

20   and you have punitive damages.

21             Because if you find that he had the cuffs on at the

22   time that he was struck, you're able to compensate him with an

23   award that sends a message directly to Officers Durden and

24   Sergeant Yurcak -- tells them, no, this can't happen anymore --

25   and a message to other officers who are able to see this or

1  hear of it that, no, we, in this society, do not tolerate the

2  police coming in and punching people, kicking people, kneeing

3  them, whatever it is, while they're cuffed, striking them,

4  laughing.

5          And what did -- what did Ned tell you?  They were

6  mocking him.  Stop resisting, stop resisting.  And then they

7  were laughing.  And he's on the ground 45 seconds and they keep

8  coming.  Stop resisting.  Why would they say stop resisting,

9  right?  Ha-ha-ha, we can do this to you.  All we have to do is

10  say you were resisting.  Yeah, we hit you.  Of course we hit

11  you.  We'll write a Use of Force report.  Yeah, we hit you.

12  Oh, he was resisting.  You know, they were coming right for us.

13          So as I close my remarks, you'll get the

14  instructions.  You'll deliberate.  But we ask you to return a

15  verdict that sends a message back to them that this is not

16  tolerated, that we've taken notice in this courtroom.

17          I appreciate all of your time and I'll let you get

18  to it.

19                    (Excerpt concluded.)

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 10/21/22          */s/  Liza W. Dubois*
                             LIZA W. DUBOIS, RMR, CRR