*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JANUARY 19, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *  *
                                    *
EDWARD MASELLI                      *
                                    *
              Plaintiff,            *
                                    *  1:19-cv-1248-AJ
         v.                         *  September 21, 2023
                                    *  8:50 a.m.
THOMAS DURDEN and JOHN YURCAK       *
                                    *
              Defendants.           *
                                    *
                                    *
* * * * * * * * * * * * * * * * *  *
```

**EXCERPT**
TRANSCRIPT OF JURY TRIAL DAY 1 - MORNING SESSION
BEFORE THE HONORABLE ANDREA K. JOHNSTONE

Appearances:

For the Plaintiff:          Jared Joseph Bedrick, Esq.
                            Champions Law

For the Defendants:         Brian J.S. Cullen, Esq.
                            Cullen, Collimore & Shirley, PLLC

Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            U.S. District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603) 225-1442

**I N D E X**

**PAGE**

**OPENING STATEMENTS**

By Mr. Bedrick                                    3
By Mr. Cullen                                     8


**WITNESS:**              **Direct**   **Cross**   **Redirect**   **Recross**

**EDWARD MASELLI**

By Mr. Bedrick            12


**EXHIBITS:**                        **FOR ID**              **IN EVD.**

(None marked.)

1          (Following is an excerpt of proceedings.)

2          THE CLERK:  This court is now in session and has for

3    consideration a jury trial in the matter of Maselli v. Durden,

4    et al, case number 19-cv-1248-AJ.

5          Will counsel please identify themselves for the

6    record, starting with the plaintiff?

7          MR. BEDRICK:  Jared Bedrick for Mr. Maselli.

8          MR. CULLEN:  And Brian Cullen for Officer Durden and

9    Sergeant Yurcak.

10          THE COURT:  All right.  Very good.  Thank you.

11          So, Attorney Bedrick, I'm going to ask you to

12    proceed with your opening statement on behalf of the plaintiff,

13    Edward Maselli.

14          MR. BEDRICK:  Thank you, your Honor, and good

15    morning everyone.

16          So I'll be the one sitting right next to everyone,

17    so I guess it's appropriate that you get to meet me first.

18          I'm Jared Bedrick.  I'm an attorney.  I represent Ed

19    Maselli right here.  Stand up, Ed.

20          MR. MASELLI:  Ned.

21          MR. BEDRICK:  Ned for short, of course.

22          You've been through kind of a long process already,

23    you know, between getting the letter, filling out the form,

24    coming into the big room.  I'm sure there's a lot of waiting.

25    I'm sure there's a lot of buildup to this.  So I want to let

1   you know that we appreciate how serious this is and how serious

2   you're taking it, because you've made it this far in the

3   process.  You've been able to come through and put your biases

4   aside and, you know, adhere to all the Court's instructions.

5          And so what you're here to do is pretty simple.  I

6   think the Court had told you earlier that it's about a dispute.

7   Right?  So my job right now is to sort of outline for you what

8   is this dispute and how do you resolve it, what's your role in

9   this.

10          Well, so Ned here is making a claim that back

11   in October of 2016, quite a long time ago, he was at his

12   apartment, sleeping, when he was aroused by a knocking at the

13   door.  He came to the door and on the other side of it were a

14   number of police officers.  And they were talking to him

15   through the door and telling him that he needed to leave his

16   apartment so that they could go in and secure what they call a

17   crime scene.

18          You'll hear that he asked whether they had a warrant

19   and they said no, so he said, okay, no, and they had this sort

20   of standoff.  And the police kept asking to come in and he kept

21   saying no.  Ten minutes go by, still having the standoff;

22   20 minutes go by, still having the standoff; 30 minutes go by,

23   still having the standoff.

24          And he'll testify that at a certain point they grew

25   frustrated and that one of the officers just kicked the door

1    down.  The officer kicks the door down and Ned is right on the

2    other side of it.

3                He's going to tell you how he submitted to the

4    arrest.  Okay?  They're going to come in and they're going to

5    arrest him and this is where the dispute comes in.  Okay?

6                Up until now there may be some details that don't

7    line up with the testimony that you're going to hear and

8    testimony we anticipate you'll hear from the defense, but this

9    is where the rubber meets the road.  The question is going to

10   be the number of strikes that are delivered by the defendants.

11               Detective Durden and retired Sergeant Yurcak,

12   they agree that they delivered some strikes and that the

13   disagreement is were those necessary in order to effect

14   arrest -- the arrest of Mr. Maselli.

15               And so facts are going to be completely different.

16   You'll hear Ned testify that he got down on the ground, his

17   hands were exposed, that he was cuffed and then was struck

18   after the cuffs were applied.  And you're likely to hear from

19   the police that Ned had, you know, hidden his arms and they had

20   to deliver blows in order to free his arms so that they could

21   cuff him.

22               And what you decide is going to be the truth.  Okay?

23   You're going to render what's called a verdict.  In Latin that

24   quite literally means that you're speaking the truth.  Right?

25               And your verdict is going to be based on what we

1    call elements of a claim.  Here there are two claims.  One is a

2    federal law claim and one is a state law claim.

3            Now, by delivering blows that were not necessary in

4    order to effect the arrest of Mr. Maselli, he claims that the

5    police violated his Fourth Amendment rights which would be the

6    federal claim and committed the state law tort or state law

7    civil wrong of battery.

8            In order for you to render a verdict of liable on

9    the use of force under the Fourth Amendment, you're going to

10   have to determine that these blows were intentional and that

11   these blows were excessive.  We agree on the fact that these

12   were police officers acting under the color of state law at the

13   time.

14           In order for you to determine that the officers are

15   liable for battery, you'll have to issue a verdict that the

16   officers acted intentionally but that they -- that their intent

17   was to create an offensive contact.  And then for battery also

18   you have to decide whether that offensive contact was

19   reasonable in light of their purpose of effecting arrest.

20           So I hope that makes sense.  Right?  There's going

21   to be a dispute about whether Ned was resisting by putting his

22   hands underneath him or, like he says, if he was submitting at

23   the time of the arrest.

24           There's going to be a dispute about whether there

25   were blows stricken before the resistance or after the

1  resistance.  And you're going to hear and put together the

2  story from witness testimony.  You'll see one video, but it's

3  more of a hearing exercise than a scene exercise because it's

4  going to be a black screen.  So you'll hear a portion of the

5  conversation that's through the door, but there won't be any

6  body cameras, there won't be any surveillance cameras, there

7  won't be any dash cameras.  There's not going to be anything

8  but people getting on the stand, looking you in the eye, and

9  telling you what happened.

10            And so in order for you to render a true and just

11  verdict, you're going to have to pay attention to the way the

12  witnesses testify.  You're going to have to pay attention to

13  how their stories match up.  Because little details could

14  indicate that someone is not telling the truth.  And when there

15  are two stories like this that are so different, only one can

16  be telling the truth.

17            And so we ask you to really pay attention to what

18  they say, how they say it, and what the others say in

19  determining whether he had his arms -- or Ned had his arms

20  underneath himself when these blows were stricken.  And that's

21  it.  It's as simple is that.

22            So next Attorney Cullen will come up and give his,

23  you know, outline of the case, but I anticipate that today

24  you're going to hear from Ned himself and we ask you -- or we

25  thank you for paying attention in advance.

1          THE COURT:  Thank you, Attorney Bedrick.

2          Now I'll turn it over to you, Attorney Cullen, if

3  you're making the opening remarks on behalf of the defendants.

4          MR. CULLEN:  Thank you, your Honor.

5          It hasn't been that long since we first introduced

6  ourselves, so, again, my name is Brian Cullen.  And together

7  with my paralegal, Stacy Furlotte, I represent Sergeant John

8  Yurcak and Officer Tom Durden.  Tom is with the Nashua Police

9  Department now.  You'll hear that Sergeant Yurcak has recently

10  retired.

11          I don't believe this is going to be a particularly

12  long case, but that doesn't mean that it's not an important

13  case.  It's important, I imagine, to Mr. Maselli; it's

14  certainly important to the officers who are here essentially

15  putting their reputation into your hands.

16          It's not going to be a long case because, as

17  Attorney Bedrick just recited, most of the facts in this case

18  aren't really disputed.  It's not going to be disputed that the

19  police arrived at Mr. Maselli's apartment sometime after

20  eight o'clock on a Sunday night in October, that they were

21  there to investigate a serious felony, and that they were there

22  both to speak with Mr. Maselli, if possible, or to secure the

23  apartment for a possible search.

24          And it won't be disputed that Mr. Maselli, as was

25  his right, declined to talk to them, didn't tell them -- didn't

1    talk to them about any underlying issues, and didn't even

2    identify himself.  But it's also going to be undisputed that

3    when they then said, well, look, you need to come out so that

4    we can freeze the scene to make sure that no evidence is

5    destroyed while we apply for the search warrant, he also

6    refused to do that.  And when the police officers instructed

7    him again that he needs to come out so the scene would be

8    secured, he refused, and he refused to let the officers in.

9    And as Attorney Bedrick said, at that point the officers forced

10   their entry.

11            Now, what is disputed after that is essentially what

12   Attorney Bedrick told you, what happens in that time.  And one

13   of the reasons that this case is likely to be a short case

14   isn't simply because there aren't a lot of disputed facts in

15   the case, but also because the events that we'll spend a day or

16   more talking about take place in less than a minute.  Seconds.

17            The police officers open the door and they'll tell

18   you what they see from their perspective from the moment that

19   door opens to the moment they have Mr. Maselli safely in

20   custody.

21            And they will tell you that Mr. Maselli did not

22   comply; that he did not kneel down, put his hands on the

23   ground, show his hands but, in fact, as he had been throughout

24   the evening, he continued to ignore their commands.

25            They brought him physically to the ground.  They'll

1  explain why, they'll talk to you a little bit about their

2  training as to why they do that, and that when his hands

3  remained under, each of them from different sides struck him

4  one time, not with a Taser, not with OC spray, but with a hand

5  or a knee to get him to release those hands from under him.

6          And they'll explain that, and tell you why, and

7  they'll tell you that they did that before they handcuffed him

8  and that as soon as he released his hands, they handcuffed him

9  and they stood him up and he was brought to the station.

10          Another fact, however, that will not be in dispute

11  is that Mr. Maselli did not complain to anybody about the use

12  of force.  He didn't seek treatment for any injuries.  He

13  didn't suffer any damages directly as a result of this

14  incident.  Those things won't be disputed.  So what you will

15  hear is important.  What you won't hear is also important.  You

16  won't hear evidence of damages.

17          At the close of the evidence, after all the -- after

18  Mr. Maselli's had his chance to testify and the officers have

19  testified, I'll be back in front of you for what's called a

20  closing argument.  And at that time I'll go over the elements

21  of the case, as Mr. Bedrick just did, and talk to you about

22  excessive force, reasonable force, and we can talk about the

23  circumstances under which officers may be able to use certain

24  types of force and what that level is.  But ultimately that is

25  going to be your decision.

1            At the end of the case, if the evidence supports it,

2   though, I'll be back here in front of you, hopefully tomorrow,

3   and asking that you find in favor of the officers.

4            Thank you.

5            THE COURT:  All right.  Counsel, before we begin

6   witness testimony, is there anything that needs to be addressed

7   with the Court?

8            MR. CULLEN:  No, your Honor.

9            MR. BEDRICK:  Nothing from us, your Honor.

10           THE COURT:  Okay.  Then, Attorney Bedrick, I'm going

11  to ask you to call your first witness, please.

12           MR. BEDRICK:  I call Mr. Maselli to the stand, your

13  Honor.

14           THE COURT:  All right.

15           I understand that counsel and the witnesses that are

16  scheduled for today have all tested negative, so you can

17  proceed without masks -- without your masks.  Thank you.

18           THE CLERK:  Please raise your right hand.

19           **EDWARD MASELLI**, having been first duly sworn,

20  testified as follows:

21           THE CLERK:  Please be seated and state your name for

22  the record and spell your last name, please.

23           THE WITNESS:  My name is Edward Maselli,

24  M-a-s-e-l-l-i.

25

<u>DIRECT EXAMINATION</u>

<u>BY MR. BEDRICK</u>:

Q.   And do you go by any other name?

A.   I go by Ned.

Q.   Ned.  All right.  Is it all right if I call you Ned?

A.   Please.

Q.   All right.  So, Ned, can you just tell us a little bit about yourself?  Where do you live?

A.   Right now I live in Brighton, Mass, which is like a neighborhood of Boston.

Q.   And where'd you grow up?

A.   I grew up in Dover, Mass, which is a suburban town of Mass.

Q.   How long did you live there?

A.   Lived there from two months old till I was 18.

Q.   Did you go to high school there and everything?

A.   I did.

Q.   Okay.  And what'd you do after high school?

A.   I went to college.

Q.   Where'd you go to college?

A.   In Baltimore.

Q.   Did you stay in Baltimore?

A.   I lived there for four and a half years.

Q.   Then what'd you do after that?

A.   I came back up to Mass and went -- got into law

1   school, started that.  And that was in the evening and I worked

2   in the daytime.

3        Q.   Where'd you work in the daytime?

4        A.   Fidelity.

5        Q.   Where's Fidelity located?

6        A.   Kind of all over the map, but I worked four days a

7   week in Merrimack and one day a week in Boston, where I was

8   going to school.

9        Q.   Is that Merrimack, New Hampshire?

10       A.   It is.

11       Q.   And so did you continue to make that drive between

12  Merrimack and Boston?

13       A.   I did -- well, eventually I moved up to Nashua

14  because I figured split the difference.  It's easier to do the

15  reverse commute going down.  And so I found a place in Nashua.

16       Q.   Okay.  And so now we're in Nashua.  About what year

17  was it that you moved to Nashua?

18       A.   2016.

19       Q.   2016.  And where were you living?

20       A.   I was living on Kinsley Street.

21       Q.   Was it 51 Kinsley Street?

22       A.   51 Kinsley Street.

23       Q.   So --

24       A.   51 and a half.

25       Q.   Okay.  51 and a half.

1              Can you tell us a little bit about this apartment?

2    Sorry.  Is it a house or an apartment?

3         A.    It's an apartment.

4         Q.    Okay.  Can you tell us a little bit about the

5    apartment at Kinsley Street?  Like did you live alone?

6         A.    I lived alone.  There was parking.  It began -- if

7    you walk in my apartment on Kinsley Street, I have like a --

8    what would be described as like a mudroom, for lack of a better

9    term, where I kept some stuff.  And then there's a staircase

10   that goes up into a hallway which leads to my kitchen and like

11   another office room and a bedroom.

12        Q.    So in that area you described as a mudroom, was

13   there anyone else that lived there?

14        A.    No.

15        Q.    Was there another door to another unit?

16        A.    There was a door that led to my landlord's apartment

17   that was permanently locked and her apartment was on actual --

18   so Kinsley Street ran perpendicular to Ash.  And so my landlord

19   lived -- actually her address was on Ash Street, whereas mine

20   was on Kinsley.

21        Q.    So same building.  Were there separate entrances?

22        A.    Yes.

23        Q.    And so on -- but for your entrance on Kinsley

24   Street, was there a door in the front?

25        A.    There were -- there is two.  There is like a storm

 1    door, like one of the glass metal ones, and a big, heavy front

 2    door.

 3         Q.    Okay.  Did you have a key to those?

 4         A.    I did.

 5         Q.    Was there any other mechanism there that you would

 6    use to, you know, announce yourself or anything?

 7         A.    There was a single doorbell you could ring.

 8         Q.    And where would that doorbell ring?

 9         A.    Right next to the -- oh, where would it ring?

10    Throughout the apartment.

11         Q.    Into just your unit or anyone else's unit?

12         A.    Just my unit.

13         Q.    All right.  And so you said that was a single

14    doorbell on the outside?  And then how about a mailbox; is

15    there --

16         A.    Yeah, it was right next to a single mailbox.

17         Q.    Okay.  And so you come inside, you go up the stairs,

18    and you said that's where your sort of living area was, right?

19         A.    Correct.

20         Q.    That door to the kitchen, does it lock?

21         A.    It does.

22         Q.    And how does it lock?

23         A.    In two ways.  There is -- I don't know the term for

24    it, but one of those pop locks where you press in and if you're

25    on the inside if you turn the handle, it would pop out and

1   unlock and then a little -- like a hook and latch, like

2   probably like a latch like that big on the top part.

3        Q.   And on a normal night, would you lock any of those

4   doors before you went to bed?

5        A.   I lock every door.

6        Q.   And can you just go through which doors you mean

7   when you say every door?

8        A.   So if you're walking into my home from the street, I

9   lock the initial storm door and I lock my front door.  And then

10  as you walk into my med room -- excuse me, my mudroom,

11  whatever, foyer, or whatever word it is, and you go up the

12  stairs, I lock my -- that other inner door as well.

13       Q.   All right.  So, tell me, on -- sorry.  Let me get by

14  the mic.

15            On October 2nd, 2016, do you remember that night?

16       A.   I do.

17       Q.   Do you remember where you were at about 8:00 p.m.?

18       A.   I was in bed.

19       Q.   What were you doing in bed?

20       A.   I was sleeping, getting ready for -- yeah, sleeping.

21       Q.   Did you sleep through the night?

22       A.   I did not, no.

23       Q.   You might -- could you pull the microphone --

24       A.   Sorry.

25       Q.   -- a tad bit closer to you?

```
 1          A.    I did not.

 2          Q.    Okay.  What happened?

 3          A.    I was awoken to some loud bangs coming from like

 4   that inner door.

 5          Q.    That inner door in the kitchen?

 6          A.    Correct.

 7          Q.    Can you describe the bangs for us?

 8          A.    Bang, bang, bang.

 9          Q.    Did it sound like a gunshot?

10          A.    It did not.

11          Q.    What did it sound like?

12          A.    It sounded like someone was banging on my inner

13   door.

14          Q.    Like physically banging on the door is what you

15   mean?

16          A.    Yes, correct.

17          Q.    Did you hear any words or anything like that at the

18   time?

19          A.    Not at that time.

20          Q.    So what did you do?

21          A.    I got out of bed and I asked who was there.

22          Q.    Now, from getting out of bed to getting to a spot

23   where you asked who was there, what did you have to do?

24          A.    So I would climb out of bed, it was about like

25   five -- would be like five or six feet to my bedroom door,
```

1   which then leads into a hallway that goes like this way.

2          I got into the hallway and then my kitchen door was

3   right here.  So I was on the other side of the kitchen door.

4      Q.   Okay.  And did you get any response to your

5   question?

6      A.   Yes.

7      Q.   What was that?

8      A.   They said it's the Nashua Police.

9      Q.   Okay.  So how'd you respond?

10     A.   Well, I was a little scared because I couldn't

11  understand how they had gotten to where they were and I also

12  had no way of verifying who they were because they're inside my

13  home and there's no peephole or window to, like, see who they

14  are.

15         And so because I had some law school experience at

16  the time and they claimed to be police, I said, well, to be

17  where you are, you either need my consent or warrant; is that

18  correct?  And they said yes.  And I said, I would like you to

19  leave and go get a warrant, please.

20     Q.   So tell me how that conversation continued to

21  unfold.

22     A.   Well, they ignored that request and then they -- so

23  they're still on the other side of the door and they're just

24  asking me questions about who I am.  And they wanted to --

25  because they were looking for Edward Maselli, and they wanted

1    to speak to an Edward Maselli, and if I was that person.  And I

2    just said, I'm not telling you who I am.  I was -- I didn't

3    really know why they were there and how they had gotten there,

4    so I did not feel comfortable telling them who I was.

5         MR. BEDRICK:  I'm going to just play for you -- this

6    is an agreed-upon exhibit for the Court's purposes here.

7                   (Audio recording played.)

8         MR. BEDRICK:  This is Exhibit E, right?  D.

9         I'm just going to play for you a fully agreed-upon

10   exhibit here, Exhibit D.

11        Go ahead.

12                  (Audio recording played.)

13        MR. BEDRICK:  Pause it for a second.  I promise I

14   won't do this that much.

15        Q.    That voice that you just heard -- well, does this

16   sound like what you heard on October 2nd?

17        A.    Yes.

18        Q.    Okay.  And who's that voice that we just heard?

19        A.    As far as I knew at the time or I know now?

20        Q.    As far as you knew at the time, who was that voice?

21        A.    I -- whoever said they were the Nashua Police

22   Department.

23        Q.    Okay.  And then I think you heard the other voice

24   for just a tiny second.  What was that voice?

25        A.    That was -- that would be me.

1              MR. BEDRICK:  Okay.  Do you mind just playing it

2    from the beginning?  And I won't interrupt this time.

3              Thank you, Stacy.

4                   (Audio recording played.)

5              MR. BEDRICK:  That's the end, right?  Okay.

6         Q.   So do you remember that part of the conversation?

7         A.   I do.

8         Q.   Okay.  How did we get this recording here?

9         A.   I -- I recorded.

10        Q.   And what did you use to record it?

11        A.   I used my cell phone.

12        Q.   Why?  Why would you record it?

13        A.   I was very scared at the time because they were not

14   leaving.  They had somehow gotten into my apartment and they

15   weren't telling me, really, why they were there.

16        Q.   Now, did you stay at the door and talk to them the

17   whole time?

18        A.   I did not.

19        Q.   What -- where did you go?

20        A.   I walked -- my poor description of my apartment.

21             So leaving my bedroom hallway, inner door, them, me.

22   I kind of walked into my kitchen and I called a lawyer who was

23   also a police officer at the time.

24        Q.   Okay.  And, now, we don't have to get into that

25   conversation at all, but about how long were you on the phone

1   with that person?

2        A.    Well, I called him, didn't reach him, and then he

3   called me back shortly after.  And that was, I want to say,

4   probably around four or five minutes.

5        Q.    Okay.  And so how long before you called him were

6   you at the door?

7        A.    Probably like a half-hour.

8        Q.    Okay.  So a half-hour, you go out and make a call.

9   Did the -- did go back to the door at all?

10       A.    It was in the same general vicinity.  So I had told

11  them -- after I still refused to identify myself, I was, again,

12  getting pretty scared because they were not leaving.  And I

13  told them, okay, if they're saying they want to talk to me,

14  I'll just tell them I'm not going to talk to you without a

15  lawyer.  And I said that to them.  Didn't get them to leave

16  either.

17       Q.    And were they saying the same things, were they

18  saying different things?  What was going on at this point?

19       A.    Well, initially they were saying, who are you?

20  We're looking to talk to Edward, who are you, are you him?

21             And then I -- after a while, they switched tactics

22  and said, well, we don't care who you are; you're not allowed

23  to be in that apartment.  And at that became the new move.

24       Q.    How was their tone -- was the tone the same as you

25  heard it throughout the entire video?

1          A.      It was getting aggravated.

2          Q.      Getting aggravated.  After the -- before or after

3     the conversation that we heard on the video -- audio?

4          A.      After.

5          Q.      So after they started getting, what did you say,

6     agitated?

7          A.      I would say agitated, aggravated, annoyed.

8          Q.      And what made you think that?

9          A.      The tone in their voice, they -- their refusals to

10    leave.

11         Q.      The refusals to leave, the tone in their voice, but

12    what was it about the tone in their voice that led you to

13    believe -- was it louder?  Was it faster?  What was going on?

14         A.      It's hard to describe.  I got the sense they were

15    trying to be more intimidating.  It was a little harsher, a

16    little more like -- I don't want to use poor language -- we

17    don't care any -- like -- to try to scare you into opening your

18    door.

19         Q.      Did you open the door?

20         A.      No, because I figured if I had to open the door and

21    they could be where they -- well, one, where they were, two,

22    further in my apartment, they would be there and they wouldn't

23    be asking me for my consent to open a door.  So I was very

24    hesitant to open that door.

25         Q.      And then what happened?

1    A.    Some time goes by of them not getting what they

2  want.  I'm now in front of the door, but I'm not talking to

3  them because I want to make sure they're still there or what's

4  going on, where they -- kind of like where they are, what's

5  going on with them.  And then the door pops a couple inches

6  towards me.

7    Q.    Now, pops a couple inches towards you, what do you

8  mean?

9    A.    It -- I had that hook and latch on the top part of

10 that inner door and it like flexed -- flexed in the door, I

11 guess, like the -- kind of like middle bottom part of the door

12 shot forward.

13   Q.    Were you able to determine what was going on at that

14 point?

15   A.    I was kind of in a state of shock, but I figured my

16 door's being kicked in, because at that point they also said,

17 we're coming in.

18   Q.    All right.  And, you know, was it the door was being

19 flexed or was it being -- sorry.  Strike that.

20         Was it making any noise when they were doing that?

21   A.    A little louder than the original bangs, forceful --

22   Q.    So it's banging, so you know that --

23   A.    Kick.

24   Q.    Okay.

25   A.    Forceful kick.

1       Q.    Did the door ever open?

2       A.    It did.

3       Q.    About how many bangs or strikes or whatever did it

4    take to open that door?

5       A.    I believe it took three.

6       Q.    And so where were you standing when the door finally

7    opened?

8       A.    So hallway, door.  I'm about three feet back,

9    directly in front of the door.

10      Q.    Three feet from the threshold or three feet from the

11   swing of the door?

12      A.    The thresh -- like just out of reach of the -- what

13   would be the swing.

14            So, you know, doors are like 32 inches, so a little

15   like three feet.

16      Q.    Okay.  But what did you see?

17      A.    I see a door, door, swing, and then I see kind of

18   the top part -- excuse me -- the top half of -- can I -- who I

19   know now as --

20      Q.    Well, is it just a figure or something?

21      A.    Like a figure and then some like figures behind it

22   that's less discernible, not easy to make out.

23      Q.    Okay.  And what was the lighting like at the time?

24      A.    The lights were off.

25      Q.    Does your kitchen or that hallway next to the

1    kitchen where you were standing have any ambient light or

2    anything?

3         A.    It does.  There's windows that look out on to

4    Kinsley and overlooking the parking lot, so some ambient

5    streetlights come in.

6         Q.    And for those of us who aren't familiar with Nashua,

7    Kinsley Street -- what kind of street is Kinsley Street?

8         A.    It's a main -- main road.  It connects the highway

9    to the center of town.

10        Q.    Are there any streetlights out there?

11        A.    There are.

12        Q.    And was any of that street light making it into the

13   apartment?

14        A.    Yes.

15        Q.    Okay.  So you were able to see, you know, what was

16   in front of you?

17        A.    Uh-huh.

18        Q.    And when the door came in, were you able to see the

19   first person to come through the door?

20        A.    Yes.

21        Q.    Do you see that person in the courtroom today?

22        A.    I do.

23        Q.    And could you, I guess, identify the person that you

24   saw that day by an article of their clothing?

25        A.    Tom -- yeah, he's furthest down.  He's got a

1    checkered tie and a blue blazer, it looks like.

2            MR. CULLEN:  We'll stipulate that Officer Durden was

3    the first officer through the door.

4            THE COURT:  All right.  Very good.  Thank you.

5            MR. BEDRICK:  Thank you, your Honor.

6        Q.    So Officer Durden comes through the door -- I guess

7    now Detective Durden, right?

8            And what happens?  What does he do?

9        A.    He is coming towards me and he's yelling, get on the

10   ground, get on the ground.

11       Q.    So what do you do?

12       A.    I lower myself in the push-up position to the

13   ground, wide grip -- because initially when they kicked in the

14   door, I'm directly on the other side waiting because I'm scared

15   and I don't want to have anything else kind of go wrong like

16   this.

17           They come in, say, get on the ground, get on the

18   ground -- do you want -- it's probably going to be easier to

19   show than tell.

20           MR. BEDRICK:  Yeah.  With the Court's permission,

21   and I'll move the microphones into the right spots, would I be

22   able to have Mr. Maselli come down to the well area just to

23   demonstrate his position?

24           THE COURT:  Why don't you have him demonstrate and

25   then he can explain it.  That way you don't have to move your

1    microphone.

2              MR. BEDRICK:  Okay.  Sure.

3         Q.   Why don't you just come down.

4              THE COURT:  Attorney Cullen --

5              MR. CULLEN:  That's fine.

6              THE COURT:  -- if you need to reposition yourself,

7    go right ahead.

8              MR. CULLEN:  Thank you.

9              THE COURT:  All right.

10        A.   So door, me; kick, charge in; get on the ground, get

11   on the ground.  So in that -- I didn't move like that.  I was

12   just giving you guys more view.  Like this into -- so I'll give

13   you this angle again so you can see more.

14             A wide grip push-up and I start to lower myself

15   down.  And as I'm about halfway down like this, I hear, stop

16   resisting.  So I immediately freeze because I don't know how

17   I'm resisting.

18             And I actually say, sir, how am I resisting?

19             And he goes, you're hiding your hands.

20             So I immediately go down and get my hands like this.

21        Q.   Let's just unpack that for a second.

22             When Officer Durden came through the door, your

23   hands were in a position that they could see them?

24        A.   Correct.

25        Q.   And you were standing?

1    A.    Correct.

2    Q.    And they told you to get on the ground, right?

3    A.    I know Durden -- I don't know.  There were other

4  voices shouting, but I can't say who else was shouting at me.

5    Q.    So what you described or what you demonstrated, I

6  should say, was your hands coming to the ground first --

7    A.    Yes.

8    Q.    -- right, before the rest of your body?

9    A.    Correct.

10    Q.    And you were lowering yourself slowly?

11    A.    Correct.

12    Q.    At what point in this process was the first time

13  that an officer touched you?

14    A.    When he was putting my hands in handcuffs.

15    Q.    Okay.  But where were you?  Were you up, down, were

16  you touching the ground?

17    A.    No, my face was in the kitchen floor and my hands

18  were on my back like -- as I demonstrated.

19    Q.    So none of them touched you until you had your hands

20  behind your back?

21    A.    That is correct.

22    Q.    Did you feel anything else?

23    A.    I did.

24    Q.    What'd you feel?

25    A.    I felt a knee slam into, like, my lower back.  Do

1    you -- may I stand up and show?

2              THE COURT:  Would you like the witness to stand up

3    and show --

4              MR. BEDRICK:  Sure.

5              THE COURT:  -- how that was happening?

6              Go right ahead, sir.

7              THE WITNESS:  So right here, I feel a knee slam into

8    my back.

9         Q.    How'd that feel?

10        A.    It was painful.

11        Q.    So that was your left side?

12        A.    Correct.

13        Q.    Okay.  Did you feel anything else?

14        A.    I did.

15        Q.    What'd you feel?

16        A.    I felt something shoot into almost kind of similar

17   area on the right side.

18        Q.    Now, before these -- how'd that feel?

19        A.    Painful.

20        Q.    Before these painful strikes, did you feel any other

21   contact?

22        A.    Besides the cuffs?

23        Q.    Sure.

24        A.    No.

25        Q.    I wonder if you could explain to us a little more

1    the level of pain you experienced with the strike to your left

2    side, the strike to your right side.

3         A.   It was pretty intense because it came as a shock.

4    You're -- or I wasn't really expecting it, nor could I see it,

5    because, again, my face is in my kitchen floor and my hands are

6    in cuffs.  And it -- if you can imagine or -- I don't know how

7    to phrase this.

8         Q.   Well, let's do it this way.  Have you ever been hit

9    before?

10        A.   I have.

11        Q.   Have you ever boxed?

12        A.   I have.

13        Q.   Okay.  Can you tell me about -- a little bit about

14   your boxing experience?

15        A.   I started boxing in eighth grade as like a fitness

16   activity.  Then I kind of competed in my later high school

17   years and then in college I competed a little bit, but then I

18   just started a -- like a volunteer boxing program in Baltimore.

19        Q.   And you didn't just box; I mean, you competed,

20   right?

21        A.   Yes.

22        Q.   Did you have any success competing?

23        A.   It depends on who you ask.  I like to think I was

24   pretty successful.

25        Q.   Did you compete in the -- in the Golden Gloves

1  tournament?

2       A.   I did.  I was a semifinalist in the Golden Gloves.

3       Q.   So you've been hit in the past.  Were you hit in the

4  head?

5       A.   Yes.

6       Q.   Hit in the body?

7       A.   Yes.

8       Q.   And by other people who were trained, right?

9       A.   Correct.

10       Q.   So describe to me the difference between the level

11  of pain in, you know, say, getting hit by someone in the boxing

12  ring and what you experienced on the day October 2nd?

13       A.   Monumentally more painful because in boxing you're

14  expecting the hit, you're seeing the hit, and you generally

15  brace; you kind of turn with it.  And it really -- while it

16  looks brutal to watch, it's the way the momentum travels.  It's

17  kind of like bouncing off and deflecting.  And even when there

18  is impact, there are gloves that cushion that, whereas with a

19  face in a floor and cuffs on your back and one's not expecting

20  to be hit and then someone, for lack of a better term, knee

21  slams you with their body weight and their knee, it's -- it was

22  pretty painful.  Because it's -- it's -- where you would want

23  to hit someone in boxing.  It's -- the vulnerable -- vulnerable

24  spots and it's not as if they just each delivered one.

25       Q.   How many did they deliver?

1      A.    I -- unfortunately, I was not counting.  I was

2    trying to get a handle of what was going on.  But there were

3    multiple shots kind of like up and down each side.

4      Q.    And I just want to make sure this is clear.  I mean,

5    you said that it hurt more because you didn't see it coming?

6      A.    That, and I think the area in which it was hit and

7    the gravity and the weight of Durden is substantial.

8      Q.    Well, I want to -- it might sound like a very

9    obvious thing, but could you tell the jury why you didn't see

10   those coming?

11     A.    My face was against the floor.

12     Q.    Okay.  Okay.  So now you're face down on the floor;

13   you are subject to, you know, multiple hits on either side, you

14   say up and down your side?

15     A.    Correct.

16     Q.    What happens now?

17     A.    They're saying stop resisting, and somebody's

18   laughing.  Maybe two people are laughing.  I -- it was hard to

19   really distinguish.

20     Q.    Hold on a second.  You're face down on the ground,

21   you've got handcuffs on --

22     A.    That's correct.

23     Q.    -- right?  And they're saying stop resisting?

24     A.    That's correct.

25     Q.    And then you said you heard laughing?

1      A.   Right.

2      Q.   In your apartment, are you able to hear neighbors or

3  anything like that?

4      A.   I am not.

5      Q.   The laughing that you described hearing, where was

6  that coming from?

7      A.   Coming from in my apartment.

8      Q.   Was there anyone else in your apartment that night?

9      A.   Besides the officers --

10     Q.   Yes.

11     A.   -- and myself?  No.

12     Q.   So you're getting hit, painful strikes to the side

13  while you're handcuffed, and the police officers are yelling

14  stop resisting and they're laughing at you?

15     A.   I wouldn't say they're yelling it.

16     Q.   Okay.  What were they -- how was --

17     A.   Kind of like a mocking tone.

18     Q.   A mocking tone?

19     A.   Yeah.

20     Q.   Okay.  And so then what happens?

21     A.   The -- it goes on for about like 45 seconds or a

22  minute and then they bring me up and they walk me out my

23  kitchen door, down my staircase, through my mudroom, out my

24  front door into a cruiser.

25          Or I don't know if -- I think it was like a Jeep S,

1   so I don't know if those are cruisers or what terms they use,

2   but a police car.

3        Q.    And where did you go from there?

4        A.    They took me to Nashua Police headquarters.

5        Q.    Did you say anything to the police about the pain?

6        A.    No.  I was scared to -- it didn't make sense to

7   report them to themselves.  That appeared to make it worse.

8        Q.    Did you ask for any help or assistance in dealing

9   with the pain?

10       A.    Not from the Nashua Police.

11       Q.    Were you still feeling pain at that time?

12       A.    Yeah, incredible amount of pain.

13       Q.    And then how long were you at the police station?

14       A.    So I think they brought me in -- let's see.  They

15  got to my place at 10:00, so they -- excuse me.  They got there

16  around like 8:00.  Got there, it had to be around 10:00, and

17  then the next morning they took me to jail.

18       Q.    At the jail, did you complain about the pain at all?

19       A.    I did, and I got some Tylenol for it.

20       Q.    Okay.  But let's just be clear.  How long after

21  being hit were you asking for Tylenol?

22       A.    18 hours would be my guess.

23            MR. BEDRICK:  Your Honor, I see we're sort of at the

24  time for lunch.  I don't know if you want to break for lunch

25  now or --

1          THE COURT:  Well, let me ask you this.  Do you think

2     you can get your direct examination done by one o'clock?  If

3     so, unless our court reporter tells me that she needs a break,

4     I would be inclined to have you finish the direct and we could

5     take a break at 1:00.

6          MR. BEDRICK:  I'm not sure that I will.

7          THE COURT:  All right.  Then why don't we take our

8     lunch break now.

9          MR. BEDRICK:  Thank you.

10          THE COURT:  All right.  So, members of the jury, we

11     are going to take our first break in the trial.  I don't always

12     take a one-hour recess, but I think today it makes sense for us

13     to do that.  It's already been a very long morning for you.  I

14     also suspect that some of you may not have brought a bag lunch

15     with you and so you'll need to go into town for lunch today.

16          If you all bring your own lunches or figure out a

17     place that's quick, we can always shorten the lunch period

18     going forward.  But for today, why don't we take a break now

19     and come back in an hour.

20          But before I can let you go, I need to remind you of

21     some of the instructions that I gave you earlier.  And please

22     don't take this as an insult.  It's just something that I need

23     to do to discharge my responsibilities for the court.

24          Until the trial is over, please remember that you

25     are not to discuss this case with anyone, including your fellow

1    jurors, members of your family, people involved in the trial,

2    or anyone else.  If anyone approaches you to try to talk about

3    the case, do not tell your fellow jurors, but please advise me

4    immediately.

5              Do not use any technology or social media to

6    communicate with anyone about this case.  Do not read or listen

7    to any news reports about the trial.  And, finally, remember to

8    keep an open mind until all the evidence has been received and

9    you have heard the views of your fellow jurors.

10             If you need to speak with me about anything, simply

11   give a signed note to our clerk of court or reach out to me.  I

12   may not repeat these things after every break that -- before

13   every break that we take, but I will be reminding you about

14   them.  Please keep this in mind throughout the trial.  No

15   communications with each other or with anyone in any format

16   whatsoever.  All right?

17             So why don't we say that we'll come back here at

18   quarter of, in an hour.  All right?

19             Thank you so much for your time and attention.

20             THE CLERK:  All rise for the jury.

21                        (Jury excused.)

22             THE COURT:  Mr. Maselli, you can step down, sir.

23             All right.  Would you please be seated?

24             Counsel, is there anything that we need to address

25   before we adjourn for the lunch hour?

37

1          MR. CULLEN:  Nothing from the defense, your Honor.

2          THE COURT:  All right.  Very good.

3          So I thank you, Attorney Bedrick, for keeping an eye

4    on the time and letting me know that this was a good place for

5    us to stop.

6          MR. BEDRICK:  Thank you, your Honor.

7          THE COURT:  Thank you all.  I'll see you all in an

8    hour.

9              (Lunch recess taken at 12:40 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 10/21/22          /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR